DEXTER K. KAʻIAMA (Bar No. 4249)
DEPARTMENT OF THE ATTORNEY
GENERAL, HAWAIIAN KINGDOM
P.O. Box 2194
Honolulu, HI 96805-2194
Telephone: (808) 284-5675
Email: attorneygeneral@hawaiiankingdom.org

*Attorney for Plaintiff, Hawaiian Kingdom*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

|  |  |
|---|---|
| HAWAIIAN KINGDOM,<br><br>        Plaintiff,<br><br>    v.<br><br>JOSEPH ROBINETTE BIDEN JR., in his official capacity as President of the United States; KAMALA HARRIS, in her official capacity as Vice-President and President of the United States Senate; ADMIRAL JOHN AQUILINO, in his official capacity as Commander, U.S. Indo-Pacific Command; CHARLES P. RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; JANE HARDY, in her official capacity as Australia's Consul General to Hawaiʻi and the United Kingdom's Consul to Hawaiʻi; JOHANN URSCHITZ, in his official capacity as Austria's Honorary Consul to Hawaiʻi; M. JAN RUMI, in his official capacity as Bangladesh's Honorary Consul to Hawaiʻi and Morocco's Honorary Consul to Hawaiʻi; JEFFREY DANIEL LAU, in his official capacity as Belgium's Honorary Consul to | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; EXHIBITS 1 & 2 |

Hawaiʻi; ERIC G. CRISPIN, in his official
capacity as Brazil's Honorary Consul to
Hawaiʻi; GLADYS VERNOY, in her
official capacity as Chile's Honorary Consul
General to Hawaiʻi; ANN SUZUKI CHING,
in her official capacity as the Czech
Republic's Honorary Consul to Hawaiʻi;
BENNY MADSEN, in his official capacity
as Denmark's Honorary Consul to Hawaiʻi;
KATJA SILVERAA, in her official capacity
as Finland's Honorary Consul to Hawaiʻi;
GUILLAUME MAMAN, in his official
capacity as France's Honorary Consul to
Hawaiʻi; DENIS SALLE, in his official
capacity as Germany's Honorary Consul to
Hawaiʻi; KATALIN CSISZAR, in her
official capacity as Hungary's Honorary
Consul to Hawaiʻi; SHEILA WATUMULL,
in her official capacity as India's Honorary
Consul to Hawaiʻi; MICHELE CARBONE,
in his official capacity as Italy's Honorary
Consul to Hawaiʻi; YUTAKA AOKI, in his
official capacity as Japan's Consul General
to Hawaiʻi; JEAN-CLAUDE DRUI, in his
official capacity as Luxembourg's Honorary
Consul to Hawaiʻi; ANDREW M.
KLUGER, in his official capacity as
Mexico's Honorary Consul to Hawaiʻi;
HENK ROGERS, in his official capacity as
Netherland's Honorary Consul to Hawaiʻi;
KEVIN BURNETT, in his official capacity
as New Zealand's Consul General to
Hawaiʻi; NINA HAMRE FASI, in her
official capacity as Norway's Honorary
Consul to Hawaiʻi; JOSELITO A. JIMENO,
in his official capacity as the Philippines's
Consul General to Hawaiʻi; BOZENA
ANNA JARNOT, in her official capacity as
Poland's Honorary Consul to Hawaiʻi;
TYLER DOS SANTOS-TAM, in his official

capacity as Portugal's Honorary Consul to
Hawaiʻi; R.J. ZLATOPER, in his official
capacity as Slovenia's Honorary Consul to
Hawaiʻi; HONG, SEOK-IN, in his official
capacity as the Republic of South Korea's
Consul General to Hawaiʻi; JOHN HENRY
FELIX, in his official capacity as Spain's
Honorary Consul to Hawaiʻi; BEDE
DHAMMIKA COORAY, in his official
capacity as Sri Lanka's Honorary Consul to
Hawaiʻi; ANDERS G.O. NERVELL, in his
official capacity as Sweden's Honorary
Consul to Hawaiʻi; THERES RYF DESAI,
in her official capacity as Switzerland's
Honorary Consul to Hawaiʻi; COLIN T.
MIYABARA, in his official capacity as
Thailand's Honorary Consul to Hawaiʻi;
DAVID YUTAKA IGE, in his official
capacity as Governor of the State of
Hawaiʻi; TY NOHARA, in her official
capacity as Commissioner of Securities;
DAMIEN ELEFANTE, in his official
capacity as the acting director of the
Department of Taxation of the State of
Hawaiʻi; RICK BLANGIARDI, in his
official capacity as Mayor of the City &
County of Honolulu; MITCH ROTH, in his
official capacity as Mayor of the County of
Hawaiʻi; MICHAEL VICTORINO, in
official capacity as Mayor of the County of
Maui; DEREK KAWAKAMI, in his official
capacity as Mayor of the County of Kauaʻi;
CHARLES E. SCHUMER, in his official
capacity as U.S. Senate Majority Leader;
NANCY PELOSI, in her official capacity as
Speaker of the United States House of
Representatives; RON KOUCHI, in his
official capacity as Senate President of the
State of Hawaiʻi;  SCOTT SAIKI, in his
official capacity as Speaker of the House of

Representatives of the State of Hawai'i;
TOMMY WATERS, in his official capacity
as Chair and Presiding Officer of the County
Council for the City and County of
Honolulu; MAILE DAVID, in her official
capacity as Chair of the Hawai'i County
Council; ALICE L. LEE, in her official
capacity as Chair of the Maui County
Council; ARRYL KANESHIRO, in his
official capacity as Chair of the Kaua'i
County Council; the UNITED STATES OF
AMERICA; the STATE OF HAWAI'I; the
CITY & COUNTY OF HONOLULU; the
COUNTY OF HAWAI'I; the COUNTY OF
MAUI; and the COUNTY OF KAUA'I,

Defendants.

## INTRODUCTION

1.      The Council of Regency, in its official capacity as a government representing the HAWAIIAN KINGDOM, brings this action to protect its officers of the Council of Regency, Dr. David Keanu Sai, Ph.D., Chairman of the Council of Regency, Minister of the Interior, and Minister of Foreign Relations *ad interim*, and Mrs. Kauʻi P. Sai-Dudoit, Minister of Finance.

2.      The Council of Regency also brings this action on behalf of all Hawaiian subjects and resident aliens that reside within the territorial jurisdiction of the HAWAIIAN KINGDOM that are subject to its laws.

## JURISDICTION AND VENUE

3.      "A foreign sovereign…who has a demand of a civil nature against any person here, may prosecute it in our courts. To deny him this privilege would manifest a want of comity and friendly feeling."[1] While this court is operating within the territory of the HAWAIIAN KINGDOM and not within the territory of Defendant UNITED STATES OF AMERICA, its jurisdiction is found as an Article II Court.[2] Being an Article II Court established during the Spanish-American War, the "jurisdiction of the Puerto Rican court was

---

[1] *The Sapphire v. Napoleon III*, 11 Wallace 164, 167 (1871).
[2] David J. Bederman, "Article II Courts," 44 *Mercer L. Rev.* 825 (1992-1993).

limited to those cases 'which would be properly cognizable by the circuit or district courts of the United States.'"[3]

4.      This Court has Federal Question Jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and Treaties, which includes the 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation,[4] the 1907 Hague Convention, IV (1907 Hague Regulations),[5] the 1907 Hague Convention, V,[6] and the 1949 Geneva Convention, IV (1949 Fourth Geneva Convention).[7]

5.      The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). The events giving rise to this claim occurred in this District, and the Defendants are being sued in their official capacities.

## **PARTIES**

7.      DAVID KEANU SAI, Ph.D., is the Minister of the Interior, Minister of Foreign Affairs *ad interim*,[8] and Chairman of the Council of Regency. As

---

[3] *Id*., 844.
[4] 9 Stat. 977 (1841-1851).
[5] 36 Stat. 2277 (1907).
[6] 36 Stat. 2310 (1907).
[7] 6.3 U.S.T 3516 (1955).
[8] His Excellency Peter Umialiloa Sai, Minister of Foreign Affairs, died on October 17, 2018, and, thereafter, by proclamation of the Council of Regency on November

Minister of the Interior he is responsible for having "a general supervision over internal affairs of the kingdom, and to faithfully and impartially execute the duties assigned by law to his department."[9] As Minister of Foreign Affairs *ad interim* he is responsible for conducting "the correspondence of this Government, with diplomatic and consular agents of all foreign nations, accredited to this Government, and with the public ministers, consuls, and other agents of the Hawaiian Islands, in foreign countries, in conformity with the law of nations, and as the [Regency] shall, from time to time, order and instruct."[10] As Chairman of the Council of Regency he is responsible for the direction and overall management of the Council. The Chairman also served as Agent for the HAWAIIAN KINGDOM in *Larsen v. Hawaiian Kingdom*, Permanent Court of Arbitration case no. 1999-01.

8.   KAUʻI P. SAI-DUDOIT is the Minister of Finance. The Minister of Finance is responsible for having "a general supervision over the financial affairs of the Kingdom, and to faithfully and impartially execute the duties assigned by law to [her] department. [She] is charged with the enforcement of all revenue

---

11, 2019, His Excellency Dr. David Keanu Sai was designated "to be Minister of Foreign Affairs *ad interim* while remaining as Minister of the Interior and Chairman of the Council of Regency," https://hawaiiankingdom.org/pdf/Proc_Minister_Foreign_Affairs_Ad_interim.pdf.
[9] §34, *Hawaiian Civil Code*, Compiled Laws of the Hawaiian Kingdom (1884).
[10] *Id.*, §437.

laws; the collection of duties on foreign imports; the collection of taxes; the

safe keeping and disbursement of the public moneys, and with all such other

matters as may, by law, be placed in [her] charge."[11] The Minister of Finance

also served as 3rd Deputy Agent for the HAWAIIAN KINGDOM in *Larsen*

*v. Hawaiian Kingdom*, Permanent Court of Arbitration case no. 1999-01.

9.     DEXTER KEʻEAUMOKU KAʻIAMA is the Attorney General. The Attorney

General is charged with representing the Hawaiian Kingdom in Court on

matters of public concern.

10.    The Civil Code of the HAWAIIAN KINGDOM provides "[t]he laws are

obligatory upon all persons, whether subjects of this kingdom, or citizens or

subjects of any foreign State, while within the limits of this kingdom, except

so far as exception is made by the laws of nations in respect to Ambassadors

or others. The property of all such persons, while such property is within the

territorial jurisdiction of this kingdom, is also subject to the laws."[12]

11.    The Council has an interest in protecting the health, safety, and welfare of its

residents during the prolonged occupation of its territory by the United States

since January 17, 1893 and ensuring international humanitarian law is

complied with. Article 43 of the 1907 Hague Regulations and Article 46 of

---

[11] *Id.*, §469.
[12] *Id.*, §6.

the 1949 Fourth Geneva Convention, obliges the United States, as the occupying State, to administer the laws of the HAWAIIAN KINGDOM, the occupied State. The Council also has an interest in the federal system where "in the case of international compacts and agreements [when it forms] the very fact that complete power over international affairs is in the National Government and is not and cannot be subject to any curtailment or interference on the part of the several States."[13] The Council's interests extend to all residents within Hawaiian territory to include resident aliens.

12.   Defendant JOSEPH ROBINETTE BIDEN, JR. is the President of the United States. He is responsible for the faithful execution of United States laws.

13.   Defendant KAMALA HARRIS is the Vice-President of the United States and President of the United States Senate. She is responsible for the faithful execution of United States laws and the enactment of United States legislation when presiding as President of the United States Senate.

14.   Defendant ADMIRAL JOHN AQUILINO is the Commander of the U.S. Indo-Pacific Command.

15.   Defendant CHARLES P. RETTIG is the Commissioner of the Internal Revenue Service. He is responsible for the United States tax system.

16.   Defendant JANE HARDY is Australia's Consul General to Hawai'i.

---

[13] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 330-31 (1936).

17.  Defendant JOHANN URSCHITZ is Austria's Honorary Consul to Hawai'i.

18.  Defendant M. JAN RUMI is Bangladesh's Honorary Consul to Hawai'i and Morocco's Honorary Consul to Hawai'i.

19.  Defendant JEFFREY DANIEL LAU is Belgium's Honorary Consul to Hawai'i.

20.  Defendant ERIC G. CRISPIN is Brazil's Honorary Consul to Hawai'i.

21.  Defendant GLADYS VERNOY is Chile's Honorary Consul General to Hawai'i.

22.  Defendant ANN SUZUKI CHING is the Czech Republic's Honorary Consul to Hawai'i.

23.  Defendant BENNY MADSEN is Denmark's Honorary Consul to Hawai'i.

24.  Defendant KATJA SILVERAA is Finland's Honorary Consul to Hawai'i.

25.  Defendant GUILLAUME MAMAN is France's Honorary Consul to Hawai'i.

26.  Defendant DENIS SALLE is Germany's Honorary Consul to Hawai'i.

27.  Defendant KATALIN CSISZAR is Hungary's Honorary Consul to Hawai'i.

28.  Defendant SHEILA WATUMULL is India's Honorary Consul to Hawai'i.

29.  Defendant MICHELE CARBONE is Italy's Honorary Consul to Hawai'i.

30.  Defendant YUTAKA AOKI is Japan's Consul General to Hawai'i.

31.  Defendant JEAN-CLAUDE DRUI is Luxembourg's Honorary Consul to Hawai'i.

32.   Defendant ANDREW M. KLUGER is Mexico's Honorary Consul to Hawai'i.

33.   Defendant HENK ROGERS is Netherland's Honorary Consul to Hawai'i.

34.   Defendant KEVIN BURNETT is New Zealand's Consul General to Hawai'i.

35.   Defendant NINA HAMRE FASI is Norway's Honorary Consul to Hawai'i.

36.   Defendant JOSELITO A. JIMENO is the Philippines's Consul General to Hawai'i.

37.   Defendant BOZENA ANNA JARNOT is Poland's Honorary Consul to Hawai'i.

38.   Defendant TYLER DOS SANTOS-TAM is Portugal's Honorary Consul to Hawai'i.

39.   Defendant R.J. ZLATOPER is Slovenia's Honorary Consul to Hawai'i.

40.   Defendant HONG, SEOK-IN is the Republic of South Korea's Consul General to Hawai'i.

41.   Defendant JOHN HENRY FELIX is Spain's Honorary Consul to Hawai'i.

42.   Defendant BEDE DHAMMIKA COORAY is Sri Lanka's Honorary Consul to Hawai'i.

43.   Defendant ANDERS G.O. NERVELL is Sweden's Honorary Consul to Hawai'i.

44.   Defendant THERES RYF DESAI is Switzerland's Honorary Consul to Hawai'i.

45.     Defendant COLIN T. MIYABARA is Thailand's Honorary Consul to Hawai'i.

46.     Defendant DAVID YUTAKE IGE is the Governor of the State of Hawai'i. He is responsible for faithful execution of State of Hawai'i laws.

