# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| HAWAIIAN KINGDOM,<br><br>   Plaintiff,<br><br>  v.<br><br>JOSEPH ROBINETTE BIDEN JR., in his official capacity as President of the United States; KAMALA HARRIS, in her official capacity as Vice-President and President of the United States Senate; ADMIRAL JOHN AQUILINO, in his official capacity as Commander, U.S. Indo-Pacific Command; CHARLES P. RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; JANE HARDY, in her official capacity as Australia's Consul General to Hawaiʻi and the United Kingdom's Consul to Hawaiʻi; JOHANN URSCHITZ, in his official capacity as Austria's Honorary Consul to Hawaiʻi; M. JAN RUMI, in his official capacity as Bangladesh's Honorary Consul to Hawaiʻi and Morocco's Honorary Consul to Hawaiʻi; JEFFREY DANIEL LAU, in his official capacity as Belgium's Honorary Consul to Hawaiʻi; ERIC G. CRISPIN, in his official capacity as Brazil's Honorary Consul to Hawaiʻi; GLADYS VERNOY, in her official capacity as Chile's Honorary Consul General to Hawaiʻi; ANN SUZUKI CHING, in her official capacity as the Czech Republic's Honorary Consul to Hawaiʻi; BENNY MADSEN, in his official capacity | Civil Action No.<br><br>DECLARATION OF PROFESSOR FEDERICO LENZERINI |

as Denmark's Honorary Consul to Hawaiʻi; KATJA SILVERAA, in her official capacity as Finland's Honorary Consul to Hawaiʻi; GUILLAUME MAMAN, in his official capacity as France's Honorary Consul to Hawaiʻi; DENIS SALLE, in his official capacity as Germany's Honorary Consul to Hawaiʻi; KATALIN CSISZAR, in her official capacity as Hungary's Honorary Consul to Hawaiʻi; SHEILA WATUMULL, in her official capacity as India's Honorary Consul to Hawaiʻi; MICHELE CARBONE, in his official capacity as Italy's Honorary Consul to Hawaiʻi; YUTAKA AOKI, in his official capacity as Japan's Consul General to Hawaiʻi; JEAN-CLAUDE DRUI, in his official capacity as Luxembourg's Honorary Consul to Hawaiʻi; ANDREW M. KLUGER, in his official capacity as Mexico's Honorary Consul to Hawaiʻi; HENK ROGERS, in his official capacity as Netherland's Honorary Consul to Hawaiʻi; KEVIN BURNETT, in his official capacity as New Zealand's Consul General to Hawaiʻi; NINA HAMRE FASI, in her official capacity as Norway's Honorary Consul to Hawaiʻi; JOSELITO A. JIMENO, in his official capacity as the Philippines's Consul General to Hawaiʻi; BOZENA ANNA JARNOT, in her official capacity as Poland's Honorary Consul to Hawaiʻi; TYLER DOS SANTOS-TAM, in his official capacity as Portugal's Honorary Consul to Hawaiʻi; R.J. ZLATOPER, in his official capacity as Slovenia's Honorary Consul to Hawaiʻi; HONG, SEOK-IN, in his official capacity as the Republic of South Korea's Consul General to Hawaiʻi; JOHN HENRY FELIX, in his official capacity as Spain's Honorary Consul to Hawaiʻi; BEDE

DHAMMIKA COORAY, in his official capacity as Sri Lanka's Honorary Consul to Hawai'i; ANDERS G.O. NERVELL, in his official capacity as Sweden's Honorary Consul to Hawai'i; THERES RYF DESAI, in her official capacity as Switzerland's Honorary Consul to Hawai'i; COLIN T. MIYABARA, in his official capacity as Thailand's Honorary Consul to Hawai'i; DAVID YUTAKA IGE, in his official capacity as Governor of the State of Hawai'i; TY NOHARA, in her official capacity as Commissioner of Securities; DAMIEN ELEFANTE, in his official capacity as the acting director of the Department of Taxation of the State of Hawai'i; RICK BLANGIARDI, in his official capacity as Mayor of the City & County of Honolulu; MITCH ROTH, in his official capacity as Mayor of the County of Hawai'i; MICHAEL VICTORINO, in official capacity as Mayor of the County of Maui; DEREK KAWAKAMI, in his official capacity as Mayor of the County of Kaua'i; CHARLES E. SCHUMER, in his official capacity as U.S. Senate Majority Leader; NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives; RON KOUCHI, in his official capacity as Senate President of the State of Hawai'i;  SCOTT SAIKI, in his official capacity as Speaker of the House of Representatives of the State of Hawai'i; TOMMY WATERS, in his official capacity as Chair and Presiding Officer of the County Council for the City and County of Honolulu; MAILE DAVID, in her official capacity as Chair of the Hawai'i County Council; ALICE L. LEE, in her official capacity as Chair of the Maui County

Council; ARRYL KANESHIRO, in his official capacity as Chair of the Kauaʻi County Council; the UNITED STATES OF AMERICA; the STATE OF HAWAIʻI; the CITY & COUNTY OF HONOLULU; the COUNTY OF HAWAIʻI; the COUNTY OF MAUI; and the COUNTY OF KAUAʻI,

Defendants.

