No. 1:21-cv-00243-LEK-RT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

HAWAIIAN KINGDOM,
*Plaintiff*,

v.

JOSEPH R. BIDEN, President of the United States, et al.,
*Defendants*.

## BRIEF OF *AMICI CURIAE*
## INTERNATIONAL ASSOCIATION OF DEMOCRATIC LAWYERS,
## NATIONAL LAWYERS GUILD, AND
## WATER PROTECTOR LEGAL COLLECTIVE
## IN SUPPORT OF PLAINTIFF'S AMENDED COMPLAINT

WATER PROTECTOR LEGAL COLLECTIVE
Natali Segovia, Esq., (AZ 033589)*
Joseph Chase, Esq., (CO 55122)*
P.O. Box 37065
Albuquerque, NM 87176
(701) 566-9108
defense@waterprotectorlegal.org

Charles M. Heaukulani, Esq. (No. 5556)
LAW OFFICE OF CHARLES M. HEAUKULANI
P.O. Box 4475
Hilo, HI 96720-0475
(808) 466-1511
bigislandlaw@earthlink.net

NATIONAL LAWYERS GUILD
132 Nassau Street, Suite 922
New York, New York 10038
(212) 739-7583

INTERNATIONAL ASSOCIATION OF
DEMOCRATIC LAWYERS
1 Whitehall Street, 16th floor
New York, New York 10031
(212) 231-2235

* Admitted *Pro Hac Vice*

*Counsel for* Amici Curiae

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state the following:

(1)    They have no parent corporations; and

(2)    They are not-for-profit corporations and as such, no publicly held corporations own 10% or more of their stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................................i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* .........................................................1

INTRODUCTION ...............................................................................4

ARGUMENT ....................................................................................5

I. The Hawaiian Kingdom is an Occupied yet Inherently Sovereign
Nation under International Law .................................................... 5

   a.  International Law Protects Sovereignty and Self-Determination of
Peoples and Nations .......................................................................7

   b. Under International Law, the Hawaiian Kingdom was an
Independent State in 1893 Prior to US Occupation .......................................8

   c.  International Law Prohibits Occupation of Sovereign States and
Imposes Duties on Occupying Powers........................................................10

   d. The Hawaiian Kingdom is an Occupied Nation Since
January 17, 1893 .........................................................................12

       i.  President Cleveland's Promise to Queen Liliʻuokalani

      ii.  The Illegal Annexation of Hawaiʻi

     iii.  Hawaiʻi's  Admission  to  the  Union  and  the  Apology
Resolution of 1993

     iv.  International Recognition of the Hawaiian Kingdom post-
*Larsen* Arbitral Proceedings at the Hague in 2001

II. There is Judicial Precedent of other Article II Occupation Courts .............. 19

    a.  What is an Article II Occupation Court? ..................................................20

    b.  Historical Precedent of Article II Courts ..................................................21

III. The Federal and State Courts of Hawaiʻi are *de facto* Article II Occupation Courts ....................................................................................... 24

  IV. Exigent Circumstances Require this Court to Assume Jurisdiction .......... 26

CONCLUSION ...............................................................................................29

CERTIFICATE OF SERVICE ..............................................................................31

# TABLE OF AUTHORITIES

**U.S. Cases**                                                                                            **Page**

*American Insurance Co. v. Canter,* 26 U.S. (l Pet.) 511 (1828) …………………20

*Cross v. Harrison*, 57 U.S. (16 How.) 164 (1853) …………………………….…19

*F. Hoffmann-La Roche Ltd. v Empagran S.A*., 542 U.S. 155 (2004) ........................5

*Graham v. Florida*, 560 U.S. 48, 80 (2010)…………………………………………….5

*Hawaiʻi v. French*, 77 Haw. 222, 228, 883 P.2d 644, 650 (Ct. App. 1994) …......17

*Hilton v. Guyot*, 159 U.S. 113, 163 (1895)…………………………………..……….5

*Lawrence v. Texas*, 539 U.S. 558 (2003)………………………………...……….....5

*Mechanics' & Traders' Bank v. Union Bank of La*., 89 U.S. 276 (1874)....20, 22, 25

*Murray* v. *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)……………….5

*Paquete Habana*, 175 U.S. 677 (1900) ...............................................................6

*Roper v. Simmons*, 543 U.S. 551, 575 (2005).. …………………………..……….5

*Talbot v. Seeman*, 5 U.S. (1 Cranch) 1 (1801) ...............................................5

*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801).............................5

*Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ………………………..…….10

*Mechanics' & Traders' Bank v. Union Bank of La*., 89 U.S. 276 (1874) …...……21


**Constitution**

U.S. Constitution, art. II ..........................................................................................13

U.S. Constitution, art. VI..........................................................................................6


**Legislative History**

United States House of Representatives, 53rd Congress, Executive Documents on Affairs in Hawaiʻi: 1894-95, 586 (1895) ……………………………………..…..13

President Woodrow Wilson's Address to Congress, *The Washington Post* (12 Feb. 1918) ..................................................................................8

Public Law No. 103-150 of the 103rd Congress, approved by President Clinton on November 23, 1999 ……………………………………………………..…..16

**International Treaties and Other Materials**

International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171 (1976) ..............................................................................7

Montevideo Convention on the Rights and Duties of States, 1933, 165 LNTS 19, Article 1 …………………….…….…….…….…….…….…..…….…….…..9

G.A. Res. 1803 (XVII), December 14, 1962 United Nations ...................................7

Article 54 of the Fourth Geneva Convention, July 6, 1955 ……..…….…….…..10

1849 Treaty of Friendship, Commerce and Navigation Vienna Convention on the Law of Treaties, April 24, 1970……..…….…….…….…….…….…….…..6