47.     Defendant DAMIEN ELEFANTE is the acting director of the Department of Taxation of the State of Hawai'i.

48.     Defendant TY NOHARA is the Commissioner of Securities for the State of Hawai'i.

49.     Defendant RICK BLANGIARDI is the Mayor of the City & County of Honolulu. He is responsible for the faithful execution of City & County of Honolulu ordinances.

50.     Defendant MITCH ROTH is the Mayor of Hawai'i County. He is responsible for the faithful execution of Hawai'i County ordinances.

51.     Defendant MICHAEL VICTORINO is the Mayor of Maui County. He is responsible for the faithful execution of Maui County ordinances.

52.     Defendant DEREK KAWAKAMI is the Mayor of Kaua'i County. He is responsible for the faithful execution of Kaua'i County ordinances.

53.     Defendant CHARLES E. SCHUMER is the Majority Leader of the United States Senate. He is responsible for the enactment of United States legislation.

54.   Defendant NANCY PELOSI is the Speaker of the United States House of Representatives. She is responsible for the enactment of United States legislation.

55.   Defendant RON KOUCHI is the President of the Senate of the State of Hawaiʻi. He is responsible for the enactment of State of Hawaiʻi legislation.

56.   Defendant SCOTT SAIKI is the Speaker of the House of Representatives of the State of Hawaiʻi. He is responsible for the enactment of State of Hawaiʻi legislation.

57.   Defendant TOMMY WATERS is the Chair of the County Council for the City and County of Honolulu. He is responsible for the enactment of City and County of Honolulu legislation.

58.   Defendant MAILE DAVID is the Chair of the Hawaiʻi County Council. She is responsible for the enactment of Hawaiʻi County legislation.

59.   Defendant ALICE L. LEE is the Chair of the Maui County Council. She is responsible for the enactment of Maui County legislation.

60.   Defendant ARRYL KANESHIRO is the Chair of the Kauaʻi County Council. He is responsible for the enactment of Kauaʻi County Council legislation.

61.   Defendant UNITED STATES OF AMERICA includes all branches of government, their agencies and departments.

62.    Defendant STATE OF HAWAI'I includes all branches of government, their agencies and departments.

63.    Defendant CITY & COUNTY OF HONOLULU includes all branches of government, their agencies and departments.

64.    Defendant COUNTY OF HAWAI'I includes all branches of government, their agencies and departments.

65.    Defendant COUNTY OF MAUI includes all branches of government, their agencies and departments.

66.    Defendant COUNTY OF KAUA'I includes all branches of government, their agencies and departments.

## <u>ALLEGATIONS</u>

**A.    Continuity of the Hawaiian Kingdom as an independent and sovereign State after its government was illegally overthrown by the United States on January 17, 1893**

67.    "[I]n the nineteenth century the Hawaiian Kingdom existed as an independent State recognized as such by the United States of America, the United Kingdom and various other States, including by exchanges of diplomatic or consular representatives and the conclusion of treaties."[14] In a message to the Congress, President Grover Cleveland acknowledged that "[b]y an act of war,

---

[14] *Larsen v. Hawaiian Kingdom*, 119 Int'l L. Reports 566, 581 (2001).

committed with the participation of a diplomatic representative of the United States and without the authority of Congress [on January 17, 1893], the Government of a feeble but friendly and confiding people has been overthrown."[15] As a subject of international law, the Hawaiian State would continue to exist despite its government being unlawfully overthrown by the United States on January 17, 1893.

68.    President Cleveland entered into a treaty, by exchange of notes, with Queen Liliʻuokalani on December 18, 1893, whereby the President committed to restoring the Queen as the Executive Monarch, and, thereafter, the Queen committed to granting a full pardon to the insurgents. Political wrangling in the Congress, however, prevented President Cleveland from carrying out his obligations under the executive agreement. Five years later, the United States Congress enacted a joint resolution for the purported annexation of the Hawaiian Islands that was signed into law on July 7, 1898 by President William McKinley.

69.    Professor Wright, a renowned American political scientist, states that "international law distinguishes between a government and the state it

---

[15] United States House of Representatives, 53d Cong., *Executive Documents on Affairs in Hawaii: 1894-95* 456 (1895), ("Executive Documents").

governs."[16] And Judge Crawford of the International Court of Justice clearly explains that "[b]elligerent occupation does not affect the continuity of the State, even where there exists no government claiming to represent the occupied State."[17] Crawford's conclusion is based on the "presumption that the State continues to exist, with its rights and obligations ... despite a period in which there is...no effective government."[18] Applying this principle to the Second Gulf War, Crawford explains, the "occupation of Iraq in 2003 illustrated the difference between 'government' and 'State'; when Members of the Security Council, after adopting SC res 1511, 16 October 2003, called for the rapid 'restoration of Iraq's sovereignty', they did not imply that Iraq had ceased to exist as a State but that normal governmental arrangements should be restored."[19]

70.   Professor Craven opined, "[i]f one were to speak about a presumption of continuity, one would suppose that an obligation would lie upon the party opposing that continuity to establish the facts substantiating its rebuttal. The continuity of the Hawaiian Kingdom, in other words, may be refuted only by

---

[16] Quincy Wright, "The Status of Germany and the Peace Proclamation," 46(2) *Am. J. Int'l L.* 299, 307 (1952).
[17] James Crawford, *Creation of States in International Law* 34 (2nd ed., 2006).
[18] *Id*.
[19] *Id*, n. 157.

reference to a valid demonstration of legal title, or sovereignty, on the part of the United States."[20]

**B.    Constraints on United States Municipal Laws**

71.   All Federal, State of Hawai'i and County laws are not HAWAIIAN KINGDOM law but rather constitute the municipal laws of the United States. As a result of the continuity of the Hawaiian State and its legal order, the law of occupation obliges the United States, as the occupying State, to administer the laws of the HAWAIIAN KINGDOM, not the municipal laws of the Defendant UNITED STATES OF AMERICA, until a peace treaty brings the occupation to an end. Article 43 of the 1907 Hague Regulations provides that "[t]he authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."[21] Article 64 of the 1949 Fourth Geneva Convention also states, "[t]he penal laws of the occupied territory shall remain in force."[22]

---

[20] Matthew Craven, "Continuity of the Hawaiian Kingdom as a State under International Law," in David Keanu Sai, ed., *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 128 (2020).
[21] 36 Stat. 2277, 2306 (1907).
[22] 6.3 U.S.T. 3516, 3558 (1955).

72.  Article 43 does not transfer sovereignty to the occupying power.[23] Section 358, United States Army Field Manual 27-10, declares, "military occupation confers upon the invading force the means of exercising control for the period of occupation. It does not transfer the sovereignty to the occupant, but simply the authority or power to exercise some of the rights of sovereignty." "The occupant," according to Professor Sassòli, "may therefore not extend its own legislation over the occupied territory nor act as a sovereign legislator. It must, as a matter of principle, respect the laws in force in the occupied territory at the beginning of the occupation." Professor Sassòli further explains that the "expression 'laws in force in the country' in Article 43 refers not only to laws in the strict sense of the word, but also to the constitution, decrees, ordinances, court precedents (especially in territories of common law tradition), as well as administrative regulations and executive orders."[24]

73.  These provisions of the Hague Regulations and the Fourth Geneva Convention were customary international law before its codification under

---

[23] See Eyal Benvenisti, *The International Law of Occupation* 8 (1993); Gerhard von Glahn, *The Occupation of Enemy of Territory—A Commentary on the Law and Practice of Belligerent Occupation* 95 (1957); Michael Bothe, "Occupation, Belligerent," in Rudolf Bernhardt (dir.), *Encyclopedia of Public International Law*, vol. 3, 765 (1997).

[24] Marco Sassòli, "Article 43 of the Hague Regulations and Peace Operations in the Twenty-first Century," *International Humanitarian Law Research Initiative* 6 (2004) (online at https://www.hpcrresearch.org/sites/default/files/publications/sassoli.pdf).

Article 43 of the 1899 Hague Convention, II, and succeeded under Article 43 of the 1907 Hague Regulations and Article 64 of the 1949 Fourth Geneva Convention. Prior to its codification, these customary laws were recognized by the United States during the Spanish-American War, when U.S. forces overthrew Spanish governance in Santiago de Cuba in July of 1898. This overthrow did not transfer Spanish sovereignty to the United States but triggered the customary international laws of occupation, which formed the basis for General Orders no. 101 issued by President McKinley to the War Department on July 13, 1898:

> The first effect of the military occupation of the enemy's territory is the severance of the former political relations of the inhabitants and the establishment of a new political power. … Though the powers of the military occupant are absolute and supreme and immediately operate upon the political condition of the inhabitants, the municipal laws of the conquered territory, such as affect private rights of person and property and provide for the punishment of crime, are considered as continuing in force, so far as they are compatible with the new order of things, until they are suspended or superseded by the occupying belligerent and in practice they are not usually abrogated, but are allowed to remain

in force and to be administered by the ordinary tribunals, substantially as they were before the occupation.[25]

74.     An armistice was eventually signed by the Spanish Government on August 12, 1898, after its territorial possessions of Philippines, Guam, Puerto Rico and Cuba were under the effective occupation and control of U.S. troops. This led to a treaty of peace that was signed by representatives of both countries in Paris on 10 December 1898. The United States Senate ratified the treaty on February 6, 1899, and Spain on March 19. The treaty came into full force and effect on April 11, 1899.[26] It was after April 11 that Spanish title and sovereignty was transferred to the United States and American municipal laws enacted by the Congress replaced Spanish municipal laws that once applied over the territories of Philippines, Guam, and Puerto Rico. Under the treaty, Cuba would become an independent State. There is no treaty of cession between the Hawaiian Kingdom and the United States.

75.     In 1988, the Office of Legal Counsel (OLC), U.S. Department of Justice, examined the purported annexation of the Hawaiian Islands by a congressional joint resolution. Douglas Kmiec, Acting Assistant Attorney General, authored the opinion for Abraham Sofaer, legal advisor to the U.S.

---

[25] *Ochoa v. Hernandez*, 230 U.S. 139, 156 (1913).
[26] 30 Stat. 1754 (1899) (online at https://uniset.ca/fatca/b-es-ust000011-0615.pdf).

Department of State. After covering the limitation of congressional authority, the OLC found that it is "unclear which constitutional power Congress exercised when it acquired Hawaii by joint resolution. Accordingly, it is doubtful that the acquisition of Hawaii can serve as an appropriate precedent for a congressional assertion of sovereignty over an extended territorial sea."[27] The OLC cited constitutional scholar Westel Willoughby, who stated:

> The constitutionality of the annexation of Hawaii, by a simple legislative act, was strenuously contested at the time both in the Congress and by the press. The right to annex by treaty was not denied, but it was denied that this might be done by a simple legislative act … Only by means of treaties, it was asserted, can the relations between States be governed, for a legislative act is necessarily without extraterritorial force—confined in its operation to the territory of the State by whose legislature it is enacted.[28]

76.    This OLC's conclusion is a position taken by the National Government similar to the OLC's position that federal prosecutors cannot charge a sitting president

---

[27] Douglas W. Kmiec, "Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea," 12 *Op. O.L.C.* 238, 252 (1988).
[28] *Id.*

with a crime.[29] From a policy standpoint, OLC opinions bind the National Government to include its courts. If it was unclear how Hawaiʻi was annexed by legislation, it would be equally unclear how the Congress could create a territorial government, under *An Act To provide a government for the Territory of Hawaii* in 1900, within the territory of a foreign State by legislation.[30] It would also be unclear how the Congress could rename the Territory of Hawaiʻi to the State of Hawaiʻi in 1959, under *An Act To provide for the admission of the State of Hawaii into the Union* by legislation.[31]

77. In its 1824 decision in *The Apollon*, the Supreme Court concluded that the "laws of no nation can justly extend beyond its own territories except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation within its own jurisdiction."[32] The Hawaiian Kingdom Supreme Court also cited *The Apollon* in its 1858 decision, *In re Francis de Flanchet*, where the court stated that the "laws of a nation cannot have force to control the sovereignty or rights of any other nation within its own jurisdiction. And however general and comprehensive the phrases used in the municipal laws may be, they must always be restricted in construction,

---

[29] Randolph D. Moss, "A Sitting President's Amenability to Indictment and Criminal Prosecution," 24 *Op. O.L.C.* 222-260 (2000).
[30] 31 Stat. 141 (1900).
[31] 73 Stat. 4 (1959).
[32] *The Apollon*, 22 U.S. 362, 370 (1824).

to places and persons upon whom the Legislature have authority and jurisdiction."[33] Both the *Apollon* and *Flanchet* cases addressed the imposition of French municipal laws within the territories of the United States and the Hawaiian Kingdom. Furthermore, the United States Supreme Court reiterated this principle in its 1936 decision in *United States v. Curtiss Wright Export Corp.*, where the Court stated:

> Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory, and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law. As a member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family.[34]

78.   In the 1927 *Lotus* case, the Permanent Court of International Justice explained that "the first and foremost restriction imposed by international law upon a State is that—failing the existence of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State."[35] Therefore, it is a legal fact that United States legislation regarding Hawai'i,

---

[33] *In Re Francis de Flanchet*, 2 Haw. 96, 108-109 (1858).
[34] *United States v. Curtiss Wright Export Corp.*, 299 U.S. 304, 318 (1936).
[35] *Lotus*, PCIJ, ser. A no. 10 (1927), 18.

whether by a statute or by a joint resolution, have no extraterritorial effect except by a "permissive rule," e.g., consent by the HAWAIIAN KINGDOM government. There is no such consent. A joint resolution of annexation is not a treaty and, therefore, the HAWAIIAN KINGDOM never consented to any cession of its territorial sovereignty to the Defendant UNITED STATES OF AMERICA. Defendant UNITED STATES OF AMERICA could no more unilaterally annex the Hawaiian Islands by enacting a municipal law in 1898 than it could unilaterally annex Canada today by enacting a municipal law.