# **DECLARATION OF PROFESSOR FEDERICO LENZERINI**

**Exhibit 2**

## DECLARATION OF PROFESSOR FEDERICO LENZERINI

I, Federico Lenzerini, declare the following:

1. I am an Italian citizen residing in Siena, Italy. I am the author of the legal opinion on the authority of the Council of Regency of the Hawaiian Kingdom dated 24 May 2020, which a true and correct copy of the same is attached hereto.

2. I have a Ph.D. in international law and I am a Professor of International Law, University of Siena, Italy, Department of Political and International Sciences. For further information see https://docenti.unisi.it/it/lenzerini. I can be contacted at federico.lenzerini@unisi.it.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: Siena, Italy, 13 May 2021.

Professor Federico Lenzerini

### LEGAL OPINION ON THE AUTHORITY OF THE COUNCIL OF REGENCY OF THE HAWAIIAN KINGDOM

PROFESSOR FEDERICO LENZERINI[*]

As requested in the Letter addressed to me, on 11 May 2020, by Dr. David Keanu Sai, Ph.D., Head of the Hawaiian Royal Commission of Inquiry, I provide below a legal opinion in which I answer the three questions included in the above letter, for purposes of public awareness and clarification of the Regency's authority.

### a) Does the Regency have the authority to represent the Hawaiian Kingdom as a State that has been under a belligerent occupation by the United States of America since 17 January 1893?

1. In order to ascertain whether the Regency has the authority to represent the Hawaiian Kingdom *as a State*, it is preliminarily necessary to ascertain whether the Hawaiian Kingdom can actually be considered a State under international law. To this purpose, two issues need to be investigated, i.e.: a) whether the Hawaiian Kingdom was a State at the time when it was militarily occupied by the United States of America, on 17 January 1893; b) in the event that the solution to the first issue would be positive, whether the continuous occupation of Hawai'i by the United States, from 1893 to present times, has led the Hawaiian Kingdom to be extinguished as an independent State and, consequently, as a subject of international law.

2. With respect to the first of the abovementioned issues, as acknowledged by the Arbitral Tribunal of the Permanent Court of Arbitration (PCA) in the *Larsen* case, "in the nineteenth century the Hawaiian Kingdom existed as an independent State recognized as such by the United States of America, the United Kingdom and various other States, including by exchanges of diplomatic or consular representatives and the conclusion of treaties."[1] At the time of the American occupation, the Hawaiian Kingdom fully satisfied the four elements of statehood prescribed by customary international law, which were later codified by the *Montevideo Convention on the Rights and Duties of States* in 1933[2]: a) a permanent population; b) a defined territory; c) government; and d) capacity to enter into relations with the other states. This is confirmed by the fact that

> "the Hawaiian Kingdom became a full member of the Universal Postal Union on 1 January 1882, maintained more than a hundred legations and consulates throughout the world, and entered into extensive diplomatic and treaty relations with other States that included Austria-Hungary,

---

[*] Ph.D., International Law. Professor of International Law, University of Siena (Italy), Department of Political and International Sciences. For further information see <https://docenti.unisi.it/it/lenzerini> The author can be contacted at federico.lenzerini@unisi.it

[1] See *Larsen v. Hawaiian Kingdom*, 119 *International Law Reports*, 2001, 566, at 581.

[2] See *Montevideo Convention on the Rights and Duties of States*, 1933, 165 *LNTS* 19, Article 1. This article codified the so-called *declarative* theory of statehood, already accepted by customary international law; see Thomas D. Grant, "Defining Statehood: The Montevideo Convention and its Discontents", 37 *Columbia Journal of Transnational Law*, 1998-1999, 403; Joshua Castellino, *International Law and Self-Determination: The Interplay of the Politics of Territorial Possession with Formulations of Post-Colonial 'National' Identity*", The Hague/Boston/London, 2000, at 77; David J. Harris (ed.), *Cases and Materials on International Law*, 6th Ed., London, 2004, at 99.

    Belgium, Bremen, Denmark, France, Germany, Great Britain, Hamburg, Italy, Japan, Netherlands, Portugal, Russia, Spain, Sweden-Norway, Switzerland and the United States".[3]

It is therefore unquestionable that **in the 1890s the Hawaiian Kingdom was an independent State and, consequently, a subject of international law**. This presupposed that its territorial sovereignty and internal affairs could not be legitimately violated by other States.

3. Once established that the Hawaiian Kingdom was actually a State, under international law, at the time when it was militarily occupied by the United States of America, on 17 January 1893, it is now necessary to determine whether the continuous occupation of Hawai'i by the United States from 1893 to present times has led the Hawaiian Kingdom to be extinguished as an independent State and, consequently, as a subject of international law. This issue is undoubtedly controversial, and may be considered according to different perspectives. As noted by the Arbitral Tribunal established by the PCA in the *Larsen* case, in principle the question in point might be addressed by means of a careful assessment carried out through "having regard *inter alia* to the lapse of time since the annexation [by the United States], subsequent political, constitutional and international developments, and relevant changes in international law since the 1890s".[4]

4. However – beyond all speculative argumentations and the consequential conjectures that might be developed depending on the different perspectives under which the issue in point could be addressed – in reality the argument which appears to overcome all the others is that a long-lasting and well-established rule of international law exists establishing that military occupation, irrespective of the length of its duration, *cannot* produce the effect of extinguishing the sovereignty and statehood of the occupied State. In fact, the validity of such a rule has *not* been affected by whatever changes occurred in international law since the 1890s. Consistently, as emphasized by the Swiss arbitrator Eugène Borel in 1925, in the famous *Affaire de la Dette publique ottomane*,