1851 Hawaiian-British Treaty …….…….…….…….…….…….…..…….…….…..9

1875 Hawaiian- Austro/Hungarian Treaty …….…….…….…….…..…….…….…..9

1862 Hawaiian-Belgian Treaty …….…….…….…….…….…….…….…..…….…..9

1846 Hawaiian-Danish Treaty …….…….…….…….…….…….…..…….…….…..9

1857 Hawaiian-French Treaty …….…….…….…….…….…….…..…….…….…..9

1879 Hawaiian-German Treaty …….…….…….…….…….…….…..…….…….…..9

1863 Hawaiian-Italian Treaty …….…….…….…….…….…….…..…….…..…….…..9

1871 Hawaiian- Japanese Treaty …….…….…….…….…….…….…..…….…….…..9

1862 Hawaiian-Dutch Treaty …….…….…….…….…….…….…..…….…….…..9

1852 Hawaiian- Norwegian/Swedish Treaty …….…….…….…….…..…….…….…..9

1882 Hawaiian-Portuguese Treaty …….…….…….…….…….…….…..…….…….…..9

1863 Hawaiian-Spanish Treaty ……………………..………..…..…………………………..9

1864 Hawaiian-Swiss Treaty…..…………………..…..………………..…………………..9

*Larsen v*. *Hawaiian Kingdom*, 119 Int'l Law Reports 566, 581 (2001)…..….. 16, 17

## Other Sources

Anonymous, *Provisional Judiciary of Louisiana*, 4 AM. L. REG. 257, 268 (March 1865) …..……………..……..…………………..…………………………..…..……..23

David J. Bederman, *Article II Courts*, Mercer Law Review Vol. 44 (1993), pg. 825-879 at 851 …..……..……..…..……..………………………………..……...20, 21-24

Federico Lenzerini, *Legal Opinion on the Authority of the Council of Regency of the Hawaiian Kingdom* (2020) …..………..……..…..…………………………..9, 12

WILLIAM SCHABAS, WAR CRIMES RELATED TO THE UNITED STATES BELLIGERENT OCCUPATION OF THE HAWAIIAN KINGDOM (The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian    Kingdom,    edited    by    David    Keanu    Sai,    151–169) …..……..……..…..……..……..………..………..……..……..……..…….… 10

Marco Sassoli, "Article 43 of the Hague Resolution and Peace Operations in the Twenty-first Century," *International Humanitarian Law Research Initiative (2004)*…..……………………..……..………..………………..………..……..… 11

Hurst Hannum, 'Rethinking Self-Determination', 34 Va. J. Int'l. L. 1, 37 (1993 ..16

National Lawyers Guild, *NLG Calls upon US to Immediately Comply with International Humanitarian Law in its Illegal Occupation of the Hawaiian Islands* (January 13, 2020) …..……………..……..……………..……...…..……… 11, 18

Resolution of the International Association of Democratic Lawyers *Calling Upon the United States to Immediately Comply with International Humanitarian Law in Its Prolonged Occupation of the Hawaiian Islands—Hawaiian Kingdom* (February 7, 2021) …..………..……..……..……..…...…..………..………..18

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are three organizations of lawyers and jurists throughout the United States and the world with ample expertise concerning international law, international human rights, humanitarian law, and norms regarding statehood, sovereignty, self-determination, and the rule of law.

*Amici* submit this brief to ensure a proper understanding and application of the international law and judicial precedent regarding occupation courts that are relevant to this case. Amici submit this brief to explain how the international norms and judicial precedent in Article II occupation courts support the Plaintiff's request for Declaratory Judgment and Injunctive Relief.

*Amici* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. Counsel for Plaintiff Hawaiian Kingdom have consented to the filing of this brief. There is no opposition to the filing of the brief at this time as Defendants have either not taken a position or not entered an appearance in this case.[1] The Court has granted leave to file this brief [ECF No. 90].

---

[1] *Amici* hereby certify that no party or person other than *amici* and their counsel authored this brief in whole or in part, or contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E). Defendants County of Kauaʻi and County of Hawaiʻi had opposed the filing of the initial amicus brief but have since been dismissed from this case.

1

**The International Association of Democratic Lawyers ("IADL")** is an international organization of lawyers and jurists with member associations and individual members in over 90 countries. IADL was founded in 1946 by a large group of lawyers, many of whom served as prosecutors at the Nuremberg trials. Shortly thereafter, the IADL, through its first President, the French jurist Rene Cassin, helped author the Universal Declaration of Human Rights (UDHR). IADL has consultative status to the Economic and Social Council of the United Nations (ECOSOC), the United Nations Educational Scientific and Cultural Organization (UNESCO), and the United Nations Children's Emergency Fund (UNICEF).

**The National Lawyers Guild ("NLG")** is a progressive public interest association of lawyers, law students, paralegals, and others founded in 1937 dedicated to the need for basic and progressive change for the furtherance of human rights. NLG was the first racially integrated bar association and has been involved in key social justice struggles throughout its history. The National Lawyers Guild is also dedicated to promoting human rights and the rights of ecosystems over property rights, and advances social justice struggles against entrenched inequalities throughout the globe. As such, the National Lawyers Guild has a long trajectory of international legal work and support for struggles involving international humanitarian law, statehood, sovereignty and self-determination.

**The Water Protector Legal Collective ("WPLC")** is an Indigenous-led legal non-profit organization that began in 2016 as the on-the-ground legal team at Oceti Sakowin camp at Standing Rock in defense of Water Protectors in frontline resistance to the Dakota Access Pipeline. The Water Protector Legal Collective provides legal support and advocacy for Indigenous Peoples and Original Nations, the Earth, and climate justice movements across Turtle Island (what is known as North America) and internationally. WPLC is dedicated to the protection and defense of sacred lands and cultural resources threatened by extractive industry and mass development, advancing Earth and climate justice, supporting the sovereignty and self-determination of Indigenous Peoples and Original Nations around the world, and international human rights advocacy.