79.   Furthermore, the HAWAIIAN KINGDOM entered into a Treaty of Friendship, Commerce and Navigation with the United States on December 20, 1849.[36] Article 8 provides, "and each of the two contracting parties engages that the citizens or subjects of the other residing in their respective states, shall enjoy their property and personal security, in as full and ample manner as their own citizens or subjects, or the subjects or citizens of the most favored nation, but subject always to the laws and statutes of the two countries respectively (emphasis added)." The treaty was ratified by both parties and ratifications were exchanged on August 24, 1850. The treaty was proclaimed on November 9, 1850. As such, the 1949 Hawaiian-American Treaty comes under the *Supremacy Clause*.

---

[36] 9 Stat. 977 (1841-1851).

### C.      Restoration of the Government of the Hawaiian Kingdom

80.    After the passing of Queen Liliʻuokalani on November 11, 1917, the throne became vacant to be later filled by an elected Monarch in accordance with Article 22 of the 1864 Constitution.[37] This was the case when King Lunalilo was elected on January 8, 1873, and the election of King Kalākaua on February 12, 1874. Until such time that this provision can be effectively carried out when the United States occupation shall come to an end, Article 33 provides that the Cabinet Council, comprised of the Minister of the Interior, the Minister of Finance, the Minister of Foreign Affairs and the Attorney General,[38] shall serve as a Council of Regency in the absence of the Monarch. Hawaiian constitutional law provides that when the office of the Monarch is vacant, "a Regent or Council of Regency…shall administer the Government

---

[37] Art. 42, 1864 Hawaiian Constitution, provides, "In case there is no heir as above provided, then the successor shall be the person whom the Sovereign shall appoint with the consent of the Nobles, and publicly proclaim as such during the King's life;  but should there be no such appointment and proclamation, and the Throne should become vacant, then the Cabinet Council, immediately after the occurring of such vacancy, shall cause a meeting of the Legislative Assembly, who shall elect by ballot some native Alii of the Kingdom as Successor to the Throne; and the Successor so elected shall become a new *Stirps* for a Royal Family; and the succession from the Sovereign thus elected, shall be regulated by the same law as the present Royal Family of Hawaii."

[38] *Id*., Art. 42 provides, "The King's cabinet shall consist of the Minister of Foreign Affairs, the Minister of the Interior, the Minister of Finance, and the Attorney General of the Kingdom."

in the name of the King, and exercise all the Powers which are Constitutionally vested in the King."[39]

81. Since November 11, 1917, the office of the Monarch became vacant and remained vacant until the Hawaiian Kingdom Government was restored on February 28, 1997 by proclamation of the *acting* Regent.[40] On September 26, 1999, the office of Regent was transformed into a Council of Regency by Privy Council resolution.[41] The legal basis for the restoration of the Hawaiian Government was Hawaiian constitutional law and the doctrine of necessity as utilized by governments that were formed in exile, while their countries were belligerently occupied by a foreign State. The difference, however, is that the Hawaiian Government was restored *in situ* and not in exile. In the words of Professor Wright, "mutual respect by states for one another's independence leaves the form and continuance of its government to the domestic jurisdiction of a state."[42]

---

[39] *Id*., Art. 33.

[40] David Keanu Sai, "Royal Commission of Inquiry" in David Keanu Sai (ed.) *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 18-21 (2020) (online at https://hawaiiankingdom.org/pdf/Hawaiian_Royal_Commission_of_Inquiry_(2020).pdf).

[41] *Id.*, at 21.

[42] Quincy Wright, "Non-Military Intervention," in K.W. Deutsch and S. Hoffman (eds.), *The Relevance of International Law: Essays in Honor of Leo Gross* 14 (1968).

82.    With a view to bringing compliance with international humanitarian law by the State of Hawai'i and its County governments, and recognizing their effective control of Hawaiian territory in accordance with Article 42 of the 1907 Hague Regulations, the Council of Regency proclaimed and recognized their existence as the administration of the occupying State on June 3, 2019. The proclamation read:

Whereas, in order to account for the present circumstances of the prolonged illegal occupation of the Hawaiian Kingdom and to provide a temporary measure of protection for its territory and the population residing therein, the public safety requires action to be taken in order for the State of Hawai'i and its Counties to begin to comply with the 1907 Hague Convention, IV, the 1949 Geneva Convention, IV, and international humanitarian law:

Now, therefore, We, the *acting* Council of Regency of the Hawaiian Kingdom, serving in the absence of the Monarch and temporarily exercising the Royal Power of the Kingdom, do hereby recognize the State of Hawai'i and its Counties, for international law purposes, as the administration of the Occupying Power whose duties and obligations are enumerated

in the 1907 Hague Convention, IV, the 1949 Geneva Convention, IV, and international humanitarian law;

And, We do hereby further proclaim that the State of Hawaiʻi and its Counties shall preserve the sovereign rights of the Hawaiian Kingdom government, and to protect the local population from exploitation of their persons and property, both real and personal, as well as their civil and political rights under Hawaiian Kingdom law.[43]

83.   The State of Hawaiʻi and its Counties, under the laws and customs of war during occupation, can now serve as the administrator of the 'laws in force in the country,' which includes the 2014 decree of provisional laws by the Council of Regency in accordance with Article 43. The 2014 proclamation read:

And, We do hereby proclaim that from the date of this proclamation all laws that have emanated from an unlawful legislature since the insurrection began on July 6, 1887 to the present, to include United States legislation, shall be the provisional laws of the Realm subject to ratification by the

---

[43] Council of Regency, Proclamation Recognizing the State of Hawaiʻi and its Counties (June 3, 2019) (online at https://hawaiiankingdom.org/pdf/Proc_Recognizing_State_of_HI.pdf).

Legislative Assembly of the Hawaiian Kingdom once assembled, with the express proviso that these provisional laws do not run contrary to the express, reason and spirit of the laws of the Hawaiian Kingdom prior to July 6, 1887, the international laws of occupation and international humanitarian law, and if it be the case they shall be regarded as invalid and void.[44]

84.   Professor Lenzerini provided the legal basis, under both Hawaiian Kingdom law and the applicable rules of international law, for concluding that the Council of Regency "has the authority to represent the Hawaiian Kingdom as a State, which has been under a belligerent occupation by the United States of America since January 17, 1893, both at the domestic and international level."[45] He added that "the Council of Regency is exactly in the same position of a government of a State under military occupation, and is vested with the rights and powers recognized to governments of occupied States pursuant to international humanitarian law."[46]

---

[44] Council of Regency, Proclamation of Provisional Laws of the Realm (October 10, 2014) (online at https://hawaiiankingdom.org/pdf/Proc_Provisional_Laws.pdf).

[45] Lenzerini, *Legal Opinion*, at para. 9. A copy of the legal opinion is attached as Exhibit 2.

[46] *Id*., para. 10. See also Royal Commission of Inquiry, *Preliminary Report: The Authority of the Council of Regency of the Hawaiian Kingdom* (27 May 2020) (online at https://hawaiiankingdom.org/pdf/RCI_Preliminary_Report_Regency_Authority.pdf).

85.    As an Italian scholar of international law, Lenzerini's legal opinion is to be recognized as a means for determination of the rules of international law, unlike how legal opinions operate within the jurisprudence of the United States. The latter types of legal opinions are limited to an "understanding of the law as applied to the assumed facts."[47] They are not regarded as a source of the rules of United States law, which include the United States constitution, State constitutions, Federal and State statutes, common law, case law, and administrative law. Instead, these types of legal opinions have persuasive qualities but are not a source of the rules of law.

86.    On the international plane, there is "no 'world government' [and] no central legislature with general law-making authority."[48] International law, however, is an essential component in the international system, which "has the character and qualities of law, and serves the functions and purposes of law, providing restraints against arbitrary state action and guidance in international relations."[49] Article 38(1)(d) of the Statute of the International Court of Justice, when applied by the Court to settle international disputes, international law includes "judicial decisions and the teachings of the most

---

[47] *Black's Law*, 896.

[48] American Law Institute, *Restatement of the Law (Third)—The Foreign Relations Law of the United States* 17 (1987).

[49] *Id*.

highly qualified publicists of the various nations for the determination of rules of law."

87.    The American Law Institute also concludes that, when "determining whether a rule has become international law, substantial weight is accorded to…the writings of scholars."[50] In the seminal case *The Paquete Habana*, the U.S. Supreme Court highlighted that:

>  International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals not for the speculations of their authors concerning what the law ought to be, but for

---

[50] *Id.*, §103(2)(c).

trustworthy evidence of what the law really is (emphasis added).[51]

**D.    United States Explicit Recognition of the continued existence of the Hawaiian Kingdom and the Council of Regency as its government**

88.    The unlawful imposition of American municipal laws came to the attention of the Defendant UNITED STATES OF AMERICA in a complaint for injunctive relief filed with the United States District Court for the District of Hawai'i on August 4, 1999 in *Larsen v. United Nations, et al.*[52] Defendant UNITED STATES OF AMERICA and the Council of Regency representing the HAWAIIAN KINGDOM were named as defendants in the complaint.

COUNT ONE

141.    Plaintiff repeats and realleges paragraphs 1 through 140.

142.    Defendant UNITED STATES OF AMERICA and Defendant HAWAIIAN KINGDOM are in continual violation of the said 1849 Treaty of Friendship, Commerce and Navigation between the same, and in violation of the principles of international law laid in the Vienna Convention on the Law of Treaties, 1969, by allowing the unlawful imposition of American

---

[51] *The Paquete Habana*, 175 U.S. 677, 700 (1900).
[52] *Larsen v. United Nations et al.*, case #1:99-cv-00546-SPK, document #1.

municipal laws over Plaintiff's person within the territorial jurisdiction of the Hawaiian Kingdom.

## COUNT TWO

143. Plaintiff repeats and realleges paragraphs 1 through 140.

144. Defendant UNITED STATES OF AMERICA and Defendant HAWAIIAN KINGDOM are in continual violation of principles of international comity by allowing the unlawful imposition of American municipal laws over Plaintiff's person within the territorial jurisdiction of the Hawaiian Kingdom

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue a permanent injunction on all proceedings by Defendant UNITED STATES OF AMERICA and its political subdivision, the State of Hawai'i and its several Counties, against this Plaintiff in Hawai'i State Courts, including the Hilo and Puna District Courts of the Third Circuit, and the Honolulu District Court of the First Circuit, until the International Title to the Hawaiian Islands can be properly adjudicated between Defendant UNITED STATES OF AMERICA and Defendant HAWAIIAN KINGDOM at the Permanent Court of Arbitration

at The Hague, Netherlands, in accordance with the Treaty of Friendship, Commerce and Navigation between the United States and the Hawaiian Kingdom, December 20, 1849, 18 U.S. Stat. 406, The Hague Convention for the Pacific Settlement of International Disputes, 1907, 36 U.S. Stat. 2199, and the Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331; 8 I.L.M. 679 (1969), as well as principles of international comity arising from those instruments, and in order to establish the rights of other subjects of the Hawaiian Kingdom and foreign nationals within the Hawaiian Islands similarly situated.

89.   On October 13, 1999 a notice of voluntary dismissal without prejudice was filed as to the Defendant UNITED STATES OF AMERICA and nominal defendants [United Nations, France, Denmark, Sweden, Norway, United Kingdom, Belgium, Netherlands, Italy, Spain, Switzerland, Russia, Japan, Germany, Portugal and Samoa] by the plaintiff.[53] On October 29, 1999, the remaining parties, Larsen and the HAWAIIAN KINGDOM, entered into a stipulated settlement agreement dismissing the entire case without prejudice as to all parties and all issues and submitting all issues to binding arbitration. An agreement between Claimant Lance Paul Larsen and Respondent

---

[53] *Id*., document #6.