    "[q]uels que soient les effets de l'occupation d'un territoire par l'adversaire avant le rétablissement de la paix, il est certain qu'à elle seule cette occupation ne pouvait opérer juridiquement le transfert de souveraineté […] L'occupation, par l'un des belligérants, de […] territoire de l'autre belligérant est un pur fait. C'est un état de choses essentiellement provisoire, qui ne substitue pas légalement l'autorité du belligérant envahisseur à celle du belligérant envahi".[5]

This position was confirmed by, among others, the US Military Tribunal at Nuremberg in 1948, holding that "[i]n belligerent occupation the occupying power does not hold enemy territory by virtue of any legal right. On the contrary, it merely exercises a precarious and temporary actual control".[6] Indeed, as noted, much more recently, by Yoram Dinstein, "occupation does not affect sovereignty. The displaced sovereign loses possession of the occupied territory de facto but it retains title *de jure* [i.e. "as a matter of law"]".[7] In this regard, as previously specified, this

---

[3] See David Keanu Sai, "Hawaiian Constitutional Governance", in David Keanu Sai (ed.), *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations in the Hawaiian Kingdom*, Honolulu, 2020, 58, at 64 (footnotes omitted).
[4] See *Larsen v. Hawaiian Kingdom*, supra n. 1, at 9.2.
[5] See *Affaire de la Dette publique ottomane (Bulgarie, Irak, Palestine, Transjordanie, Grèce, Italie et Turquie)*, 18 April 1925, *Reports of International Arbitral Awards*, Volume I, 529, also available at <https://legal.un.org/riaa/cases/vol_I/529-614.pdf> (accessed on 16 May 2020), at 555 ("whatever are the effects of the occupation of a territory by the enemy before the re-establishment of peace, it is certain that such an occupation alone cannot legally determine the transfer of sovereignty […] The occupation, by one of the belligerents, of […] the territory of the other belligerent is nothing but a pure fact. It is a state of things essentially provisional, which does not legally substitute the authority of the invading belligerent to that of the invaded belligerent").
[6] See *USA v. Otto Ohlendorf et al. (Einsatzgruppen Trial)*, 10 April 1948, (1948) *LRTWC* 411, at 492.
[7] See Yoram Dinstein, *The International Law of Belligerent Occupation*, 2nd Ed., Cambridge, 2019, at 58.

    conclusion can in no way be influenced by the length of the occupation in time, as "[p]rolongation of the occupation does not affect its innately temporary nature".[8] It follows that "'precarious' as it is, the sovereignty of the displaced sovereign over the occupied territory is not terminated" by belligerent occupation.[9] Under international law, "le transfert de souveraineté ne peut être considéré comme effectué juridiquement que par l'entrée en vigueur du Traité qui le stipule et à dater du jour de cette mise en vigueur",[10] which means, in the words of the famous jurist Oppenheim, that "[t]he only form in which a cession [of sovereignty] can be effected is an agreement embodied in a treaty between the ceding and the acquiring State. Such treaty may be the outcome of peaceable negotiations or of war".[11] Such a conclusion corresponds to "a universally recognized rule which is endorsed by jurists and confirmed by numerous rulings of international and national courts".[12]

5. The United States has taken possession of the territory of Hawai'i solely through de facto occupation and unilateral annexation, without concluding any treaty with the Hawaiian Kingdom. Furthermore, it appears that such an annexation has taken place in contravention of the rule of *estoppel*. At it is known, in international law "the doctrine of estoppel protects legitimate expectations of States induced by the conduct of another State".[13] On 18 December 1893 President Cleveland concluded with Queen Lili'uokalani a treaty, by executive agreement, which obligated the President to restore the Queen as the Executive Monarch, and the Queen thereafter to grant clemency to the insurgents.[14] Such a treaty, which was never carried into effect by the United States, would have precluded the latter from claiming to have acquired Hawaiian territory, because it had evidently induced in the Hawaiian Kingdom the legitimate expectation that the sovereignty of the Queen would have been reinstated, an expectation which was unduly frustrated through the annexation. It follows from the foregoing that, according to a plain and correct interpretation of the relevant legal rules, **the Hawaiian Kingdom cannot be considered, by virtue of the prolonged US occupation, as extinguished as an independent State and a subject of international law**, despite the long and effective exercise of the attributes of government by the United States over Hawaiian territory.[15] In fact, in the event of illegal annexation, "the legal existence of […] States [is] preserved from extinction",[16] since "illegal occupation cannot of itself terminate statehood".[17] The possession of the attribute of statehood by the Hawaiian Kingdom was substantially confirmed by the PCA, which, before establishing the Arbitral Tribunal for the *Larsen* case, had to get assured that one of the parties of the arbitration was a State, as a necessary precondition for its jurisdiction to exist. In

---

[8] Ibid.

[9] Ibid. (footnotes omitted). See also, consistently, Peter M.R. Stirk, *The Politics of Military Occupation*, Edinburgh, 2009, at 168 and 230.

[10] See *Affaire de la Dette publique ottomane*, *supra* n. 5, at 555 ("the transfer of sovereignty can only be considered legally effected by the entry into force of a treaty which establishes it and from the date of such entry into force").

[11] See Lassa FL Oppenheim, *Oppenheim's International Law*, 7th Ed., vol. 1, 1948, at 500.