**INTRODUCTION**

The purpose of this brief is to bring to the Court's attention customary international law norms and judicial precedent regarding Article II occupation courts that bear on the long-standing belligerent occupation of the Hawaiian Kingdom by the United States at issue in this case.

In assessing the legality of the US occupation of Hawaiʻi, the Court should be cognizant of customary international law and international human rights treaties that are incorporated into domestic law by virtue of Article VI, section 2 of the Constitution (the "Supremacy Clause"). International law, which includes treaties ratified by the United States as well as customary international law, is part of U.S. law and must be faithfully executed by the President and enforced by U.S. courts except when clearly inconsistent with the U.S. Constitution or subsequent acts of Congress.

The question here is not whether the Hawaiian Kingdom has standing in an Article III court. The question is whether this court can sit as an Article II occupation court and whether the claims of the Hawaiian Kingdom can be redressed. The answer to both questions is yes.

## ARGUMENT

In deciding this matter, the Court must do so in a manner that is consistent with the United States' obligations under international law.

## I.     The Hawaiian Kingdom is an Occupied yet Inherently Sovereign Nation under International Law

The Court should render its decision for the Plaintiff consistent with the United States' obligations under international law.[2] In an 1801 Supreme Court case, the Court ordered the President to restore a French merchant ship to its owner pursuant to treaty obligations: "The constitution of the United States declares a treaty to be the supreme law of the land.  Of consequence its obligation on the courts of the United States must be admitted."[3]

Federal courts look to international law for interpretative guidance of constitutional and statutory provisions, as well as to ensure compliance with international legal obligations. *Graham v. Florida*, 560 U.S. 48, 80 (2010); *see also Roper v. Simmons*, 543 U.S. 551, 575 (2005) (noting international authority as "instructive for [the Court's] interpretation" of the Constitution); *Lawrence v.*

---

[2] "Taking notice" of treaty obligations comports with a core principle of statutory construction announced by the Supreme Court in *Murray* v. *The Charming Betsy*: "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains. 6 U.S. (2 Cranch) 64, 118 (1804); *accord Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 43 (1801); *see aff'd, e.g.*, *F. Hoffmann-La Roche Ltd. v Empagran S.A.*, 542 U.S. 155, 164 (2004).

[3] *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801).

*Texas*, 539 U.S. 558, 572–73 (2003). *See Hilton v. Guyot*, 159 U.S. 113, 163 (1895) ("International law . . . is part of our law, and must be ascertained and administered by the courts of justice . . . .").

When the United States entered into the 1849 Treaty of Friendship, Commerce and Navigation with the Hawaiian Kingdom, it created obligations under international law and the U.S. Constitution which recognizes treaties as part of U.S. law. Customary international law is also part of U.S. law and is enforceable by U.S. courts.[4] Under the Supremacy Clause of the Constitution, "treaties made ... under the authority of the United States, shall be the supreme law of the land, and judges of every state shall be bound thereby."[5]

The United States violated that treaty, and the Vienna Convention on the Law of Treaties, by imposing American law over people within the territorial jurisdiction of the Hawaiian Kingdom. The U.S. has duties to the Hawaiian Kingdom pursuant to its treaty obligations as a signatory (as of April 24, 1970) to the Vienna Convention on the Law of Treaties. Although the US hasn't ratified the Vienna Convention, it is U.S. policy to regard it as an expression of customary

---

[4] In *The Paquete Habana*, the Supreme Court held that customary international law "is part of our law" and directly enforceable in courts when no conflicting treaty, legislative act, or judicial decision controls. 175 U.S. 677, 700 (1900). *See also* Restatement (Third) of the Foreign Relations Law of the United States § 111(3) (customary international law must be enforced in U.S. courts even in the absence of implementing legislation or whether they appear in a treaty).
[5] U.S. Const. art. VI, cl. 2.

international law, including the provisions under Part V. applicable to Invalidity, Termination and Suspension of the Operation of Treaties.

Despite the customary international law and the duties under treaties and other international instruments, the history of the Hawaiian Kingdom shows a usurpation of sovereignty via the illegal occupation of Hawaiʻi by the United States.

### a. International Law Protects Sovereignty and Self-Determination of Peoples and Nations

The United Nations Charter states that all states are juridically equal and enjoy the same rights and duties based upon their existence under international law. The right of nations to determine their own political status and exercise permanent sovereignty within their territorial jurisdictions is widely recognized.[6] Sovereignty, is the most essential attribute of the state and is often defined as complete self-sufficiency and supremacy in domestic policy and independence in foreign policy. Taken together with the principle of self-determination and the prohibition against the use of force, has developed into one of the *jus cogens* norms of modern international law.

As stated in the Charter of the United Nations (United Nations 1945) (treaty ratified by the United States in 1945) and in Article 1 of the

---

[6] General Assembly Res. 1803 (XVII) of December 14, 1962, United Nations. *See also* International Covenant on Civil and Political Rights.

International Covenant on Economic, Social and Cultural Rights (ICESCR) (UN General Assembly 1966) and the International Covenant on Civil and Political Rights (ICCPR) (treaty signed by the United States in 1992), "[a]l peoples have the right to self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development."

The right to self-determination attributes peoples a free choice to determine their own destiny, particularly in political terms. In 1918, United States President Woodrow Wilson consecrated self-determination as "a paramount principle of international legitimation" and declared that "[n]ational aspirations must be respected; peoples may now be dominated and governed by their own consent. Self-determination is not a mere phrase, it is an imperative principle of action which statesman will henceforth ignore at their peril."[7]

Despite the protections under international law, it is these norms of sovereignty and self-determination of the Hawaiian Kingdom and the Hawaiian people that the United States has violated in its ongoing occupation.