HAWAIIAN KINGDOM to submit the dispute to final and binding arbitration at the Permanent Court of Arbitration at the The Hague, the Netherlands was entered into on October 30, 1999.[54] The stipulated settlement agreement was filed with the court by the plaintiff on November 5, 1999.[55] On November 8, 1999, a notice of arbitration was filed with the International Bureau of the Permanent Court of Arbitration—*Lance Paul Larsen v. Hawaiian Kingdom*.[56] An order dismissing the case by Judge Samuel P. King, on behalf of the plaintiff, was entered on November 11, 1999.

90.   As stated in the plaintiff's complaint, the "International Title to the Hawaiian Islands can be properly adjudicated between Defendant UNITED STATES OF AMERICA and Defendant HAWAIIAN KINGDOM at the Permanent Court of Arbitration at The Hague, Netherlands," by virtue of the Permanent Court of Arbitration's institutional jurisdiction.

91.   Distinct from the subject matter jurisdiction of the *Larsen v. Hawaiian Kingdom* ad hoc arbitral tribunal, the PCA must first possess "institutional jurisdiction" by virtue of Article 47 of the 1907 Hague Convention for the

---

[54] Agreement between plaintiff Lance Paul Larsen and defendant Hawaiian Kingdom to submit the dispute to final and binding arbitration at the Permanent Court of Arbitration at The Hague, the Netherlands (October 30, 1999), https://www.alohaquest.com/arbitration/pdf/Arbitration_Agreement.pdf.

[55] *Larsen v. United Nations et al.*, document #8.

[56] Notice of Arbitration (November 8, 1999), https://www.alohaquest.com/arbitration/pdf/Notice_of_Arbitration.pdf.

Pacific Settlement of International Disputes, I (1907 PCA Convention), before it could establish the ad hoc tribunal in the first place ("The jurisdiction of the Permanent Court may, within the conditions laid down in the regulation, be extended to disputes [with] non-Contracting [States] [emphasis added].").[57] According to UNCTAD, there are three types of jurisdictions at the PCA, "Jurisdiction of the Institution," "Jurisdiction of the Arbitral Tribunal," and "Contentious/Advisory Jurisdiction."[58] Article 47 of the Convention provides for the jurisdiction of the PCA as an institution. Before the PCA could establish an ad hoc arbitral tribunal for the *Larsen* dispute it needed to possess institutional jurisdiction beforehand by ensuring that the HAWAIIAN KINGDOM is a non-Contracting State, thus bringing the international dispute within the auspices of the PCA.

92.    Evidence of the PCA's recognition of the continuity of the HAWAIIAN KINGDOM as a State and its government is found in Annex 2—*Cases Conducted Under the Auspices of the PCA or with the Cooperation of the International Bureau* of the PCA Administrative Council's annual reports

---

[57] 36 Stat. 2199. The Senate ratified the 1907 PCA Convention on April 2, 1898 and entered into force on January 26, 1910.

[58] United Nations Conference on Trade and Development (UNCTAD), *Dispute Settlement: General Topics—1.3 Permanent Court of Arbitration* 15-16 (2003) (online at https://unctad.org/system/files/official-document/edmmisc232add26_en.pdf).

from 2000 through 2011. Annex 2 of these annual reports stated that the *Larsen* arbitral tribunal was established "[p]ursuant to article 47 of the 1907 Convention."[59] Since 2012, the annual reports ceased to include all past cases conducted under the auspices of the PCA but rather only cases on the docket for that year. Past cases became accessible at the PCA's case repository on its website at https://pca-cpa.org/en/cases/.

93.     In determining the continued existence of the HAWAIIAN KINGDOM as a non-Contracting State to the 1907 PCA Convention, the relevant rules of international law that apply to established States must be considered, and not those rules of international law that would apply to new States. Professor Lenzerini concluded that, "according to a plain and correct interpretation of the relevant rules, the Hawaiian Kingdom cannot be considered, by virtue of the prolonged US occupation, as extinguished as an independent State and subject of international law. In fact, in the event of illegal annexation, 'the legal existence of […] States [is] preserved from extinction,' since 'illegal occupation cannot of itself terminate statehood.'"[60] The PCA Administrative

---

[59] Permanent Court of Arbitration, *Annual Reports*, Annex 2 (online at https://pca-cpa.org/en/about/annual-reports/).

[60] Federico Lenzerini, *Legal Opinion on the Authority of the Council of Regency of the Hawaiian Kingdom* para. 5 (May 24, 2020) (online at https://hawaiiankingdom.org/pdf/Legal_Opinion_Re_Authority_of_Regency_Lenzerini.pdf).

Council did not "recognize" the HAWAIIAN KINGDOM as a new State, but merely "acknowledged" its continuity since the nineteenth century for purposes of the PCA's institutional jurisdiction. What was sought by the plaintiff in *Larsen v. United Nations, et al*., where the "International Title to the Hawaiian Islands can be properly adjudicated between Defendant UNITED STATES OF AMERICA and Defendant HAWAIIAN KINGDOM at the Permanent Court of Arbitration at The Hague, Netherlands," was accomplished by virtue of Article 47 of the 1907 PCA Convention.

94.  If the United States objected to the PCA Administrative Council's annual reports, which it was a member State, that the HAWAIIAN KINGDOM is a non-Contracting State to the 1907 PCA Convention, it would have filed a declaration with the Dutch Foreign Ministry as it did when it objected to Palestine's accession to the 1907 PCA Convention on December 28, 2015. Palestine was seeking to become a Contracting State to the 1907 PCA Convention and submitted its accession to the Dutch government on October 30, 2015. In its declaration, which the Dutch Foreign Ministry translated into French, the United States explicitly stated, *inter alia*, "the government of the United States considers that 'the State of Palestine' does not answer to the definition of a sovereign State and does not recognize it as such

(translation)."[61] While the State of Palestine is a new State, the HAWAIIAN KINGDOM is a State in continuity since the nineteenth century. Furthermore, since the Defendant UNITED STATES OF AMERICA explicitly recognized the validity of the HAWAIIAN KINGDOM as an independent State in the nineteenth century it is precluded from "contesting its validity at any future time."[62]

95.   Because the State is a juristic person, it requires a government to speak on its behalf, without which the State is silent, and, therefore, there could be no arbitral tribunal to be established by the PCA. On the contrary, the PCA did form a tribunal after confirming the existence of the Hawaiian State and its government, the Council of Regency, pursuant to Article 47. In international intercourse, which includes arbitration at the PCA, the Permanent Court of International Justice, in *German Settlers in Poland*, explained that "States can act only by and through their agents and representatives."[63] As Professor Talmon states, "[t]he government, consequently, possesses the *jus repraesentationis omnimodae*, i.e. plenary and exclusive competence in

---

[61] Ministry of Foreign Affairs of the Kingdom of the Netherlands, *Notification of the Declaration of the United States translated into French* (January 29, 2016) (online at https://repository.overheid.nl/frbr/vd/003316/1/pdf/003316_Notificaties_11.pdf).

[62] Georg Schwarzenberger, "Title to Territory: Response to a Challenge," 51(2) *Am. J. Int'l L.* 308, 316 (1957).

[63] *German Settlers in Poland,* 1923, *PCIJ, Series B, No. 6*, 22.

international law to represent its State in the international sphere. [Talmon

submits] that this is the case irrespective of whether the government is *in situ*

or in exile."[64]

96.   After the PCA verified the continued existence of the Hawaiian State, as a

juristic person, it also simultaneously ascertained that the Hawaiian State was

represented by its government—the Council of Regency. The PCA identified

the international dispute in *Larsen* as between a "State" and a "private entity"

in its case repository. Furthermore, the PCA described the dispute between

the Council of Regency and Larsen as between a government and a resident

of Hawai'i.

Lance Paul Larsen, a resident of Hawaii, brought a claim

against the Hawaiian Kingdom by its Council of Regency

("Hawaiian Kingdom") on the grounds that the Government of

the Hawaiian Kingdom is in continual violation of: (a) its 1849

Treaty of Friendship, Commerce and Navigation with the United

States of America, as well as the principles of international law

laid down in the Vienna Convention on the Law of Treaties, 1969

and (b) the principles of international comity, for allowing the

---

[64] Stefan Talmon, *Recognition of Governments in International Law: With
Particular Reference to Governments in Exile* 115 (1998).

> unlawful imposition of American municipal laws over the
> claimant's person within the territorial jurisdiction of the
> Hawaiian Kingdom (emphasis added)."[65]

97.    In 1994, the Intermediate Court of Appeals (ICA), in *State of Hawai'i v. Lorenzo*,[66] opened the door to the question as to whether or not the HAWAIIAN KINGDOM continues to exist as a State. According to the ICA, Lorenzo argued, "the Kingdom was illegally overthrown in 1893 with the assistance of the United States; the Kingdom still exists as a sovereign nation [and] he is a citizen of the Kingdom."[67] Judge Walter Heen, author of the decision, denied Lorenzo's appeal and upheld the lower court's decision to deny Lorenzo's motion to dismiss. He explained that Lorenzo "presented no factual (or legal) basis for concluding that the Kingdom [continues to exist] as a state in accordance with recognized attributes of a state's sovereign nature."[68] While the ICA affirmed the trial court's decision, it admitted "the court's rationale is open to question in light of international law."[69] In other

---

[65] Permanent Court of Arbitration Case Repository, *Larsen v. Hawaiian Kingdom*, PCA Case no. 1999-01 (online at https://pca-cpa.org/en/cases/35/).

[66] *State of Hawai'i v. Lorenzo*, 77 Haw. 219; 883 P.2d 641 (1994).

[67] *Id*., 220; 642.

[68] *Id*., 221; 643.

[69] *Id*.

words, the ICA and the trial court did not apply international law in their decisions.

98.    The PCA Administrative Council's annual reports from 2000-2011 clearly states that the Defendant UNITED STATES OF AMERICA, as a member of the PCA Administrative Council, explicitly recognized the continued existence of the HAWAIIAN KINGDOM as a non-Contracting State to the 1907 PCA Convention as evidenced in the PCA Administrative Council's annual reports. Unlike the ICA and the trial court in *Lorenzo*, the PCA Administrative Council did apply international law in their determination of the continued existence of the HAWAIIAN KINGDOM as an independent and sovereign State for jurisdictional purpose of the PCA. As such, the treaties between the HAWAIIAN KINGDOM and the Defendant UNITED STATES OF AMERICA remain in full force and effect except where the law of occupation supersedes them. The other Contracting States with the HAWAIIAN KINGDOM in its treaties, which include Austria,[70] Belgium,[71]

---

[70] Embassy of Austria, whose address is Van Alkemadelaan 342, 2597 AS Den Haag, Netherlands.
[71] Embassy of Belgium, whose address is Johan van Oldenbarneveltlaan 11, 2582 NE Den Haag, Netherlands.

Denmark,[72] France,[73] Germany,[74] Great Britain,[75] Hungary,[76] Italy,[77] Japan,[78] Luxembourg,[79] Netherlands, Norway,[80] Portugal,[81] Russia,[82] Spain,[83] Sweden,[84] and Switzerland,[85] are also members of the PCA Administrative Council and, therefore, their acknowledgment of the continuity of the Hawaiian State is also an acknowledgment of the full force and effect of their

---

[72] Embassy of Denmark, whose address is Koninginnegracht 30, 2514 AB Den Haag, Netherlands.

[73] Embassy of France, whose address is Anna Paulownastraat 76, 2518 BJ Den Haag, Netherlands.

[74] Embassy of Germany, whose address is Groot Hertoginnelaan 18-20, 2517 EG Den Haag, Netherlands.

[75] Embassy of Great Britain, whose address is Lange Voorhout 10, 2514 ED Den Haag, Netherlands.

[76] Embassy of Hungary, whose address is Hogeweg 14, 2585 JD Den Haag, Netherlands.

[77] Embassy of Italy, whose address is Parkstraat 28, 2514 JK Den Haag, Netherlands.

[78] Embassy of Japan, whose address is Tobias Asserlaan 5, 2517 KC Den Haag, Netherlands.

[79] Embassy of Luxembourg, whose address is Nassaulaan 8, 2514 JS Den Haag, Netherlands.

[80] Embassy of Norway, whose address is Eisenhowerlaan 77J, 2517 KK Den Haag, Netherlands.

[81] Embassy of Portugal, whose address is Zeestraat 74, 2518 AD Den Haag, Netherlands.

[82] Embassy of Russia, whose address is Andries Bickerweg 2, 2517 JP Den Haag, Netherlands.

[83] Embassy of Spain, whose address is Lange Voorhout 50, 2514 EG Den Haag, Netherlands.

[84] Embassy of Sweden, whose address is Johan de Wittlaan 7, 2517 JR Den Haag, Netherlands.

[85] Embassy of Switzerland, whose address is Lange Voorhout 42, 2514 EE Den Haag, Netherlands.

treaties with the HAWAIIAN KINGDOM except where the law of occupation supersedes them.[86]

99.   The Consular Corps Hawai'i is comprised of 38 countries, 32 of which are also members of the PCA Administrative Council in The Hague, Netherlands. These countries include, Australia, Austria, Bangladesh, Belgium, Brazil, Chile, Czech Republic, Denmark, Finland, France, Germany, Hungary, India, Italy, Japan, Luxembourg, Mexico, Morocco, Netherlands, New Zealand, Norway, Philippines, Poland, Portugal, Slovenia, South Korea, Spain, Sri Lanka, Sweden, Switzerland, Thailand and the United Kingdom via the Australian Consulate.