[12] See Jean S. Pictet, *Commentary on the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War of 12 August 1949*, Geneva, 1958, at 275.

[13] See Thomas Cottier, Jörg Paul Müller, "Estoppel", *Max Planck Encyclopedias of International Law*, April 2007, available at <https://opil.ouplaw.com/view/10.1093/law:epil/9780199231690/law-9780199231690-e1401> (accessed on 20 May 2020).

[14] See United States House of Representatives, 53rd Congress, *Executive Documents on Affairs in Hawai'i: 1894-95*, 1895, at 1269, available at <https://hawaiiankingdom.org/pdf/Willis_to_Gresham_(12.20.1893).pdf> (accessed on 20 May 2020).

[15] In this respect, it is to be emphasized that "a sovereign State would continue to exist despite its government being overthrown by military force"; see David Keanu Sai, "The Royal Commission of Inquiry", in David Keanu Sai (ed.), *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations in the Hawaiian Kingdom*, Honolulu, 2020, 12, at 14.

[16] See James Crawford, *The Creation of States in International Law*, 2nd Ed., Oxford, 2006, at 702.

[17] See Ian Brownlie, *Principles of Public International Law*, 7th Ed., Oxford, 2008, at 78.

that case, the Hawaiian Kingdom was actually qualified as a "State", while the Claimant – Lance Paul Larsen – as a "Private entity."[18]

6. The conclusion according to which the Hawaiian Kingdom cannot be considered as having been extinguished – as a State – as a result of the American occupation also allows to confirm, *de plano*, that the Hawaiian Kingdom, as an independent State, **has been under uninterrupted belligerent occupation by the United States of America, from 17 January 1893 up to the moment of this writing**. This conclusion cannot be validly contested, even by virtue of the hypothetical consideration according to which, since the American occupation of Hawai'i has not substantially involved the use of military force, and has not encountered military resistance by the Hawaiian Kingdom,[19] it consequently could not be considered as "belligerent". In fact, a territory is considered occupied "when it is placed under the authority of the hostile army […] The law on occupation applies to all cases of partial or total occupation, even if such occupation does not encounter armed resistance. The essential ingredient for applicability of the law of occupation is therefore the actual control exercised by the occupying forces".[20] This is consistent with the rule expressed in Article 42 of the Regulations annexed to the *Hague Convention (IV) respecting the Laws and Customs of War on Land* of 1907 – affirming that a "[t]erritory is considered occupied when it is actually placed under the authority of the hostile army" – as well as with Article 2 common to the four Geneva Conventions of 1949, establishing that such Conventions apply "to all cases of partial or total occupation of the territory of a High Contracting Party, *even if the said occupation meets with no armed resistance*" (emphasis added).

7. Once having ascertained that, under international law, the Hawaiian Kingdom continues to exist as an independent State, it is now time to assess the legitimacy and powers of the Regency. According to the *Lexico Oxford Dictionary*, a "regency" is "[t]he office of or period of government by a regent".[21] In a more detailed manner, the *Black's Law Dictionary*, which is the most trusted and widely used legal dictionary in the United States, defines the term in point as "[t]he man or body of men intrusted with the vicarious government of a kingdom during the minority, absence, insanity, or other disability of the king".[22] Therefore, it appears that, in consideration of the current situation of the Hawaiian Kingdom, a regency is the right body entitled to provisionally exercise the powers of the Hawaiian Executive Monarch in the absence of the latter, an absence which forcibly continues at present due to the persistent situation of military occupation to which the Hawaiian territory is subjected.

8. In legal terms, the legitimacy of the Hawaiian Council of Regency is grounded on Articles 32 and 33 of the *Hawaiian Kingdom Constitution* of 1864. In particular, Article 32 states that "[w]henever, upon the decease of the Reigning Sovereign, the Heir shall be less than eighteen years of age, the Royal Power shall be exercised by a Regent Council of Regency; as hereinafter provided". As far as Article 33 is concerned, it affirms that

> "[i]t shall be lawful for the King at any time when he may be about to absent himself from the Kingdom, to appoint a Regent or Council of Regency, who shall administer the Government in

---

[18] See <https://pcacases.com/web/view/35> (accessed on 16 May 2020).

[19] It is to be noted, in this respect, that no armed resistance was opposed to the occupation despite the fact that, as acknowledged by US President Cleveland, the Queen "had at her command at least five hundred fully armed men and several pieces of artillery. Indeed, the whole military force of her kingdom was on her side and at her disposal"; see United States House of Representatives, 53rd Congress, *Executive Documents on Affairs in Hawai'i: 1894-95*, 1895, at 453, available at <https://hawaiiankingdom.org/pdf/Willis_to_Gresham_(12.20.1893).pdf> (accessed on 20 May 2020).

[20] See International Committee of the Red Cross, "The Law of Armed Conflict. Belligerent Occupation", Geneva, June 2002, available at <https://www.icrc.org/en/doc/assets/files/other/law9_final.pdf> (accessed on 17 May 2020), at 3.

[21] See <https://www.lexico.com/en/definition/regency> (accessed on 17 May 2020).

[22] See <https://thelawdictionary.org/regency/> (accessed on 17 May 2020).