### b. Under International Law, the Hawaiian Kingdom was an Independent State in 1893 Prior to US Occupation

At the time of the American occupation, the Hawaiian Kingdom fully satisfied the four elements of statehood prescribed by customary international law,

_____

[7] *See* President Woodrow Wilson's address to Congress, *The Washington Post* 912 Feb. 1918).

which were later codified by the Montevideo Convention on the Rights and Duties of States in 1933: a) a permanent population; b) a defined territory; c) government; and d) capacity to enter into relations with the other states.[8] This instrument codified the so-called declarative theory of statehood, already accepted by customary international law.

It is undisputed that in the nineteenth century, the Hawaiian Kingdom existed as an independent State recognized by the United States and the international community, including by exchanges of diplomatic or consular representatives, and the conclusion of treaties, which to-date have never been rescinded.[9] Undoubtedly, the Hawaiian Kingdom was a State at the time when the United States of America militarily occupied it on January 17, 1893.[10]

---

[8] *See* Montevideo Convention on the Rights and Duties of States, 1933, 165 LNTS 19, Article 1.

[9] Treaties include: The 1851 Hawaiian-British Treaty, the 1875 Hawaiian-Austro/Hungarian Treaty, the 1862 Hawaiian-Belgian Treaty, the 1846 Hawaiian-Danish Treaty, the 1857 Hawaiian-French Treaty, the 1879 Hawaiian-German Treaty, 1863 Hawaiian-Italian Treaty, the 1871 Hawaiian- Japanese Treaty, the 1862 Hawaiian-Dutch Treaty, the 1852 Hawaiian- Norwegian/Swedish Treaty, the 1882 Hawaiian-Portuguese Treaty, the 1863 Hawaiian-Spanish Treaty, the 1864 Hawaiian-Swiss Treaty.

[10] Federico Lenzerini, *Legal Opinion on the Authority of the Council of Regency of the Hawaiian Kingdom* (2020). https://hawaiiankingdom.org/pdf/Legal_Opinion_Re_Authority_of_Regency_Lenzerini.pdf (Last visited July 29, 2021).

### c. International Law Prohibits Occupation of Sovereign States and Imposes Duties on Occupying Powers

The U.S. Supreme Court stated in *Underhill v. Hernandez*, "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). Additionally, it is a rule of international law as enunciated in *Lotus,* "[that] the first and foremost restriction imposed by international law upon a State is that—failing the existence of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State."[11] The usurpation of sovereignty is thus considered a war crime under international law.[12]

Similarly, Article 54 of the Fourth Geneva Convention states, "[t]he Occupying Power may not...in any way apply sanctions to or take any measures of coercion or discrimination against them." The Fourth Geneva Convention was ratified by the United States Senate on July 6, 1955 and came into force on February 2, 1956; it is binding on the United States.

---

[11] *See Lotus*, PCIJ Series A, No. 10, 18 (1927).

[12] WILLIAM SCHABAS, WAR CRIMES RELATED TO THE UNITED STATES BELLIGERENT OCCUPATION OF THE HAWAIIAN KINGDOM. (The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom, edited by David Keanu Sai, 151–169. Honolulu: Ministry of the Interior, Hawaiian Kingdom, Royal Commission of Inquiry).

On November 10, 2020, the National Lawyers Guild (NLG) sent a letter to

Governor Ige that stated:

> "International humanitarian law recognizes that proxies of an
> occupying State, which are in effective control of the territory of the
> occupied State, are obligated to administer the laws of the occupied
> State. The State of Hawai'i and its County governments, and not the
> Federal government, meet this requirement of effective control of
> Hawaiian territory under Article 42 of the 1907 Hague Regulations,
> and need to immediately comply with the law of occupation. The
> United States has been in violation of international law for over a
> century, exercising, since 1893, the longest belligerent occupation of a
> foreign country in the history of international relations without
> establishing an occupying government."[13]

Article 43 of The Hague Regulations respecting the laws and customs of war

on land with special relation to military authority over the territory of a hostile

state (1907) states: "The authority of the legitimate power having in fact passed

into the hands of the occupant, the latter shall take all the measures in his power to

restore, and ensure, as far as possible, public order and safety, while respecting,

unless absolutely prevented, the laws in force in the country."[14]

---

[13]National Lawyers Guild, *NLG Calls upon US to Immediately Comply with International Humanitarian Law in its Illegal Occupation of the Hawaiian Islands* (January 13, 2020), https://www.nlg.org/nlg-calls-upon-us-to-immediately-comply-with-international-humanitarian-law-in-its-illegal-occupation-of-the-hawaiian-islands/.

[14] 36 Stat. 2306; *see also* Marco Sassoli, "Article 43 of the Hague Resolution and Peace Operations in the Twenty-first Century," *International Humanitarian Law Research Initiative (2004) (online* at https://www.hpcrresearch.org/sites/default/files/publications/sassoli.pdf*)* (explaining that an occupying force may not extend its own legislation over the

### d. The Hawaiian Kingdom is an Occupied Nation Since January 17, 1893

The operative question here is whether the continuous occupation of Hawaiʻi by the United States, from 1893 to the present, extinguished the Hawaiian Kingdom as an independent State and, consequently, as a subject of international law.[15] Pending the outcome of that question, it can be established whether the courts in Hawaiʻi are Article III courts properly established under the Constitution or if, as *de facto* product of a belligerent occupation by the United States, they are occupation courts under Article II war-making powers of the Executive. The historical facts support the continuity of the Hawaiian Kingdom as a state and that its courts are Article II occupation courts.

While the history of the Hawaiian Kingdom is undoubtedly known to this Court, it is important to restate the essential facts. The United States occupation began on January 17, 1893, when a small group of American businessmen and politicians who favored annexation by the United States, supported by John Stevens, the U.S. Minister to Hawaiʻi, and a contingent of Marines from the warship U.S.S. Boston, overthrew Queen Liliʻuokalani in a *coup de main* and proclaimed a provisional government.