100.   §458 of the Hawaiian Civil Code states, "[n]o foreign consul, or consular or commercial agent shall be authorized to act as such, or entitled to recover his fees and perquisites in the courts of this Kingdom, until he shall have received his exequatur." These consulates have not presented their credentials to the HAWAIIAN KINGDOM in order to receive exequaturs but rather received

---

[86] For treaties of the Hawaiian Kingdom with Austria, Belgium, Denmark, France, Germany, Great Britain,Hungary, Italy, Japan, Luxembourg, Netherlands, Norway, Portugal, Russia, Spain, Sweden and Switzerland see "Treaties with Foreign States," in David Keanu Sai, ed., *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 237-310 (2020) (online at https://hawaiiankingdom.org/pdf/Hawaiian_Royal_Commission_of_Inquiry_(2020).pdf).

their exequaturs from the Defendant UNITED STATES OF AMERICA under the municipal laws of the United States.

101.  In diplomatic packages sent to the foreign embassies in Washington, D.C., that maintain consulates in the territory of the HAWAIIAN KINGDOM by DAVID KEANU SAI, as Minister of Foreign Affairs *ad interim*, on April 15th and 20th of 2021, the Ambassadors were notified that their Consulates "within the territory of the Hawaiian Kingdom is by virtue of 'American municipal laws,' which stand in violation of Hawaiian sovereignty and independence, and, therefore constitutes an internationally wrongful act." The diplomatic note further stated that the "Council of Regency acknowledges that [foreign] nationals should be afforded remedial prescriptions regarding defects in their real estate holdings that have resulted from the illegal occupation in accordance with 'laws and established customs' of the Hawaiian Kingdom." This subject is covered in the Royal Commission of Inquiry's Preliminary Report re *Legal Status of Land Titles throughout the Realm*[87] and its Supplemental Report re *Title Insurance*."[88]

---

[87] Royal Commission of Inquiry, Preliminary Report—*Legal Status of Land Titles throughout the Realm* (16 July 2020) (online at https://hawaiiankingdom.org/pdf/RCI_Preliminary_Report_Land_Titles.pdf).
[88] *Id*., Supplemental Report—*Title Insurance* (28 October 2020) (online at https://hawaiiankingdom.org/pdf/RCI_Supp_Report_Title_Insurance.pdf).

102.   The explicit recognition by the United States of the continued existence of the HAWAIIAN KINGDOM as a State and the Council of Regency as its government prevents the denial of this civil action in the courts of the United States under the political question doctrine. In *Williams v. Suffolk Insurance Co.*, the Supreme Court rhetorically asked whether there could be "any doubt, that when the executive branch of the government, which is charged with our foreign relations…assumes a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department."[89] In *Sai v. Clinton*[90] and in *Sai v. Trump*[91] the court erred when it invoked the political question doctrine. In both cases the plaintiff provided evidence of the Hawaiian Kingdom's continuity by virtue of the proceedings at the Permanent Court of Arbitration in *Larsen v. Hawaiian Kingdom*.

103.   In *Jones v. United States*, the Supreme Court concluded that "[w]ho is the sovereign, *de jure* or *de facto,* of a territory is not a judicial, but is a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government. This principle has always been upheld by this Court, and has been affirmed under a great variety

---

[89] *Williams v. Suffolk Insurance Co.*, 36 U.S. 415, 420 (1839).
[90] *Sai v. Clinton*, 778 F. Supp. 2d 1 - Dist. Court, Dist. of Columbia (2011).
[91] *Sai v. Trump*, 325 F. Supp. 3d 68 - Dist. Court, Dist. of Columbia (2018).

of circumstances."[92] As a leading constitutional scholar, Professor Corwin, concluded, "[t]here is no more securely established principle of constitutional practice than the exclusive right of the President to be the nation's intermediary in its dealing with other nations."[93] The 'executive' did determine '[w]ho is the sovereign' of the HAWAIIAN KINGDOM, and, therefore, since there is no political question, it 'binds the judges, as well as all other officers, citizens, and subjects of that government.'

**E.   United States practice of recognizing governments of existing States**

104.   The restoration of the Hawaiian government by a "Council of Regency, as officers *de facto*, was a political act of self-preservation, not revolution, and was grounded upon the legal doctrine of limited necessity."[94] As such, according to pertinent U.S. practice, the Council of Regency did not require recognition by any other government, to include the United States, nor did it have to be in effective control of the HAWAIIAN KINGDOM's territory unless it was a new regime born out of revolutionary changes in government. The legal doctrine of recognizing "new" governments of an existing State only arises when there are "extra-legal changes in government."[95] The Council of

---

[92] *Jones v. United States*, 137 U.S. 202, 212 (1890).
[93] Edward Corwin, *The President: Office and Powers*, 1787-1984 214 (1957).
[94] Sai, *Royal Commission of Inquiry*, 22.
[95] M. J. Peterson, *Recognition of Governments: Legal Doctrine and State Practice, 1815-1995* 26 (1997).

Regency was not established through "extra-legal changes in government" but rather through existing laws of the kingdom as it stood before January 17, 1893. The Council of Regency was not a new government but rather a successor in office to Queen Liliʻuokalani in accordance with Hawaiian law. In other words, "[t]he existence of the restored government *in situ* was not dependent upon diplomatic recognition by foreign States, but rather operated on the presumption of recognition these foreign States already afforded the Hawaiian government as of 1893."[96]

105.   If the Council of Regency was a new regime within an independent State, like the insurgency of 1893 that called themselves a provisional government, it would require *de facto* recognition by foreign governments after securing effective control of the territory away from the monarchical government. As stated by U.S. Secretary of State John Foster in a dispatch to resident Minister John Stevens in the Hawaiian Islands dated January 28, 1893, "[t]he rule of this Government has uniformly been to recognize and enter into relation with an actual government in <u>full possession of effective power with the assent of the people</u> (emphasis added)."[97] Applying this rule, President Cleveland concluded that the provisional government "was neither a government *de*

---

[96] Sai, *Royal Commission of Inquiry*, 22.
[97] Executive Documents, 1179.

*facto* nor *de jure*. That it was not in such possession of the Government property and agencies as entitled it to recognition."[98] As such, the legal order of the Hawaiian Kingdom remained intact for it "is a dictum of international law that it will presume the old order as continuing."[99]

106. In the context of the international legal order, at the core of sovereignty is effective control of the territory of the State. However, under international humanitarian law, which is also called the laws of war and belligerent occupation, the principle of effectiveness is reversed. When the United States bore the responsibility of illegally overthrowing, by an "act of war," the HAWAIIAN KINGDOM government, it transformed the state of affairs from a state of peace to a state of war, where you have the existence of two legal orders in one and the same territory, that of the occupying State—the Defendant UNITED STATES OF AMERICA—and that of the occupied State—the HAWAIIAN KINGDOM.[100]

---

[98] *Id.*, 453 (online at
https://hawaiiankingdom.org/pdf/Cleveland's_Message_(12.18.1893).pdf).
[99] Osmond K. Fraenkel, *A Digest of Cases on International Law Relating to Recognition of Governments* 4 (1925).
[100] David Keanu Sai, "United States Belligerent Occupation of the Hawaiian Kingdom," in David Keanu Sai, ed., *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 99-103 (2020).

107.   Professor Marek explains that in "the first place: of these two legal orders, that of the occupied State is regular and 'normal,' while that of the occupying power is exceptional and limited. At the same time, the legal order of the occupant is … strictly subject to the principle of effectiveness, while the legal order of the occupied State continues to exist notwithstanding the absence of effectiveness."[101] Therefore, belligerent occupation "is thus the classical case in which the requirement of effectiveness as a condition of validity of a legal order is abandoned."[102] When the Hawaiian government was restored in 1997, it was not required to be in effective control of Hawaiian territory in order to give it legitimacy under international law. In needed only to be a successor of the last reigning Monarch in accordance with the laws of the HAWAIIAN KINGDOM.

**F.    United States explicit recognition of the continued existence of the Hawaiian Kingdom as an independent and sovereign State triggers the _Supremacy Clause_**

108.   There are two instances through which the Defendant UNITED STATES OF AMERICA continued to recognize the HAWAIIAN KINGDOM's Head of State after January 17, 1893 by executive agreements, through exchange of

---

[101] Krystyna Marek, _Identity and Continuity of States in Public International Law_ 102 (1968).
[102] _Id._

notes. The first was the executive agreement of restoration between Queen Liliʻuokalani and President Grover Cleveland, by his U.S. Minister Albert Willis, of December 18, 1893, which took place eleven months after the overthrow of the Hawaiian government.[103] The second instance occurred between the Defendant UNITED STATES OF AMERICA, by its Department of State through its embassy in The Hague, and the Council of Regency after the PCA confirmed the existence of the Hawaiian State and its government in accordance with Article 47, and prior to the PCA's formation of the *Larsen* tribunal on June 9, 2000. According to DAVID KEANU SAI, when he served as Agent for the HAWAIIAN KINGDOM in *Larsen v. Hawaiian Kingdom*:

> Mr. Tjaco T. van den Hout, Secretary General of the PCA, spoke with [the Chair], as agent for the Hawaiian Kingdom, over the telephone and recommended that the Hawaiian government provide an invitation to the United States to join in the arbitration. The Hawaiian government agreed with the recommendation, which resulted in a conference call meeting on 3 March 2000 in Washington, D.C., between [the Chair of the Council], Larsen's counsel, Mrs. Ninia Parks, and John Crook

---

[103] United States House of Representatives, 53d Cong., *Executive Documents on Affairs in Hawaii: 1894-95* 1179 (1895), ("Executive Documents") (online at https://hawaiiankingdom.org/pdf/EA_2(HI%20Claim).pdf).

from the State Department. The meeting was reduced to a formal note and mailed to Crook in his capacity as legal adviser to the State Department, and a copy of the note was submitted by the Council of Regency to the PCA Registry for record that the United States was invited to join in the arbitral proceedings. The note was signed off by the [Chair] as "Acting Minister of Interior and Agent for the Hawaiian Kingdom."

Thereafter, the PCA's Deputy Secretary General, Phyllis Hamilton, informed the [Chair] that the United States, through its embassy in The Hague, notified the PCA, by note verbal, that the United States declined the invitation to join the arbitral proceedings. Instead, the United States requested permission from the Hawaiian government to have access to the pleadings and records of the case. The Hawaiian government consented to the request. The PCA, represented by the Deputy Secretary General, served as an intermediary to secure an agreement between the Hawaiian Kingdom and the United States.[104]

---

[104] David Keanu Sai, "Royal Commission of Inquiry," in David Keanu Sai, ed., *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 25 (2020). See also declaration of David Keanu Sai as Exhibit 1.

109. The request by the United States of the Council of Regency's permission to access all records and pleadings of the arbitral proceedings, together with the subsequent granting of such a permission by the Council of Regency, constitutes an agreement under international law. As Oppenheim asserts, "there exists no other law than International Law for the intercourse of States with each other, every agreement between them regarding any obligation whatever is a treaty."[105] The request by the Defendant UNITED STATES OF AMERICA constitutes an offer, and the Council of Regency's acceptance of the offer created an obligation, on the part of the HAWAIIAN KINGDOM, to allow the Defendant UNITED STATES OF AMERICA unfettered access to all records and pleadings of the arbitral proceedings. According to Hall, "a valid agreement is therefore concluded so soon as one party has signified his intention to do or to refrain from a given act, conditionally upon the acceptance of his declaration of intention by the other party as constituting an engagement, and so soon as such acceptance clearly indicated."[106] If, for the sake of argument, the Council of Regency later denied the Defendant UNITED STATES OF AMERICA access to the records and pleadings of the

---

[105] Lassa Oppenheim, *International Law* 661 (3rd ed., 1920).
[106] William Edward Hall, *A Treatise on International Law* 383 (1904).

arbitral proceedings, the latter would, no doubt, call the former's action a violation of the agreement.