> His name; and likewise the King may, by His last Will and Testament, appoint a Regent or Council of Regency to administer the Government during the minority of any Heir to the Throne; and should a Sovereign decease, leaving a Minor Heir, and having made no last Will and Testament, the Cabinet Council at the time of such decease shall be a Council of Regency, until the Legislative Assembly, which shall be called immediately, may be assembled, and the Legislative Assembly immediately that it is assembled shall proceed to choose by ballot, a Regent of Council of Regency, who shall administer the Government in the name of the King, and exercise all the powers which are Constitutionally vested in the King, until he shall have attained the age of eighteen years, which age is declared to be the Legal Majority of such Sovereign".

The Council of Regency was established by proclamation on February 28, 1997, by virtue of the offices made vacant in the Cabinet Council, on the basis of the doctrine of necessity, the application of which was justified by the absence of a Monarch. Therefore, **the Council of Regency possesses the constitutional authority to temporarily exercise the Royal powers of the Hawaiian Kingdom**. The Council of Regency, composed by *de facto* officers, is actually serving as the provisional government of the Hawaiian Kingdom, and, should the military occupation come to an end, it shall immediately convene the Legislative Assembly, which "shall proceed to choose by ballot, a Regent of Council of Regency, who shall administer the Government in the name of the King, and exercise all the powers which are Constitutionally vested in the King" until it shall not be possible to nominate a Monarch, pursuant to Article 33 of the Hawaiian Kingdom Constitution of 1864.

9. In light of the foregoing – particularly in consideration of the fact that, under international law, the Hawaiian Kingdom continues to exist as an independent State, although subjected to a foreign occupation, and that the Council of Regency has been established consistently with the constitutional principles of the Hawaiian Kingdom and, consequently, possesses the legitimacy of temporarily exercising the functions of the Monarch of the Kingdom – it is possible to conclude that **the Regency actually has the authority to represent the Hawaiian Kingdom as a State, which has been under a belligerent occupation by the United States of America since 17 January 1893, both at the domestic and international level**.

   b) *Assuming the Regency does have the authority, what effect would its proclamations have on the civilian population of the Hawaiian Islands under international humanitarian law, to include its proclamation recognizing the State of Hawai'i and its Counties as the administration of the occupying State on 3 June 2019?*

10. As previously ascertained, the Council of Regency actually possesses the constitutional authority to temporarily exercise the Royal powers of the Hawaiian Kingdom and, consequently, has the authority to represent the Hawaiian Kingdom as a State pending the American occupation and, in any case, up to the moment when it shall be possible to convene the Legislative Assembly pursuant to Article 33 of the Hawaiian Kingdom Constitution of 1864. This means that **the Council of Regency is exactly in the same position of a government of a State under military occupation, and is vested with the rights and powers recognized to governments of occupied States pursuant to international humanitarian law**.

11. In principle, however, such rights and powers are quite limited, by reason of the fact that the governmental authority of a government of a State under military occupation has been replaced by that of the occupying power, "[t]he authority of the legitimate power having in fact passed into the

hands of the occupant".[23] At the same time, the ousted government retains the function and the duty of, to the extent possible, preserving order, protecting the rights and prerogatives of local people and continuing to promote the relations between its people and foreign countries. In the *Larsen* case, the claimant even asserted that the Council of Regency had "an obligation and a responsibility under international law, to take steps to protect Claimant's nationality as a Hawaiian subject";[24] the Arbitral Tribunal established by the PCA, however, did not provide a response regarding this claim. In any event, leaving aside the latter specific aspect, in light of its position the Council of Regency may to a certain extent interact with the exercise of the authority by the occupying power. This is consistent with the fact that the occupant is under an international obligation to "take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country".[25] Indeed, as noted by the eminent jurist Robert Y. Jennings in an influential article published in 1946,[26] one of the main purposes of the law of belligerent occupation is to protect the sovereign rights of the legitimate government of the occupied territory, and the obligations of the occupying power in this regard continue to exist "even when, in disregard of the rules of international law, it claims […] to have annexed all or part of an occupied territory".[27] It follows that, the ousted government being the entity which represents the "legitimate government" of the occupied territory, it may "attempt to influence life in the occupied area out of concern for its nationals, to undermine the occupant's authority, or both. One way to accomplish such goals is to legislate for the occupied population".[28] In fact, "occupation law does not require an exclusive exercise of authority by the Occupying Power. It allows for authority to be shared by the Occupying Power and the occupied government, provided the former continues to bear the ultimate and overall responsibility for the occupied territory".[29] While in several cases occupants have maintained the inapplicability to the occupied territory of new legislation enacted by the occupied government, for the reason that it "could undermine their authority […] the majority of post-World War II scholars, also relying on the practice of various national courts, have agreed that the occupant should give effect to the sovereign's new legislation as long as it addresses those issues in which the occupant has no power to amend the local law, most notably in matters of personal status".[30] The Swiss Federal Tribunal has even held that "[e]nactments by the [exiled government] are constitutionally laws of the [country] and applied *ab initio* to the territory occupied […] even though they could not be effectively implemented until the liberation".[31] Although this position was taken with specific regard to exiled governments, and the Council of Regency was not established *in exile* but *in situ*, the conclusion, to the extent that it is considered valid, would not substantially change as regards the Council of Regency itself.