---

occupied territory – "it must, as a matter of principle, respect the laws in force in the occupied territory at the beginning of the occupation.").

[15] *See* Lenzerini *supra* note 10.

There has been no "treaty of peace or a proclamation of peace" ending the state of war between the Hawaiian Kingdom and the United States. Instead, in violation of international law, customary law, and the laws of war, the United States annexed, later acquired, and finally added Hawai'i as a State of the Union in 1959.

### i. President Cleveland's Promise to Queen Lili'uokalani

Shortly into his presidency, Cleveland appointed Special Commissioner Blount to look into the events in the Hawaiian Islands leading to Queen Lili'uokalani's yielding her authority temporarily. Special Commissioner Blount found that Minister Stevens had acted improperly and after Queen Lili'uokalani yielded her executive authority "until such time as the Government of the United States shall, upon facts being presented to it, undo the actions of its representative… [and restore the Queen] as the constitutional sovereign of the Hawaiian Islands."[16]

The President is also obligated to respect international law pursuant to his constitutional duty faithfully to execute the law and respect treaties as the supreme law of the land.[17] This was the intent of the Framers.[18] President Cleveland

---

[16] United States House of Representatives, 53rd Congress, Executive Documents on Affairs in Hawai'i: 1894-95, 586 (1895)
[17] U.S. CONST. art. II, sec. 3.

13

promised Queen Liliʻuokulani that she would be restored, but Sanford Dole, the president of the Provisional Government of Hawaiʻi, refused to turn over power and unilaterally proclaimed Hawaiʻi a republic in 1894.

### ii.  The Illegal Annexation of Hawaiʻi

On June 16, 1897, with President William McKinley recently inaugurated, McKinley and representatives of the self-proclaimed government of the Republic of Hawaiʻi signed a treaty of annexation which was submitted for ratification to the U.S. Senate. That treaty was defeated in the Senate due to the organizing of fierce opposition from over 21,269 native Hawaiian subjects and resident aliens opposed to annexation.

Nevertheless, when the Spanish-American war broke out, part of which was fought in the Philippines, the strategic value of the Hawaiian islands became palatable and pro-annexation forces in Congress submitted a proposal to annex Hawaiʻi by joint resolution.

On July 12, 1898, a Joint Resolution passed requiring only a simple majority in both houses of Congress to annex Hawaiʻi. While annexation is historically a permissible mode of acquiring title to some territory, "it is now regarded as illegitimate and primarily as a consequence of the general prohibition on the use of

---

[18] Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 THE PAPERS OF ALEXANDER HAMILTON 33, 33-43 (Harold C. Syrett ed. 1969).

force as expressed in article 2(4) of the UN Charter" and other declarations since than such as the General Assembly Resolution 2625 on Friendly Relations which provides: "The territory of a State shall not be the object of acquisition by another State resulting from the threat of use of force. No territorial acquisition resulting from the threat or use of force shall be recognized as legal."[19]

Congress exceeded its authority to annex Hawaiʻi by legislation rather than executive determination of foreign policy. The laws of the United States must comport with and be interpreted in a manner consistent with international law wherever possible. So, even if the President is not directly bound by international law, he is obligated to comply with the Constitution itself and all applicable legislation enacted by Congress within its authority must also comply with international norms incorporated into domestic law.

### iii. Hawaiʻi's Admission to the Union and the Apology Resolution of 1993

Once annexed by the United States, Hawaiʻi remained a U.S. territory until 1959, when it became the 50th state to be admitted to the Union on March 18, 1959. Nevertheless, purported Hawaiian statehood does not comport with international

---

[19] Declaration of Principles of International Law, GA Resn. 2625; *see also* Professor Matthew Craven, *Continuity of the Hawaiian Kingdom as A State Under International Law,* Ch. 3, pg. 126-149 in The Royal Commission of Inquiry: Investigating War Crimes and Human Rights Violations Committed in the Hawaiian Kingdom, ed. Dr. David Keanu Sai (2020).

law. The admission into the Union was premised on an illegal annexation and a plebiscite that presented several irregularities including tactics that favored non-native Hawaiian residents rather than nationals of the Hawaiian Kingdom when the United States held a plebiscite on June 27, 1959 regarding the admission of Hawaiʻi into the Union.[20]

Article 73(e) of the UN Charter requires UN Member States which administer "territories whose peoples have not yet attained a full measure of self-government" to report these territories to the Secretary General. In 1946, the United States reported Hawaiʻi along with the territories of Alaska, American Samoa, Guam, Panama Canal Zone, Puerto Rico and the Virgin Islands. Of those territories, only Hawaiʻi was self-governing, since November 28, 1843 when the United Kingdom recognized the independence of the Hawaiian Kingdom.

Public Law No. 103-150 of the 103rd Congress, approved by President Clinton on November 23, 1999, known as the Apology Resolution, "acknowledge[d] the 100th anniversary of the January 17, 1893 overthrow of the Kingdom of Hawaii, and [offered] an apology to the native Hawaiians on behalf of the United States for the overthrow of the Kingdom of Hawaii." Importantly, Congress noted that "the indigenous Hawaiian people never directly relinquished

---

[20] *See* H. Hannum, 'Rethinking Self-Determination', 34 Va. J. Int'l. L. 1, 37 (1993).

their claims to their inherent sovereignty as people or over their national lands to the United States, either through their monarchy or through a plebiscite or referendum."