110. When the President of the Defendant UNITED STATES OF AMERICA enters into executive agreements, through his authorized agents, with foreign governments, it preempts U.S. state law or policies by operation of the *Supremacy Clause* under Article VI, para. 2 of the U.S. Constitution ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in [the State of Hawai'i] shall be bound thereby, anything in the Constitution or laws of [the State of Hawai'i] to the contrary notwithstanding."). In *United States v. Belmont*, the Court stated, "[p]lainly, the external powers of the United States are to be exercised without regard to [State of Hawai'i] laws or policies,"[107] and "[i]n respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear."[108]

111. While the supremacy of treaties is expressly stated in the Constitution, the Supreme Court, in *United States v. Curtiss-Wright Export Corp.*, stated that

---

[107] *United States v. Belmont*, 301 U. S. 324, 330 (1937),
[108] *Id.*

the same rule holds "in the case of international compacts and agreements [when it forms] the very fact that complete power over international affairs is in the National Government and is not and cannot be subject to any curtailment or interference on the part of the several States."[109] In *United States v. Pink*, the Supreme Court reiterated that:

> No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively. It need not be so exercised as to conform to state laws or state policies, whether they be expressed in constitutions, statutes, or judicial decrees. And the policies of the States become wholly irrelevant to judicial inquiry when the United States, acting within its constitutional sphere, seeks enforcement of its foreign policy in the courts.[110]

112.  The "curtailment or interference" by the Defendant STATE OF HAWAI'I is its unqualified denial of the Council of Regency as a government and its authorized power to issue government bonds. The Defendant STATE OF HAWAI'I is precluded from denying the status of the Council of Regency as

---

[109] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 330-31 (1936).
[110] *United States v. Pink*, 315 U.S. 203, 229-31, 233-34 (1942).

a government by virtue of the *Supremacy Clause*, because the 'National Government' already recognized the Council of Regency as the government of the Hawaiian State in its agreement with the Council of Regency by virtue of the PCA's institutional jurisdiction under Article 47 of the 1907 PCA Convention and with regard to accessing the *Larsen* arbitral pleadings and records. The 'National Government,' as a member of the PCA Administrative Council and co-publisher of the annual reports of 2000 through 2011, explicitly acknowledged the HAWAIIAN KINGDOM as a State and its government—the Council of Regency—pursuant to Article 47 of the 1907 PCA Convention. The action taken by the 'National Government,' as a member of the Administrative Council, was by virtue of a treaty provision. The United States signed the Convention on October 18, 1907 and the Senate gave its consent to ratification on April 2, 1908. The Convention entered into force on January 26, 1910, and, consequently, the PCA Convention became the supreme law of the land by virtue of the *Supremacy Clause.*

113. The annual reports are a function of the Administrative Council pursuant to Article 49 of the Convention. As such, the Defendant STATE OF HAWAI'I is precluded from any 'curtailment or interference' of the actions taken by the Defendant UNITED STATES OF AMERICA, as a member of the PCA Administrative Council and co-publisher of the annual reports. Therefore, the

Defendant STATE OF HAWAI'I is precluded from denying these facts and actions taken by the Defendant UNITED STATES OF AMERICA as a Contracting State to the 1907 PCA Convention because the Defendant UNITED STATES OF AMERICA, from a domestic standpoint, enjoys "legal superiority over any conflicting provision of a State constitution or law."[111]

114.  The 1907 PCA Convention, which has been ratified by the Senate, and the action taken by the Defendant UNITED STATES OF AMERICA, as a member State of the PCA Administrative Council, pursuant to Article 49, preempt Defendant STATE OF HAWAI'I laws through the operation of the *Supremacy Clause*. The agreement entered into between the U.S. Department of State, by its embassy in The Hague, and the Council of Regency stems from the "Executive [that has] authority to speak as the sole organ" of international relations for the United States.[112] The Department of State, speaking on behalf of the Defendant UNITED STATES OF AMERICA, did not require Congressional approval or ratification of the Senate, or consultation with the Defendant STATE OF HAWAI'I. Therefore, the Defendant UNITED STATES OF AMERICA agreement with the Council of Regency to access all records and pleadings of the *Larsen* arbitral proceedings also preempts the

---

[111] Black's Law, 1440.
[112] *Belmont*, 330.

Defendant STATE OF HAWAIʻI, through the operation of the *Supremacy Clause*, from denying this international agreement or acting in ways inconsistent with it.

## G. Unlawful presence of U.S. military forces in the Hawaiian Kingdom

115. To preserve its political independence, should war break out in the Pacific Ocean, the HAWAIIAN KINGDOM ensured that its neutrality would be recognized beforehand. Provisions recognizing Hawaiian neutrality were incorporated in its treaties with Sweden-Norway (1852),[113] Spain (1863)[114] and Germany (1879).[115] "A nation that wishes to secure her own peace," says

---

[113] Article XV states, "All vessels bearing the flag of Sweden and Norway in time of war shall receive every possible protection, short of actual hostility, within the ports and waters of His Majesty the King of the Hawaiian Islands; and His Majesty the King of Sweden and Norway engages to respect in time of war the neutral rights of the Hawaiian Kingdom, and to use his good offices with all other powers, having treaties with His Majesty the King of the Hawaiian Islands, to induce them to adopt the same policy towards the Hawaiian Kingdom;" accessed January 17, 2021, http://hawaiiankingdom.org/pdf/Sweden_Norway_Treaty.pdf.

[114] Article XXVI states, "All vessels bearing the flag of Spain shall, in time of war, receive every possible protection, short of active hostility, within the ports and waters of the Hawaiian Islands, and Her Majesty the Queen of Spain engages to respect, in time of war the neutrality of the Hawaiian Islands, and to use her good offices with all the other powers having treaties with the same, to induce them to adopt the same policy toward the said Islands;" accessed January 17, 2021, http://hawaiiankingdom.org/pdf/Spanish_Treaty.pdf.

[115] Article VIII states, "All vessels bearing the flag of Germany or Hawaii shall in times of war receive every possible protection, short of actual hostility, within the ports and waters of the two countries, and each of the High Contracting Parties engages to respect under all circumstances the neutral rights of the flag and the dominions of the other;" accessed January 17, 2021, http://hawaiiankingdom.org/pdf/German_Treaty.pdf.

de Vattel, "cannot more successfully attain that object than by concluding treaties" of neutrality.[116]

116. The gravity of the Hawaiian situation has been heightened by North Korea's announcement that "all of its strategic rocket and long-range artillery units are assigned to strike bases of the U.S. imperialist aggressor troops in the U.S. mainland and on Hawaii."[117] The New York Times also reported that the North Korean command stated, "[t]hey should be mindful that everything will be reduced to ashes and flames the moment the first attack is unleashed."[118]

117. On April 13, 2021, the New York Times reported "China's effort to expand its growing influence represents one of the largest threats to the United States, according to a major annual intelligence report released on Tuesday, which also warned of the broad national security challenges posed by Moscow and Beijing."[119] Furthermore, on April 21, 2021, the New York Times reported that Russian President Vladimir "Putin says nations that threaten Russian's

---

[116] Emerich De Vattel, *The Law of Nations*, 6th ed., 333 (1844).

[117] Choe Sang-Hun, North Korea Calls Hawaii and U.S. Mainland Targets, New York Times (Mar. 26, 2013) (online at http://www.nytimes.com/2013/03/27/world/asia/north-korea-calls-hawaii-and-us-mainland-targets.html).

[118] *Id.*

[119] Julian E. Barnes, China Poses Biggest Threat to U.S., Intelligence Report Says, New York Times (April 13, 2021) (online at https://www.nytimes.com/2021/04/13/us/politics/china-national-security-intelligence-report.html).

security will 'regret their deeds.'"[120] The New York Times also reported that "Russia's response will be 'asymmetric, fast and tough' if it is forced to defend its interests, Mr. Putin said, pointing to what he claimed were Western efforts at regime change in neighboring Belarus as another threat to Russia's security."[121]

118.   The island of O'ahu serves as headquarters for the U.S. Indo-Pacific Command,   with its Subordinate Component Commands—U.S. Marine Forces Pacific, U.S. Pacific Fleet, U.S. Army Pacific, U.S. Pacific Air Forces and Special Operations Command Pacific. "Camp H.M. Smith, home of the headquarters of Commander, U.S. Indo-Pacific Command and the Commanding General of Marine Forces Pacific, is located on Oahu's Halawa Heights at an elevation of about 600 feet above Pearl Harbor near the community of Aiea."[122] Defendant JOHN AQUILINO stated, "[t]he most dangerous concern is that of military force against Taiwan. To combat that, the forward posture west of the international dateline is how [current INDO-

---

[120] Andrew E. Kramer, Ivan Nechepurenko, Anton Troianovski and Katie Rogers, Putin says nations that threaten Russia's security will 'regret their deeds,' New York Times (Mar. 26, 2013) (online at https://www.nytimes.com/2021/04/21/world/europe/putin-russia-threats.html).
[121] *Id*.
[122] Indo-Pacific Command, *History of United States Indo-Pacific Command* (online at https://www.pacom.mil/About-USINDOPACOM/History/#:~:text=Camp%20H.M.%20Smith%2C%20home%20of,near%20the%20community%20of%20Aiea).

PACOM Commander Adm. Phil] Davidson describes it—and I concur with that: forces positioned to be able to respond quickly, and not just our forces."[123]

119. The significance of North Korea's declaration of war of March 30, 2013, and China's threat to Taiwan has specifically drawn the HAWAIIAN KINGDOM, being a neutral State, into the region of war because it has been targeted as a result of the United States 115 military bases and installations throughout the territory of the HAWAIIAN KINGDOM. There is no consent or status of forces agreement between the HAWAIIAN KINGDOM and the Defendant UNITED STATES OF AMERICA that would have allowed stationing of U.S. military forces.

120. The maintenance of DEFENDANT UNITED STATES OF AMERICA's military installations within the territory of the HAWAIIAN KINGDOM, being a neutral State, are an imminent threat to the civilian population of the HAWAIIAN KINGDOM and is a violation of Article 4 of the 1907 Hague Convention, V, whereby, "[c]orps of combatants cannot be formed nor

---

[123] Megan Eckstein, Senate Confirms Aquilino to Serve as Next INDO-PACOM Commander, USNI News (April 21, 2021) (online at https://news.usni.org/2021/04/21/senate-confirms-aquilino-to-serve-as-next-indo-pacom-commander#:~:text=U.S.%20Pacific%20Fleet%20Commander%20Adm,currently%20filled%20by%20Adm.%20Phil%E2%80%A6).

recruiting agencies opened on the territory of a neutral Power to assist the belligerents.".[124] Article 1 provides that "[t]he territory of neutral Powers is inviolable."[125] The 1907 Hague Convention, V, was ratified by the United States Senate on March 10, 1908 and came into force on January 26, 1910. As such, the 1907 Hague Convention, V, comes under the *Supremacy Clause*.

**H.** **Jus cogens and certain war crimes committed in the Hawaiian Kingdom**

121. Professor Schabas, who authored a legal opinion for the Royal Commission of Inquiry on the elements of war crimes committed in the Hawaiian Kingdom, notes the Defendant UNITED STATES OF AMERICA's position on war crimes during the First Gulf War:

> In a diplomatic note to the Government of Iraq in 1991, the Government of the United States declared that 'under International Law, violations of the Geneva Conventions, the Geneva Protocol of 1925, or related International Laws of armed conflict are war crimes, and individuals guilty of such violations may be subject to prosecution at any time, without any statute of

---

[124] 36 Stat. 2310, 2323 (1907).
[125] *Id.*, 2322.

limitations. This includes members of the Iraqi armed forces and civilian government officials.' [126]

122.   Municipal laws of the Defendant UNITED STATES OF AMERICA being imposed in the HAWAIIAN KINGDOM constitute a violation of the law of occupation, which, according to Professor Schabas, is the war crime of *usurpation of sovereignty*. The actus reus of the offense "would consist of the imposition of legislation or administrative measures by the occupying power that go beyond those required by what is necessary for military purposes of the occupation."[127] All war crimes committed in the HAWAIIAN KINGDOM have a direct nexus and extend from the war crime of *usurpation of sovereignty*.

123.   According to Professor Schabas, the requisite elements for the following war crimes are:

> *Elements of the war crime of usurpation of sovereignty during occupation*
>
> 1. The perpetrator imposed or applied legislative or administrative measures of the occupying power going

---

[126] William Schabas, "War Crimes Related to the United States Belligerent Occupation of the Hawaiian Kingdom," in David Keanu Sai, ed., *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom* 155 (2020)
[127] *Id.*, 157.

beyond those required by what is necessary for military purposes of the occupation.

2. The perpetrator was aware that the measures went beyond what was required for military purposes or the protection of fundamental human rights.

3. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

4. The perpetrator was aware of factual circumstances that established the existence of the armed conflict and subsequent occupation.[128]

*Elements of the war crime of denationalization*

1. The perpetrator participated in the imposition or application of legislative or administrative measures of the occupying power directed at the destruction of the national identity and national consciousness of the population.

2. The perpetrator was aware that the measures were directed at the destruction of the national identity and national consciousness of the population.

---

[128] *Id.*, 167.

3. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

4. The perpetrator was aware of factual circumstance that established the existence of the armed conflict and subsequent occupation.

*Elements of the war crime of pillage*

1. The perpetrator appropriated certain property.

2. The perpetrator intended to deprive the owner of property and to appropriate it for private or personal use.

3. The appropriation was without the consent of the owner.

4. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

5. The perpetrator was aware of factual circumstances that established the existence of the armed conflict and subsequent occupation.

*Elements of the war crime of confiscation or destruction of property*

1. The perpetrator confiscated or destroyed property in an occupied territory, be it that belonging to the State or individuals.

2. The confiscation or destruction was not justified by military purposes of the occupation or by the public interest.

3. The perpetrator was aware that the owner of the property was the State or an individual and that the act of confiscation or destruction was not justified by military purposes of the occupation or by the public interest.

4. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

5. The perpetrator was aware of factual circumstance that established the existence of the armed conflict and subsequent occupation.

*Elements of the war crime of deprivation of fair and regular trial*

1. The perpetrator deprived one or more persons in an occupied territory of fair and regular trial by denying judicial guarantees recognized under international law,

including those of the fourth Geneva Convention and the International Covenant on Civil and Political Rights.

2. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

3. The perpetrator was aware of factual circumstance that established the existence of the armed conflict and subsequent occupation.

*Elements of the war crime of deporting civilians of the occupied territory*

1. The perpetrator deported or forcibly transferred, without grounds permitted under international law, one or more persons in the occupied State to another State or location, including the occupying State, or to another location within the occupied territory, by expulsion or coercive acts.

2. Such person or persons were lawfully present in the area from which they were so deported or transferred.

3. The perpetrator was aware of the factual circumstances that established the lawfulness of such presence.

4. The conduct took place in the context of and was associated with an occupation resulting from international armed conflict.

5. The perpetrator was aware of factual circumstances that established the existence of the armed conflict and subsequent occupation.

124. With regard to the last two elements of the aforementioned war crimes, Schabas states:

1. There is no requirement for a legal evaluation by the perpetrator as to the existence of an armed conflict as international [...].