12. It follows from the foregoing that, under international humanitarian law, **the proclamations of the Council of Regency are not divested of effects as regards the civilian population of the Hawaiian Islands**. In fact, considering these proclamations as included in the concept of "legislation" referred

---

[23] See Article 43 of the Regulations annexed to the Hague Convention (IV) respecting the Laws and Customs of War on Land of 1907.
[24] See *Larsen v. Hawaiian Kingdom*, *supra* n. 1, at 12.8.
[25] See Article 43 of the Regulations annexed to the Hague Convention (IV) respecting the Laws and Customs of War on Land of 1907.
[26] See "Government in Commission", 23 *British Year Book of International Law*, 1946, 112.
[27] See Pictet, *Commentary on the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War of 12 August 1949*, *supra* n. 12, at 276.
[28] See Eyal Benvenisti, *The International Law of Occupation*, 2nd Ed., Oxford, 2012, at 104.
[29] See Philip Spoerri, "The Law of Occupation", in Andrew Clapham and Paola Gaeta (eds.), *The Oxford Handbook of International Law in Armed Conflict*, Oxford, 2014, 182, at 190.
[30] See Benvenisti, *The International Law of Occupation*, *supra* n. 28, at 104-105.
[31] See *Ammon v. Royal Dutch Co.*, 21 *International Law Reports*, 1954, 25, at 27.

to in the previous paragraph,[32] they might even, if the concrete circumstances of the case so allow, apply retroactively at the end of the occupation, irrespective of whether or not they must be respected by the occupying power during the occupation, on the condition that the legislative acts in point do not "disregard the rights and expectations of the occupied population".[33] It is therefore necessary that the occupied government refrains "from using the national law as a vehicle to undermine public order and civil life in the occupied area".[34] In other words, in exercising the legislative function during the occupation, the ousted government is subjected to the condition of not undermining the rights and interests of the civilian population. However, once the latter requirement is actually respected, the proclamations of the ousted government – including, in the case of Hawai'i, those of the Council of Regency – may be considered applicable to local people, unless such applicability is explicitly refuted by the occupying authority, in its position of an entity bearing "the ultimate and overall responsibility for the occupied territory".[35] In this regard, however, it is reasonable to assume that the occupying power should not deny the applicability of the above proclamations when they do not undermine, or significantly interfere with the exercise of, its authority. This would be consistent with the obligation of the occupying power "to maintain the status quo ante (i.e. as it was before) in the occupied territory as far as is practically possible",[36] considering that local authorities are better placed to know what are the actual needs of the local population and of the occupied territory, in view of guaranteeing that the status quo ante is effectively maintained.

13. As regards, specifically, the Council of Regency's Proclamation recognizing the State of Hawai'i and its Counties as the administration of the occupying State of 3 June 2019,[37] it reads as follows:

> "Whereas, in order to account for the present circumstances of the prolonged illegal occupation of the Hawaiian Kingdom and to provide a temporary measure of protection for its territory and the population residing therein, the public safety requires action to be taken in order for the State of Hawai'i and its Counties to begin to comply with the 1907 Hague Convention, IV, the 1949 Geneva Convention, IV, and international humanitarian law:
> Now, therefore, We, the acting Council of Regency of the Hawaiian Kingdom, serving in the absence of the Monarch and temporarily exercising the Royal Power of the Kingdom, do hereby recognize the State of Hawai'i and its Counties, for international law purposes, as the administration of the Occupying Power whose duties and obligations are enumerated in the 1907 Hague Convention, IV, the 1949 Geneva Convention, IV, and international humanitarian law;
> And, We do hereby further proclaim that the State of Hawai'i and its Counties shall preserve the sovereign rights of the Hawaiian Kingdom government, and to protect the local population from exploitation of their persons and property, both real and personal, as well as their civil and political rights under Hawaiian Kingdom law".

---

[32] This is consistent with the assumption that the expression "laws in force in the country", as used by Article 43 of the Regulations annexed to the Hague Convention (IV) respecting the Laws and Customs of War on Land of 1907 (see *supra*, text corresponding to n. 25), "refers not only to laws in the strict sense of the word, but also to the constitution, decrees, ordinances, court precedents […] as well as administrative regulations and executive orders"; see Marco Sassòli, "Legislation and Maintenance of Public Order and Civil Life by Occupying Powers", 16 *European Journal of International Law*, 2005, 661, at 668-69.
[33] See Benvenisti, *The International Law of Occupation*, *supra* n. 28, at 105.
[34] Ibid., at 106.
[35] See *supra*, text corresponding to n. 29.
[36] See International Committee of the Red Cross, "The Law of Armed Conflict. Belligerent Occupation", *supra* n. 20, at 9.
[37] Available at <https://www.hawaiiankingdom.org/pdf/Proc_Recognizing_State_of_HI.pdf> (accessed on 18 May 2020).