### iv. International Recognition of the Hawaiian Kingdom post-*Larsen* Arbitral Proceedings at the Hague in 2001

Purported statehood did not extinguish the Hawaiian Kingdom. In the *Larsen v. Hawaiian Kingdom* arbitral proceedings that began at the Hague in 1999 and concluded in 2001, the Arbitral Tribunal of the Permanent Court of Arbitration (PCA) acknowledged that: "in the nineteenth century the Hawaiian Kingdom existed as an independent State recognized as such by the United States of America, the United Kingdom and various other States, including by exchanges of diplomatic or consular representatives and the conclusion of treaties."[21] Further, in its annual reports, the Permanent Court of Arbitration, as an intergovernmental organization, acknowledged the continuity of the Hawaiian Kingdom as a non-Contracting State pursuant to Article 47 of the 1907 Convention on the Pacific Settlement of International Disputes.[22]

In Defendant County of Kaua'i's Motion to Dismiss to Plaintiffs' original

---

[21] *See Larsen v. Hawaiian Kingdom*, 119 International Law Reports 566, 581 (2001).

[22] *See* PCA Annual Reports 2000-2011, Annex 2, *Cases Conducted under the Auspices of the PCA or with the Cooperation of the International Bureau* ("Pursuant to article 47 of the 1907 Convention (article 26 of the 1899 Convention)").

17

Complaint, the County cites *Hawai'i v. French*, 77 Haw. 222, 228, 883 P.2d 644, 650 (Ct. App. 1994) in support of the statement that there is "no factual (or legal) basis for concluding that the [Hawaiian] Kingdom exists as a state in accordance with recognized attributes of a state's sovereign nature." [ECF No. 15-1, Page ID #158]. This assertion is factually and legally incorrect. The 1994 ruling in *French* stands in stark contrast to the 2001 Arbitral Award of the Permanent Court of Arbitration of the *Larsen v. Hawaiian Kingdom* and the PCA Annual Reports from 2000-2011, that explicitly found Hawai'i to be a continued state to-date under international public law.

On February 25, 2018, Dr. Alfred M. deZayas, a United Nations Independent Expert from the Office of the High Commissioner for Human Rights, communicated to two State of Hawai'i trial judges and members of the judiciary:

> "I have come to understand that the lawful political status of the Hawaiian Islands is that of a sovereign nation-state in continuity; but a nation-state that is under a strange form of occupation by the United States resulting from an illegal military occupation and a fraudulent annexation. As such, international laws (the Hague and Geneva Conventions) require that governance and legal matters within the occupied territory of the Hawaiian Islands must be administered by the application of the laws of the occupied state (in this case, the Hawaiian Kingdom), not the domestic laws of the occupier (the United States)."[23]

In a resolution dated February 7, 2021, the International Association of Democratic Lawyers (IADL) "call[ed] on all United Nations members States and

---

[23] *See* Letter from National Lawyers Guild to State of Hawai'i, pg. 3.

non-member States to not recognize as lawful a situation created by a serious violation of international law, and to not render aid or assistance in maintaining the unlawful situation. As an internationally wrongful act, all States shall cooperate to ensure the United States complies with international humanitarian law and consequently bring to an end the unlawful occupation of the Hawaiian Islands."[24]

The laws of the United States must be interpreted in accordance with the Constitution, treaties, and international law.

## II.    There is Judicial Precedent of other Article II Occupation Courts

The bare assertion that "this Court is not an Article II Court" [ECF No. 15-1, Page ID #155] is conclusory without any supporting law or discussion of historical precedent. In actuality, there is ample historical precedent regarding Article II courts, or occupation courts. This history is not widely known given the majority of courts are Article III ("Constitutional" courts) or Article I ("legislative" courts). Nevertheless, academic legal scholars and legal history show ample precedent for Article II courts when the United States has militarily occupied territory.

---

[24] Resolution of the International Association of Democratic Lawyers *Calling Upon the United States to Immediately Comply with International Humanitarian Law in Its Prolonged Occupation of the Hawaiian Islands—Hawaiian Kingdom* (February 7, 2021) (online at https://hawaiiankingdom.org/pdf/IADL_Resolution_on_the_Hawaiian_Kingdom.pdf).

### a. What is an Article II Occupation Court?

### i. General Characteristics

The central attribute of an Article II court is an executive action that grants it criminal and civil jurisdiction over civilians in an occupied territory. The President's ability to create Article II courts extends from the responsibility as commander in chief to govern areas occupied by U.S. forces.[25] Most Article II courts in history have been created by an executive order—either before the creation of the court or by ratification after-the-fact—but creation of an Article II court does not require such express action. The President can authorize local commanders to form a civil government for the occupied territory.[26] Any court whose jurisdiction over an occupied territory flows from the exercise of executive war powers is an Article II court.[27] This authority remains until: (1) a peace treaty grants sovereignty of the occupied territory to the United States; and (2) an act of Congress transfers criminal and civil jurisdiction over civilians to a legislative court.[28] The President alone has power to negotiate treaties as "part of a general

---

[25] *See Cross v. Harrison*, 57 U.S. (16 How.) 164, 189 (1853) (Wayne, J.); *see also* David J. Bederman, *Article II Courts*, Mercer Law Review Vol. 44 (1993), pg. 825-879 at 851.

[26] *Bederman* at 851.

[27] *Cf. Mechanics' & Traders' Bank v. Union Bank,* 89 U.S. (22 Wall.) 276 (1874), aff'g 25 La. Ann. 387 (1873).

[28] *See American Insurance Co. v. Canter,* 26 U.S. (1 Pet.) 511 (1828).

authority to control diplomatic communications."[29]  The Senate must ratify any treaty by a two-thirds majority, but the legislature has no other role in the treaty process.