2. In that context there is no requirement for awareness by the perpetrator of the facts that established the character of the conflict as international [...].

3. There is only a requirement for the awareness of the factual circumstances that established the existence of an armed conflict [...].[129]

---

[129] *Id.*, 167.

125.   The prohibition of war crimes is an "old norm which [has] acquired the character of *jus cogens*."[130] According to the International Criminal Tribunal for the Former Yugoslavia (ICTY), international crimes, which include war crimes, are "universally condemned wherever they occur,"[131] because they are "peremptory norms of international law or jus cogens."[132] *Jus cogens* norms are peremptory norms that "are nonderogable and enjoy the highest status within international law."[133] Schabas' legal opinion is undeniably, and pursuant to *The Paquette Habana* case, a means for the determination of the rules of international law.

126.   In a letter of correspondence from DAVID KEANU SAI, as Head of the Royal Commission of Inquiry (RCI), to Attorney General Clare E. Connors, dated June 2, 2020, the Attorney General was notified that:

---

[130] Grigory I. Tunkin, "Jus Cogens in Contemporary International Law," 3 *U. Tol. L. Rev.* 107, 117 (1971).

[131] ICTY, *Prosecutor v. Furundzija*, Case No. IT-95-17/1, Judgment, 156 (Dec. 10, 1998).

[132] ICTY, *Prosecutor v. Kupreskic*, Case No. IT-95-16-T, Judgement, para. 520 (Jan. 14, 2000).

[133] *Committee of United States Citizens in Nicaragua, et al., v. Reagan*, 859 F.2d 929, 940 (D.C. Cir. 1988); see also *Vienna Convention on the Law of Treaties*, art. 53, May 23, 1969, 1155 U.N.T.S. 331 (defining a jus cogens norm as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character").

Imposition of United States legislative and administrative measures constitutes the war crime of *usurpation of sovereignty* under customary international law. This includes the legislative and administrative measures of the State of Hawai'i and its Counties. Professor William Schabas, renowned expert in international criminal law, authored a legal opinion for the Royal Commission that identified *usurpation of sovereignty*, among other international crimes, as a war crime that has and continues to be committed in the Hawaiian Islands.[134]

127.  Carbon copied to that letter was Governor David Ige, Lieutenant Governor Josh Green, President of the Senate Ron Kouchi, Speaker of the House of Representatives Scott Saiki, Adjutant General Kenneth Hara, City & County of Honolulu Mayor Kirk Caldwell, Hawai'i County Mayor Harry Kim, Maui County Mayor Michael Victorina, Kaua'i County Mayor Derek Kawakami, United States Senator Brian Schatz, United States Senator Mazie Hirono, United States Representative Ed Case, and United States Representative Tulsi Gabbard. For the purposes of international criminal law, it meets the requisite fourth element of the war crime of *usurpation of sovereignty* whereby the

---

[134] *Letter of the Royal Commission of Inquiry to State of Hawai'i Attorney General Clare E. Connors* (June 2, 2020), https://hawaiiankingdom.org/pdf/RCI_Ltr_to_State_of_HI_AG_(6.2.20).pdf.

"perpetrator was aware of factual circumstances that established the existence of the armed conflict and subsequent occupation."

128.   Furthermore, on November 10, 2020, the National Lawyers Guild (NLG) sent a letter to Governor Ige that stated:

> International humanitarian law recognizes that proxies of an occupying State, which are in effective control of the territory of the occupied State, are obligated to administer the laws of the occupied State. The State of Hawai'i and its County governments, and not the Federal government, meet this requirement of effective control of Hawaiian territory under Article 42 of the 1907 Hague Regulations, and need to immediately comply with the law of occupation. The United States has been in violation of international law for over a century, exercising, since 1893, the longest belligerent occupation of a foreign country in the history of international relations without establishing an occupying government.[135]

129.   The NLG also stated that it "supports the Hawaiian Council of Regency, who represented the HAWAIIAN KINGDOM at the Permanent Court of

---

[135] *National Lawyers Guild Letter to State of Hawai'i Governor David Ige* (November 10, 2020) (online at https://nlginternational.org/newsite/wp-content/uploads/2020/11/Letter-from-the-NLG-to-State-of-HI-Governor-.pdf).

Arbitration, in its effort to seek resolution in accordance with international law as well as its strategy to have the State of Hawai'i and its Counties comply with international humanitarian law as the administration of the Occupying State."[136] The NLG further stated that it "supports the actions taken by the Council of Regency and the RCI in its efforts to ensure compliance with the international law of occupation by the United States and the State of Hawai'i and its Counties."[137]

130.   The NLG received the backing and support of the International Association of Democratic Lawyers (IADL) in its resolution adopted on February 7, 2021 *Calling Upon the United States to Immediately Comply with International Humanitarian Law in Its Prolonged Occupation of the Hawaiian Islands— Hawaiian Kingdom.* The IADL also "supports the Hawaiian Council of Regency"[138] and "calls on all United Nations members States and non-member States to not recognize as lawful a situation created by a serious violation of international law, and to not render aid or assistance in

---

[136] *Id.*, 2.

[137] *Id.*, 3.

[138] Resolution of the International Association of Democratic Lawyers *Calling Upon the United States to Immediately Comply with International Humanitarian Law in Its Prolonged Occupation of the Hawaiian Islands—Hawaiian Kingdom* 3 (February 7, 2021) (online at https://hawaiiankingdom.org/pdf/IADL_Resolution_on_the_Hawaiian_Kingdom.pdf).

maintaining the unlawful situation. As an internationally wrongful act, all States shall cooperate to ensure the United States complies with international humanitarian law and consequently bring to an end the unlawful occupation of the Hawaiian Islands."[139] Furthermore, the "IADL fully supports the NLG's November 10, 2020 letter to State of Hawai'i Governor David Ige urging him to 'proclaim the transformation of the State of Hawai'i and its Counties into an occupying government pursuant to the Council of Regency's proclamation of June 3, 2019, in order to administer the laws of the Hawaiian Kingdom'."[140]

131. Defendant DAVID YUTAKA IGE has met the 'requirement for the awareness of the factual circumstances that established the existence of an armed conflict' regarding war crimes.

**I.  State of Hawai'i violates international law and the *Supremacy Clause* by attacking officers of the Council of Regency**

132. In a letter dated March 15, 2021, Bruce Schoenberg of the Securities Enforcement Branch of the State of Hawai'i (SOH-Enforcement Branch) stated, "[t]he Commissioner of Securities of the State of Hawaii is about to commence an enforcement action against [David Keanu Sai] and [Kau'i Sai-

---

[139] *Id.*
[140] *Id.*

Dudoit] based upon the sale of unregistered Kingdom of Hawaii Exchequer Bonds, in violation of HRS § 485A-301."[141]

133.   By letter dated March 26, 2021, attorney Stephen Laudig, on behalf of [David Keanu Sai] and [Kau'i Sai-Dudoit],  responded to the March 15, 2021 letter from the SOH-Enforcement Branch.[142] Attorney Laudig's letter included specific notice of the: (a) Explicit Recognition by the United States of the Continuity of the HAWAIIAN KINGDOM and its restored government by its Council of Regency; (b) Authority of the Council of Regency; (c) Sovereign Immunity; (d)  Preemption of the State of Hawai`i from Interference in International Relations between the Defendant UNITED STATES OF AMERICA and the HAWAIIAN KINGDOM; (e) Defendant UNITED STATES OF AMERICA's Practice of Recognition of "New" Governments of Existing States; (f) "Constraints on United States Municipal Laws; and (g) Usurpation of Sovereignty and Jus Cogens.

134.   After having received neither an acknowledgement of receipt, nor a response to his March 26, 2021 communication, but merely an April 8, 2021 communication from the SOH-Enforcement Branch, by email, asking whether

---

[141] Bruce A. Schoenberg to Stephen Laudig (March 15, 2021) (online at https://hawaiiankingdom.org/pdf/Schoenberg_to_Laudig_ltr_(3.15.21).pdf).
[142] Stephen Laudig to Bruce A. Schoenberg (March 26, 2021) (online at https://hawaiiankingdom.org/pdf/Laudig_to_Schoenberg_(3.26.21).pdf).

he would "accept service of process on behalf of Mr. Sai and Ms. Goodhue",
Attorney Laudig, by communication dated April 12, 2021, submitted his
supplemental communication to the SOH-Securities Enforcement Branch.[143]
Included in his April 12, 2021 supplemental communication, Attorney Laudig
stated:

> I am not authorized to accept service of process until the
> SOH: 1] acknowledges receipt of the communication of the 26th;
> and, 2] responds to the points made in it regarding the United
> States' explicit recognition of the continuity of the Hawaiian
> Kingdom as a State and the Council of Regency as its
> government, which it did during arbitral proceedings at the
> Permanent Court of Arbitration (PCA) between 8 November
> 1999, when the arbitral proceedings were initiated, and 9 June
> 2000 when the arbitral tribunal was formed. This explicit
> recognition by the U.S. Department of State, acting through its
> embassy in The Hague which sits as a member of the PCA
> Administrative Council, triggers the Supremacy Clause.

---

[143] Stephen Laudig to Bruce A. Schoenberg (April 12, 2021) (online at
https://hawaiiankingdom.org/pdf/Laudig_to_Schoenberg_(4.12.21).pdf).

According to the USPS, your office received the communication of 26 March on 29 March.

As stated in that communication, the actions taken by the SOH have serious repercussions under U.S. constitutional law and also international humanitarian law. These include the war crime of usurpation of sovereignty. This non-response is an acquiescence to the facts and the law cited in that communication and precludes the SOH from proceeding without violating the Supremacy Clause.

According to *Notes of Advisory Committee on Proposed Federal Rules of Evidence* (Rule 801):

Under established principles an admission may be made by adopting or acquiescing in the statement of another. While knowledge of contents would ordinarily be essential, this is not inevitably so: "X is a reliable person and knows what he is talking about." See McCormick §246, p. 527, n. 15. Adoption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the

circumstances, protest the statement made in his presence, if untrue.1

[Ft. nt. 1, citing Cornell Law School, Legal Information Institute, "Rule 801. Definitions That Apply to This Article; Exclusions from Hearsay," https://www.law.cornell.edu/rules/fre/rule_801. [Last accessed as of 14 April 2021]

Furthermore, according to the New York Court of Appeals, in *People v. Vining*, 2017 NY Slip Op 01144:

An adoptive admission occurs "when a party acknowledges and assents to something 'already uttered by another person, which thus becomes effectively the party's own admission'" (People v Campney, 94 NY2d 307, 311 [1999], citing 4 75 Wigmore, Evidence § 1609, at 100 [Chadbourne rev]). Assent can be manifested by silence, because "a party's silence in the face of an accusation, under circumstances that would prompt a reasonable person to protest, is generally considered an admission" (Robert A. Barker & Vincent C. Alexander, Evidence in New York State and Federal Courts § 8:17

[2016]; see also People v Koerner, 154 NY 355, 374 [1897] ["If he is silent when he ought to have denied, the presumption of acquiescence arises"]). We have also recognized that "an equivocal or evasive response may similarly be used against [a] party either as an adoptive admission by silence or an express assent" (Campney, 94 NY2d at 316 [Smith, J., dissenting], quoting 2 McCormick, Evidence, op cit., § 262, at 176). Here, despite the dissent's characterization, the defendant was not silent in the face of the victim's accusations. He gave "equivocal or evasive response[s]" (id.).2

[Ft. Nt. 2, citing *People v. Vining*, 2017 NY Slip Op 01144, https://law.justia.com/cases/new-york/court-of-appeals/2017/1.html. [Last accessed 14 April 2021]

My clients look forward to the SOH's response to the communication and the specific points that were made. Upon receipt I will consult with my clients accordingly, regarding the SOH inquiry as to service of process.

If you are of the opinion that I have a mis-stated either a fact, or a principle of international law, Hawaiian Kingdom law, or United States domestic law, I look forward to you providing what the SOH contends is authority that, in your opinion, contradicts any of the facts or counters any of the conclusions of law stated.

135. Thereafter, by letter dated April 15, 2021, the SOH-Enforcement Branch, while acknowledging receipt, was non-responsive and/or provided equivocal or evasive responses to Attorney Laudig's letters dated March 15, 2021 and April 12, 2021.[144]   Instead, the SOH-Enforcement Branch affirmed its commitment to pursue enforcement claims against [David Keanu Sai] and [Kauʻi Sai-Dudoit] in violation of HAWAIIAN KINGDOM law, the *Supremacy Clause* and international humanitarian law.

136. The allegation by the Defendant STATE OF HAWAIʻI that HAWAIIAN KINGDOM government bonds, issued by the Council of Regency, are commercial bonds and subjected to the securities regulations is absurd. It would appear that the Defendant STATE OF HAWAIʻI has taken a dubious position that the Council of Regency is a not a government and that the

---

[144] Bruce A. Schoenberg to Stephen Laudig (April 15, 2021) (online at https://hawaiiankingdom.org/pdf/Schoenberg_to_Laudig_ltr_(4.15.21).pdf).

HAWAIIAN KINGDOM does not exist. This position runs counter to the Defendant UNITED STATES OF AMERICA's explicit recognition of the continuity of the HAWAIIAN KINGDOM, as a State, and its government— the Council of Regency, when arbitral proceedings were instituted at the Permanent Court of Arbitration on November 8, 1999, thereby triggering the *Supremacy Clause* that preempts any interference by the Defendant STATE OF HAWAIʻI.