As it is evident from a plain reading of its text, this Proclamation pursues the clear purpose of ensuring the protection of the Hawaiian territory and the people residing therein against the prejudicial effects which may arise from the occupation to which such a territory is actually subjected. Therefore, it represents a legislative act aimed at furthering the interests of the civilian population through ensuring the correct administration of their rights and of the land. As a consequence, it has the nature of an act that is equivalent, in its rationale and purpose (although not in its precise subject), to a piece of legislation concerning matters of personal status of the local population, requiring the occupant to give effect to it.[38] It is true that the Proclamation of 3 June 2019 takes a precise position on the status of the occupying power, the State of Hawai'i and its Counties being a direct emanation of the United States of America. However, in doing so, the said Proclamation simply reiterates an aspect that is self-evident, since the fact that the State of Hawai'i and its Counties belong to the political organization of the occupying power, and that they are de facto administering the Hawaiian territory, is objectively irrefutable. It follows that the Proclamation in discussion simply restates rules already existing under international humanitarian law. In fact, the latter clearly establishes the obligation of the occupying power to preserve the sovereign rights of the occupied government (as previously ascertained in this opinion),[39] the "overarching principle [of the law of occupation being] that an occupant does not acquire sovereignty over an occupied territory and therefore any occupation must only be a temporary situation".[40] Also, it is beyond any doubts that an occupying power is bound to guarantee and protect the human rights of the local population, as defined by the international human rights treaties of which it is a party as well as by customary international law. This has been authoritatively confirmed, *inter alia*, by the International Court of Justice.[41] While the Proclamation makes reference to the duty of the State of Hawai'i and its Counties to protect the human rights of the local population "under Hawaiian Kingdom law", and not pursuant to applicable international law, this is consistent with the obligation of the occupying power to respect, to the extent possible, the law in force in the occupied territory. In this regard, respecting the domestic laws which protect the human rights of the local population undoubtedly falls within "the extent possible", because it certainly does not undermine, or significantly interfere with the exercise of, the authority of the occupying power, and is consistent with existing international obligations. In other words, the occupying power cannot be considered "absolutely prevented"[42] from applying the domestic laws protecting the human rights of the local population, unless it is demonstrated that the level of protection of human rights guaranteed by Hawaiian Kingdom law is less advanced than human rights standards established by international law. Only in this case, the occupying power would be under a duty to ensure in favour of the local population the higher level of protection of human rights guaranteed by international law. In sum, **the Council of Regency's Proclamation of 3 June 2019 may be considered as a domestic act implementing international rules at the internal level,**

---

[38] See *supra* text corresponding to n. 30.

[39] See, in particular, *supra*, para. 11.

[40] See United Nations, Officer of the High Commissioner of Human Rights, "Belligerent Occupation: Duties and Obligations of Occupying Powers", September 2017, available at <https://www.humanitarianresponse.info/sites/www.humanitarianresponse.info/files/documents/files/ohchr_syria_-_belligerent_occupation_-_legal_note_en.pdf> (accessed on 19 May 2020), at 3.

[41] See, in particular, *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion of 9 July 2004, *ICJ Reports*, 2004, at 111-113; *Case Concerning Armed Activities on the Territory of the Congo (Democratic Republic of Congo v. Uganda)*, Judgement of 19 December 2005, at 178. For a more comprehensive assessment of this issue see Federico Lenzerini, "International Human Rights Law and Self-Determination of Peoples Related to the United States Occupation of the Hawaiian Kingdom", in David Keanu Sai (ed.), *The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations in the Hawaiian Kingdom*, Honolulu, 2020, 173, at 203-205.

[42] See *supra*, text corresponding to n. 25

**which should be effected by the occupying power pursuant to international humanitarian law, since it does not undermine, or significantly interfere with the exercise of, its authority**.

14. It may be concluded that, under international humanitarian law, **the proclamations of the Council of Regency** – including the Proclamation recognizing the State of Hawai'i and its Counties as the administration of the occupying State on 3 June 2019 – **have on the civilian population the effect of acts of domestic legislation aimed at protecting their rights and prerogatives, which should be, to the extent possible, respected and implemented by the occupying power**.

### c) Comment on the working relationship between the Regency and the administration of the occupying State under international humanitarian law.

15. As previously noted, "occupation law […] allows for authority to be shared by the Occupying Power and the occupied government, provided the former continues to bear the ultimate and overall responsibility for the occupied territory".[43] This said, it is to be kept well in mind that belligerent occupation necessarily has a *non-consensual nature*. In fact, "[t]he absence of consent from the state whose territory is subject to the foreign forces' presence […] [is] a precondition for the existence of a state of belligerent occupation. Without this condition, the situation would amount to a 'pacific occupation' not subject to the law of occupation".[44] At the same time, we also need to remember that the absence of armed resistance by the territorial government can in no way be interpreted as determining the existence of an implied consent to the occupation, consistently with the principle enshrined by Article 2 common to the four Geneva Conventions of 1949.[45]. On the contrary, the consent, "for the purposes of occupation law, […] [must] be genuine, valid and explicit".[46] It is evident that such a consent has never been given by the government of the Hawaiian Kingdom. On the contrary, the Hawaiian government opposed the occupation since its very beginning. In particular, Queen Lili'uokalani, executive monarch of the Hawaiian Kingdom, on 17 January 1893 stated that,

> "to avoid any collision of armed forces and perhaps the loss of life, I do, under this protest, and impelled by said force, yield my authority until such time as the Government of the United States shall, upon the facts being presented to it, undo the action of its representatives and reinstate me in the authority which I claim as the constitutional sovereign of the Hawaiian Islands".[47]

The opposition to the occupation has never been abandoned up to the time of this writing, although for some long decades it was stifled by the policy of *Americanization* brought about by the US government in the Hawaiian Islands. It has eventually revived in the last three lustrums, with the establishment of the Council of Regency.

16. Despite the fact that the occupation inherently configures as a situation unilaterally imposed by the occupying power – any kind of consent of the ousted government being totally absent – there still is some space for "cooperation" between the occupying and the occupied government – in the specific case of Hawai'i between the State of Hawai'i and its Counties and the Council of Regency.