### b.  Historical Precedent of Article II Courts

Article II courts—also known as "occupation courts"—have existed throughout United States history, starting with the Mexican War in 1846 and followed by the "heyday of occupation courts" during the Civil War as large tracts of Confederate territory came under Union control in the 1860s and there was a need for provisional military governments and provisional tribunals. This continued during the Spanish-American War in 1899 and occupation courts were established after World War II from 1949 until 1971 in Okinawa and Ryukyu Islands, when the United States returned those territories to Japan. At least twelve occupation tribunals, organized under the executive war-making power of the President, were established throughout that time.[30]

"Executive courts were a phenomenon closely associated with the occupation of enemy territory by American troops. Because military occupation invariably entailed the replacement of one sovereign with another, American jurists

---

[29] National Constitution Center, *Interactive Constitution- Article II, Section 2: Treaty Power and Appointments*, https://constitutioncenter.org/interactive-constitution/interpretation/article-ii/clauses/346
[30] *Bederman* s*upra* note 25 at 837-849 (providing a survey of executive courts in the history of the United States).

were particularly sensitive to the constitutional implications of this presidential war-making power."[31]

Essential juridical principals of military occupation that stemmed from these tribunals apply to the present day: 1) the President, by virtue of his war making powers under Article II, may govern regions subject to belligerent occupation; 2) it is implicit that the President substantially delegates to his army and navy commanders the responsibility for the actual conduct of the military government; 3) no apparent restrictions force the President, or his commanders, to conduct the belligerent occupation in a particular fashion; and 4) at some point the occupation must come to an end—presumably, but not necessarily, by the conclusion of hostilities—and, at that time, the President's exclusive and unfettered powers of military occupation should lapse[32]

Executive tribunals are, "[f]irst and foremost, [a] testament to the elasticity of a constitutional text that can stretch to accommodate circumstances of national emergency without snapping in defense of basic freedoms."[33]

Particularly analogous to the situation here are the Provost Courts of Louisiana, first established by the military and President Lincoln in 1862 as the Union Army occupied New Orleans and surrounding areas. After the authority of

_____

[31] *Id.* at 849.
[32] *Id.* at 851.
[33] *Id.* at 877.

these Article II courts was challenged, the U.S. Supreme Court "for the first time"[34] addressed the distinction between Article III and Article II courts. In *Mechanics' & Traders' Bank v. Union Bank of La.*, Justice Strong wrote of Article III, "That clause of the Constitution has no application to the abnormal condition of conquered territory in the occupancy of the conquering army." 89 U.S. 276 at 295 (1874). Given that, as previously discussed, Hawai'i remains belligerently occupied by the United States, Article III courts similarly should have no application in the instant case, and must instead be replaced by an Article II court.

Moreover, the Louisiana precedent demonstrates that Article II occupation courts can continue to exist after military battles have subsided, as is the case in Hawai'i: "[t]he Provisional Court for Louisiana…carried on with its work long after the state had been militarily subdued."[35] These courts also continued to apply the laws of the occupied state. As a contemporary *American Law Register* article makes clear, "These courts were all of them ever guided by the laws of Louisiana in the administration of justice."[36] So, too, must the court here apply the laws of the occupied Hawaiian Kingdom.

---

[34] *Id.* at 853
[35] *Id.* at 861.
[36] Anonymous, *Provisional Judiciary of Louisiana*, 4 AM. L. REG. 257, 268 (March 1865)

### III.    The Federal and State Courts of Hawai'i are *de facto* Article II Occupation Courts

There is no dispute that the United States gained control of Hawai'i through an act of war.  [ECF No. 1, Page ID #15] After the *coup de main*, the U.S. forces controlling Hawai'i allowed the contemporary court system of the Hawaiian Kingdom to maintain operations.  While this is not the creation of new courts by direct executive order, this is an example of a local commander exercising executive authority to govern occupied territory.  The Hawaiian Kingdom's government had been overthrown.  In this situation, the President's power to govern occupied territory is the only valid power that could grant jurisdiction to the Hawaiian Kingdom courts.  Consequently, this means Article II courts have existed *de facto* in Hawai'i since 1893.

The authority of those Article II courts has never been abrogated.  It is true that Congress has organized Hawai'i into a territory and later admitted it into the Union.  However, there is no peace treaty between the Hawaiian Kingdom and the United States. Whenever an Article II court's power has been abrogated by Congressional action, there has first been a treaty that granted the United States sovereignty over the occupied territory. Accordingly, "neither the end of hostilities nor the conclusion of a treaty of peace marks the end of presidential power to continue to administer justice through occupation courts. Instead, Congress must

establish courts, thereby supplanting presidential authority in this realm."[37] Through such treaties, the governments previously in control relinquished all claim to the occupied territories.  This transfer of sovereignty is a necessary condition for Congress to organize a territory because Congress has no power outside U.S. territory.  [ECF No. 1, Page ID # 21].

The facts here show that Congress has no legitimate power over Hawai'i because there was never a peace treaty between nations ending the occupation and Congress has no extraterritorial capabilities.  Essentially Congress exceeded its constitutional powers and legislated a legal framework over a sovereign Nation that never ceded its state sovereignty nor the ability and desire to rule itself.  Rather than wait to ratify a negotiated peace treaty with Hawai'i to end the occupation and remedy the illegal annexation and later acquisition of Hawai'i, Congress admitted Hawai'i into the Union as the 50th State seeking to sweep a century of inconvenient truths and illegal acts under the rug. The extensive judicial and political infrastructure in modern Hawai'i exists in violation of the laws of war and norms of international law applicable to occupying powers.  Yet the Hawaiian Kingdom persists and the United States occupation of Hawai'i that began in 1893 has never effectively ended.

---

[37] *Bederman supra* note 25 at 878.

Because Article III courts are created expressly in the United States and organized under the Constitution, there can be no Article III courts outside the territory of the United States. Congress lacked authority to organize Hawai'i as a state because its legislative powers have no extraterritorial effect. Any court in Hawai'i at present, therefore, cannot be an Article I legislative tribunal or an Article III court. [38] As such, the only remaining possibility is that courts in Hawai'i are *de facto* Article II occupation courts and may hear this case while applying the laws of the Hawaiian Kingdom, as required under international law.