137. While commercial bonds or securities "represent a share in a company or a debt owed by a company,"[145] a government bond is "[e]vidence of indebtedness issued by the government to finance its operations."[146] On its face, the HAWAIIAN KINGDOM is not a commercial entity or business and the bondholders, who submit an application to purchase government bonds, are aware that they are loaning money to the Hawaiian government 'to finance its operations.'[147]

138. In similar fashion to the conditional redemption of Irish bonds when Ireland was fighting for its independence from the United Kingdom,[148] Hawaiian

---

[145] Black's Law 1354 (6th ed., 1990).

[146] *Id.*, 179.

[147] Hawaiian Kingdom bonds, Frequently Asked Questions (online at https://hawaiiankingdom.org/bonds/).

[148] The Irish government sold bonds in the United States with the following condition, "Said Bond to bear interest at five percent per annum from the first day of the seventh month after the freeing of the territory of the Republic of Ireland

bonds shall be redeemable at par within 1 year after the 5th year from the date when the United States of America's military occupation of the Hawaiian Islands has come to an end and that the Hawaiian government is in effective control in the exercising of its sovereignty, as explicitly stated on the bond. HAWAIIAN KINGDOM bonds are authorized under *An Act To authorize a National Loan and to define the uses to which the money borrowed shall be applied* (1886). Under Section 1 of the Act, "The Minister of Finance with the approval of the King in Cabinet Council is hereby authorized to issue coupon bonds of the Hawaiian Government."

139.   The actions taken by Defendant STATE OF HAWAI'I against government officials of the HAWAIIAN KINGDOM—the occupied State, is also a violation of Article 54 of the Fourth Geneva Convention, which states, "[t]he Occupying Power may not…in any way apply sanctions to or take any measures of coercion or discrimination against them."[149] The Fourth Geneva Convention was ratified by the United States Senate on July 6, 1955 and came into force on February 2, 1956. As such, the Fourth Geneva Convention comes under the *Supremacy Clause*. Furthermore, as the U.S. Supreme Court stated in *Underhill v. Hernandez*, "[e]very sovereign state is bound to respect the

---

from Britain's military control and said Bond to be redeemable at par within one year thereafter."

[149] 6.3 U.S.T 3516, 3552 (1955).

independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."[150]

140.    The Council of Regency has not, and does not intend, to waive its sovereign immunity. In light of the awareness of the occupation by the aforementioned leadership of the Defendant STATE OF HAWAI'I, these allegations against Hawaiian government officials constitute malicious intent—*mens rea*. As pointed out by Professor Lenzerini, under the rules of international law, "the working relationship between the Regency and the administration of the occupying State would have the form of a cooperative relationship aimed at guaranteeing the realization of the rights and interests of the civilian population and the correct administration of the occupied territory."[151] These unwarranted attacks is a violation of the law of occupation, and as a proxy for Defendant UNITED STATES OF AMERICA, it also constitutes an internationally wrongful act.

---

[150] *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).
[151] Lenzerini, *Legal Opinion*, para. 20.

## CAUSE OF ACTION

### COUNT I

### (*Supremacy Clause*)

141. The foregoing allegations are realleged and incorporated by reference herein.

142. The *Supremacy Clause* prohibits the Defendant STATE OF HAWAIʻI from 'any curtailment or interference' of the Defendant UNITED STATES OF AMERICA's explicit recognition of the Council of Regency as the government of the HAWAIIAN KINGDOM.

143. As the government of the HAWAIIAN KINGDOM, the Council of Regency 'has the authority to represent the Hawaiian Kingdom as a State, which has been under a belligerent occupation by the United States of America since 17 January 1893, both at the domestic and international level…and is vested with the rights and powers recognized to governments of occupied States pursuant to international humanitarian law.'

144. The *Supremacy Clause* reserves foreign relations to the 'National Government' and, therefore, regulation of the sale of foreign government bonds "within" the United States where State statutes provide an exemption from registration of securities guaranteed by a foreign government which the United States maintains diplomatic relations. HAWAIIAN KINGDOM bonds

"within" Hawaiian territory are regulated by Hawaiian municipal laws and not U.S. municipal laws.

145.   The Council of Regency possesses the statutory power to issue Exchequer Bonds in accordance with *An Act To authorize a National Loan and to define the uses to which the money borrowed shall be applied* (1886).

146.   Through actions described in this Complaint, Defendant TY NOHARA has violated the *Supremacy Clause* and the 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation, the 1907 Hague Regulations, and the 1949 Fourth Geneva Convention. Defendant's violation inflicts ongoing harm to the officers of the Council of Regency and the sovereign interests of the HAWAIIAN KINGDOM within its own territory.

## CAUSE OF ACTION

## COUNT II

## (Usurpation of Sovereignty)

147.   The foregoing allegations are realleged and incorporated by reference herein.

148.   The 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation, the 1907 Hague Regulations and the 1949 Fourth Geneva Convention, prohibits the imposition of all laws of the United States and the State of Hawai'i and its Counties, to include the United States constitution, State of Hawai'i constitution, Federal and State of Hawai'i statutes, County

ordinances, common law, case law, and administrative law within the territory of the HAWAIIAN KINGDOM as an occupied State. As a neutral State, the 1907 Hague Convention, V, prohibits the maintenance of Defendant UNITED STATES OF AMERICA's military installations within the territory of the HAWAIIAN KINGDOM, which includes the territorial sea.

149.   In enacting and implementing the laws of the Defendant UNITED STATES OF AMERICA, to include the laws of Defendant STATE OF HAWAI'I and its Counties, *i.e.*, the United States constitution, State of Hawai'i constitution, Federal and State of Hawai'i statutes, County ordinances, common law, case law, and administrative law within the territory of the HAWAIIAN KINGDOM and the maintenance of Defendant UNITED STATES OF AMERICA's military installations are acts contrary to the *Supremacy Clause* of the U.S. Constitution whereby "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

150.   Furthermore, in enacting and implementing the laws of the United States, to include the laws of the State of Hawai'i and its Counties, *i.e.*, the United States constitution, State of Hawai'i constitution, Federal and State of Hawai'i statutes, County ordinances, common law, case law, administrative law, and

the maintenance of Defendant UNITED STATES OF AMERICA's military installations, Defendants JOSEPH ROBINETTE BIDEN JR., KAMALA HARRIS, ADMIRAL JOHN AQUILINO, CHARLES P. RETTIG, CHARLES E. SCHUMER, NANCY PELOSI, DAVID YUTAKE IGE, DAMIEN ELEFANTE, RICK BLANGIARDI, MITCH ROTH, MICHAEL VICTORINO, AND DEREK KAWAKAMI, RON KOUCHI, SCOTT SAIKI, TOMMY WATERS, TOMMY WATERS, ALICE L. LEE, and ARRYL KANESHIRO have exceeded their statutory authority, engaged in violating the 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation, the 1907 Hague Regulations, the 1907 Hague Convention, V, and the 1949 Fourth Geneva Convention, and has failed to comply with international humanitarian law by administering the laws of the HAWAIIAN KINGDOM, which include the 1864 constitution, statutes, common law, case law, and administrative law.

151. Through their actions described in this Complaint, Defendants have violated the substantive requirements of international humanitarian law. Defendants' violations inflict ongoing harm upon residents of the Hawaiian Islands, to include resident aliens, and the sovereign interests of the HAWAIIAN KINGDOM.

**CAUSE OF ACTION**

**COUNT III**

**(Pillaging and Destruction of Property)**

152.   The foregoing allegations are realleged and incorporated by reference herein.

153.   International humanitarian law prohibits pillaging and destruction of property through the collection of taxes that are exacted from the residents of the HAWAIIAN KINGDOM by the Internal Revenue Service of the Defendant UNITED STATES OF AMERICA and the Department of Taxation of the Defendant STATE OF HAWAI'I in violation of Article 8 of the 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation, Article 43 of the 1907 Hague Regulations, and Article 64 of the 1949 Fourth Geneva Convention.

154.   The Internal Revenue Service is an agency of the Defendant UNITED STATES OF AMERICA, and the Department of Taxation is an agency of the Defendant STATE OF HAWAI'I.

155.   International humanitarian law provides for the Defendant UNITED STATES OF AMERICA, as the occupying State, to collect taxes as provided under HAWAIIAN KINGDOM law and not the laws of the Defendant UNITED STATES OF AMERICA.

156. In implementing Defendant UNITED STATES OF AMERICA tax laws, these agencies have and continue to commit violations of the international criminal law of pillaging and destruction of property. This, among other actions by Defendants CHARLES P. RETTIG and DAMIEN ELEFANTE, impacts substantive rights of the civilian population whose rights are envisaged under Article 4 of the 1949 Geneva Convention, IV, as "protected persons."

157. Through their actions described in this Complaint, Defendants CHARLES P. RETTIG and DAMIEN ELEFANTE have violated international humanitarian law, which includes the 1949 Hawaiian-American Treaty of Friendship, Commerce and Navigation, the 1907 Hague Regulations, and the 1949 Fourth Geneva Convention. Defendants' violations inflict ongoing harm upon the residents of the Hawaiian Islands, to include resident aliens, and the sovereign interests of the HAWAIIAN KINGDOM.

**<u>CAUSE OF ACTION</u>**

**COUNT V**

**(Exequaturs)**

158. The foregoing allegations are realleged and incorporated by reference herein.

159.  §458 of the Hawaiian Civil Code requires foreign consulates to receive exequaturs from the Hawaiian Kingdom government and not from the government of the United States.

160.  International humanitarian law prohibits *usurpation of sovereignty* by granting exequaturs to foreign consulates under American municipal laws within the territory of the HAWAIIAN KINGDOM in violation of Article 8 of the 1849 Hawaiian-American Treaty of Friendship, Commerce and Navigation, Article 43 of the 1907 Hague Regulations, and Article 64 of the 1949 Fourth Geneva Convention.

161.  International humanitarian law provides for the United States, as the occupying State, to ensure that foreign consulates within the territory of the HAWAIIAN KINGDOM are in compliance with HAWAIIAN KINGDOM law and not the laws of the Defendant UNITED STATES OF AMERICA.

162.  Through their actions described in this Complaint, Defendants, JANE HARDY, JOHANN URSCHITZ, M. JAN RUMI, JEFFREY DANIEL LAU, ERIC G. CRISPIN, GLADYS VERNOY, ANN SUZUKI CHING, BENNY MADSEN, KATJA SILVERAA, GUILLAUME MAMAN, DENIS SALLE, KATALIN CSISZAR, SHEILA WATUMULL, MICHELE CARBONE, YUTAKA AOKI, JEAN-CLAUDE DRUI, ANDREW M. KLUGER, HENK ROGERS, KEVIN BURNETT, NINA HAMRE FASI, JOSELITO A.

JIMENO, BOZENA ANNA JARNOT, TYLER DOS SANTOS-TAM, R.J. ZLATOPER, HONG, SEOK-IN, JOHN HENRY FELIX, BEDE DHAMMIKA COORAY, ANDERS G.O. NERVELL, THERES RYF DESAI, and COLIN T. MIYABARA, who are foreign Consuls in the territory of the HAWAIIAN KINGDOM, have violated international humanitarian law, which includes the 1907 Hague Regulations, the 1949 Fourth Geneva Convention, the 1851 Hawaiian-British Treaty, the 1875 Hawaiian-Austro/Hungarian Treaty, the 1862 Hawaiian-Belgian Treaty, the 1846 Hawaiian-Danish Treaty, the 1857 Hawaiian-French Treaty, the 1879 Hawaiian-German Treaty, 1863 Hawaiian-Italian Treaty, the 1871 Hawaiian-Japanese Treaty, the 1862 Hawaiian-Dutch Treaty, the 1852 Hawaiian-Norwegian/Swedish Treaty, the 1882 Hawaiian-Portuguese Treaty, the 1863 Hawaiian-Spanish Treaty, the 1864 Hawaiian-Swiss Treaty, and the principles of international law. Defendants have violated the sovereign interests of the HAWAIIAN KINGDOM.

## **PRAYER FOR RELIEF**

163.   WHEREFORE, the HAWAIIAN KINGDOM prays that the Court:

a.   Declare that all laws of the Defendants UNITED STATES OF AMERICA and the STATE OF HAWAIʻI and its Counties, to include the United States constitution, State of Hawaiʻi constitution, Federal

and State of Hawai'i statutes, County ordinances, common law, case law, administrative law, and the maintenance of Defendant UNITED STATES OF AMERICA's military installations are unauthorized by, and contrary to, the Constitution and Treaties of the United States;

b. Enjoin Defendants from implementing or enforcing all laws of the Defendants UNITED STATES OF AMERICA and the STATE OF HAWAI'I and its Counties, to include the United States constitution, State of Hawai'i constitution, Federal and State of Hawai'i statutes, County ordinances, common law, case law, administrative law, and the maintenance of Defendant UNITED STATES OF AMERICA's military installations across the territory of the HAWAIIAN KINGDOM, to include its territorial sea;

c. Enjoin Defendants who are or agents of foreign diplomats from serving as foreign consulates within the territorial jurisdiction of the HAWAIIAN KINGDOM until they have presented their credentials to the HAWAIIAN KINGDOM Government and received exequaturs; and

d. Award such additional relief as the interests of justice may require.

91

DATED:      Honolulu, Hawai'i, May 20, 2021.

Respectfully submitted,


/s/ Dexter K. Ka'iama


DEXTER K. KA'IAMA (Bar No. 4249)
Attorney General of the Hawaiian Kingdom

DEPARTMENT OF THE ATTORNEY
GENERAL, HAWAIIAN KINGDOM

*Attorney for Plaintiff, Hawaiian Kingdom*