---

[43] See *supra*, text corresponding to n. 29.
[44] See Spoerri, "The Law of Occupation", supra n. 29, at 190.
[45] See *supra*, para. 6.
[46] See Spoerri, "The Law of Occupation", supra n. 29, at 190.
[47] See United States House of Representatives, 53rd Congress, *Executive Documents on Affairs in Hawai'i: 1894-95*, 1895, at 586.

Before trying to specify the characteristics of such a cooperation, it is however important to reiterate that, under international humanitarian law, the last word concerning any acts relating to the administration of the occupied territory is with the occupying power. In other words, "occupation law would allow for a vertical, but not a horizontal, sharing of authority […] [in the sense that] this power sharing should not affect the ultimate authority of the occupier over the occupied territory".[48] This vertical sharing of authority would reflect "the hierarchical relationship between the occupying power and the local authorities, the former maintaining a form of control over the latter through a top-down approach in the allocation of responsibilities".[49]

17. The cooperation referred to in the previous paragraph is implied or explicitly established in some provisions of the Fourth Geneva Convention of 1949. In particular, Article 47 states that

> "Protected persons who are in occupied territory shall not be deprived, in any case or in any manner whatsoever, of the benefits of the present Convention by any change introduced, as the result of the occupation of a territory, into the institutions or government of the said territory, nor by any agreement concluded between the authorities of the occupied territories and the Occupying Power, nor by any annexation by the latter of the whole or part of the occupied territory".

Through referring to possible agreements "concluded between the authorities of the occupied territories and the Occupying Power", this provision clearly implies the possibility of establishing cooperation between the occupying and the occupied government. More explicitly, Article 50 affirms that "[t]he Occupying Power shall, with the cooperation of the national and local authorities, facilitate the proper working of all institutions devoted to the care and education of children", while Article 56 establishes that, "[t]o the fullest extent of the means available to it, the Occupying Power has the duty of ensuring and maintaining, with the cooperation of national and local authorities, the medical and hospital establishments and services, public health and hygiene in the occupied territory […]".

As far as United States practice is concerned, it acknowledges that "[t]he functions of the [occupied] government – whether of a general, provincial, or local character – continue only to the extent they are sanctioned".[50] With specific regard to cooperation with the occupied government, it is also recognized that "[t]he occupant may, while retaining its paramount authority, permit the government of the country to perform some or all of its normal functions".[51]

18. Importantly, the provisions referred to in the previous paragraph exactly refer to issues related to the protection of civilian persons and of their rights, which is one of the two main aspects (together with the preservation of the sovereign rights of the Hawaiian Kingdom government) dealt with by the Council of Regency's Proclamation recognizing the State of Hawai'i and its Counties as the administration of the occupying State of 3 June 2019.[52] In practice, the cooperation advocated by the provisions in point may take different forms, one of which translates into the possibility for the ousted government to adopt legislative provisions concerning the above aspects. As previously seen, the occupying power has, *vis-à-vis* the ensuing legislation, a duty not to oppose to it, because it normally does not undermine, or significantly interfere with the exercise of, its authority. Further to this, it is reasonable to assume that – in light of the spirit and the contents of the provisions referred to in the previous paragraph – the occupying power has a duty to cooperate in giving

---

[48] See International Committee of the Red Cross, *Expert Meeting. Occupation and Other Forms of Administration of Foreign Territory. Report*, Geneva, 2012, available at <https://www.icrc.org/en/doc/assets/files/publications/icrc-002-4094.pdf> (accessed on 20 May 2020), at 20.
[49] Ibid., at footnote 7.
[50] See "The Law of Land Warfare", *United States Army Field Manual* 27-10, July 1956, Section 367(a).
[51] Ibid., Section 367(b).
[52] See *supra*, text following n. 37.

realization to the legislation in point, unless it is "absolutely prevented" to do so. This duty to cooperate appears to be reciprocal, being premised on both the Council of Regency and the State of Hawai'i and its Counties to ensure compliance with international humanitarian law.

19. The latter conclusion is consistent with the logical (and legally-grounded) assumption that the ousted government is better placed than the occupying power in order to know what are the real needs of the civilian population and what are the concrete measures to be taken to guarantee an effective response to such needs. It follows that, through allowing the legislation in discussion to be applied – and through contributing in its effective application – the occupying power would better comply with its obligation, existing under international humanitarian law and human rights law, to guarantee and protect the human rights of the local population. It follows that the occupying power has a duty – if not a proper legal obligation – to cooperate with the ousted government to better realize the rights and interest of the civilian population, and, more in general, to guarantee the correct administration of the occupied territory.

20. In light of the foregoing, it may be concluded that **the working relationship between the Regency and the administration of the occupying State should have the form of a cooperative relationship aimed at guaranteeing the realization of the rights and interests of the civilian population and the correct administration of the occupied territory**, provided that there are no objective obstacles for the occupying power to cooperate and that, in any event, the "supreme" decision-making power belongs to the occupying power itself. This conclusion is consistent with the position of the latter as "administrator" of the Hawaiian territory, as stated in the Council of Regency's Proclamation recognizing the State of Hawai'i and its Counties as the administration of the occupying State of 3 June 2019 and presupposed by the pertinent rules of international humanitarian law.

24 May 2020

Professor Federico Lenzerini