## IV.   Exigent Circumstances Require the Court to Assume Jurisdiction

While the issue of Hawaiian sovereignty may be familiar to this Court, this matter is undoubtedly a case of first impression. However, there are exigent circumstances that necessitate this court's assuming jurisdiction as an Article II occupation court.

This court can sit as an Article II court because the United States controls Hawai'i not as a sovereign but as an occupying power and there has been no peace

---

[38] *See Mechanics' & Traders' Bank v. Union Bank of La.,* 89 U.S. 276, 22 L. Ed. 871 (1874). The United States Supreme Court offered some guidance in this area and articulated the distinction between executive tribunals and Article III tribunals stating that Article III "has no application to the abnormal condition of conquered territory in the occupancy of the conquering army."

treaty between states to end the occupation.[39] Article II courts can extend their jurisdiction to maintain orderly control of an occupied territory. Exercising Article II jurisdiction and granting the requested injunctive relief complies with public international law.  In this manner, this Court could apply local law as required of an occupying power by the laws of war.

Article II courts can extend their jurisdiction to maintain orderly control of an occupied territory.  For example, the Provisional Court of Louisiana held Article II jurisdiction over the sections of Louisiana under the control of Union forces.[40] The Provisional Court (as provost courts established by military commanders immediately after capturing the territory) first heard cases concerning soldiers and the laws of war but eventually extended its jurisdiction to civil and criminal matters in the occupied territory.  Concurrently, Union military commanders revived the local parish courts in occupied territory.  These parish courts directed their judgments to the Louisiana Supreme Court for appellate review.  One problem: the Louisiana Supreme Court sat in Baton Rouge, which the Confederacy still controlled.  Judge Peabody, the chief judge of the Provisional Court, remedied this problem by transferring all cases pending before the Louisiana Supreme Court to his tribunal.  By extending his jurisdiction Judge

---

[39] *See supra* section on continuity of the Hawaiian Kingdom as a Nation-State under International Law at note 13 and note 15.

[40] *See generally* Bederman supra note 25 at 843-44.

Peabody was able to maintain orderly control of an occupied territory.  Louisianans could have their cases heard in local courts applying local law without giving up their right to appellate review.  This Court could do the same by assuming jurisdiction as an Article II court and allow Hawaiians to have their cases heard by an occupying court applying local law, as required by the laws of war.

Most importantly, functioning as an Article II court here would not undermine all this Court's past judgments; previous judgments and laws of the United States would remain in effect unless they are at odds with the laws of the occupied Hawaiian Kingdom.[41]

---

[41] *See* Proclamation of the Council of Regency of the Hawaiian Kingdom, October 10, 2014, p. 7 ("We do hereby proclaim that from the date of this proclamation all laws that have emanated from an unlawful legislature since the insurrection began on July 6, 1887 to the present, to include United States legislation, shall be the provisional laws of the Realm subject to ratification by the Legislative Assembly of the Hawaiian Kingdom once assembled, with the express proviso that these provisional laws do not run contrary to the express, reason and spirit of the laws of the Hawaiian Kingdom prior to July 6, 1887, the international laws of occupation and international humanitarian law, and if it be the case they shall be regarded as invalid and void[.]").

28

## CONCLUSION

Under the concept of *void ab initio,* there are structures that have no legal effect from inception. The United States occupation of Hawai'i began with unclean hands, and this can only be remedied by a clean slate and a new beginning. Recognition of the prolonged occupation of the Hawaiian Kingdom by the United States through Declaratory Judgment is not only a redressable claim, it is long overdue and would only be consistent with what is already known to the international community and clear under international law. Additionally, granting the Hawaiian Kingdom injunctive relief would acknowledge the Kingdom's continuous sovereignty, mitigate the United States' liability for its war crimes against the Hawaiian people, and apply local law as required of an occupying power by the international law of war. Acknowledging extraterritoriality and occupation would have the practical effect of applying the laws of the Hawaiian Kingdom but as was the case with prior occupation courts, this would not nullify any prior decisions of any of the courts currently operating in Hawai'i, so long as they are not inconsistent with local law.

For the foregoing reasons, *amici* request that the Court consider U.S. obligations under international law, which forms part of U.S. law, in evaluating the long-standing occupation of the Hawaiian Kingdom.

Dated: October 6, 2021

Respectfully submitted,

_/s/_Natali Segovia_____          _/s/_ Charles M. Heaukulani_____
Natali Segovia, Esq., (AZ 033589)*              Charles M. Heaukulani, Esq. (No. 5556)
Joseph Chase, Esq., (CO 55122)*                 LAW OFFICE OF CHARLES M. HEAUKULANI
WATER PROTECTOR LEGAL COLLECTIVE                P.O. Box 4475
P.O. Box 37065                                  Hilo, HI 96720-0475
Albuquerque, NM 87176                           (808) 466-1511
(701) 566-9108                                  bigislandlaw@earthlink.net
defense@waterprotectorlegal.org

NATIONAL LAWYERS GUILD
132 Nassau Street, Suite 922
New York, New York 10038
(212) 739-7583

INTERNATIONAL ASSOCIATION OF
DEMOCRATIC LAWYERS
1 Whitehall Street, 16th floor
New York, New York 10031
(212) 231-2235

* Admitted *Pro Hac Vice*

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Amended Brief of *Amici Curiae* with the Clerk of the Court for the United States District Court for the District of Hawai'i by using the CM/ECF system on October 6, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:          October 6, 2021

_/s/_ Charles M. Heaukulani_____
Charles M. Heaukulani, Esq. (No. 5556)
LAW OFFICE OF CHARLES M. HEAUKULANI
P.O. Box 4475
Hilo, HI 96720-0475
(808) 466-1511
bigislandlaw@earthlink.net

_/s/_ Natali Segovia_____
Natali Segovia, Esq., (AZ 033589) *
Joseph Chase, Esq., (CO 55122)*

* Admitted *Pro Hac Vice*

Counsel for *Amici Curiae*

31