DEXTER K. KAʻIAMA (Bar No. 4249)
DEPARTMENT OF THE ATTORNEY
GENERAL, HAWAIIAN KINGDOM
P.O. Box 2194
Honolulu, HI 96805-2194
Telephone: (808) 284-5675
Email: attorneygeneral@hawaiiankingdom.org

*Attorney for Plaintiff, Hawaiian Kingdom*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| HAWAIIAN KINGDOM, | Civil No. 1:21:cv-00243-LEK-RT |
| Plaintiff, | PLAINTIFF'S RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AS TO ANDERS G.O. NERVELL FILED SEPTEMBER 21, 2021 [ECF 74]; DECLARATION OF DEXTER K. KAʻIAMA; EXHIBITS "1-3"; CERTIFICATE OF SERVICE |
| v. | |
| JOSEPH ROBINETTE BIDEN JR., in his official capacity as President of the United States; KAMALA HARRIS, in her official capacity as Vice-President and President of the United States Senate; ADMIRAL JOHN AQUILINO, in his official capacity as Commander, U.S. Indo-Pacific Command; CHARLES P. RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; et al., | |
| Defendants. | Non-Hearing Motion: Judge: Leslie E. Kobayashi |

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES…………………………………………………ii

I.      INTRODUCTION……………………………………………………...1

II.     SWEDISH CONSULATE IN THE HAWAIIAN KINGDOM……………...2

III.    CONTINUITY OF THE HAWAIIAN KINGDOM AS A STATE…………4

IV.     GOVERNING LAW…………………………………………………...8

V.      JURISDICTION OF THE COURT IN

        A STATE OF WAR……………………………………………………...17

VI.     CONCLUSION……………………………….....................................19

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES:**

<u>United States</u>

*American Insurance Association v. Garamendi*, 539 U.S. 396 (2003)……………..6

*Hamilton v. Kentucky Distilleries & Warehouse Co.,* 251 U.S. 146 (1919)……….13

*In re Edwards,* 962 F.2d 641 (7th Cir. 1992)…………………………………………..1

*J. Ribas y Hijo v. United States*, 194 U.S. 315, 323 (1904)………………………..14

*Jalapeno Prop. Mgmt., L.L.C. v. Dukas,* 265 F.3rd 506 (6th Cir. 2001)……………1

*New York Life Ins. Co. v. Bennion*, 158 F.2d 260 (C.C.A. 10th, 1946)……………12

*Picquet v. Swan*, 19 F. Cas. 609 (C.C.D. Mass. 1828) (No. 11,134)………………...1

*Pennoyer v. Neff*, 95 U.S. 714 (1878)……………………………………………….2

*Stoll v. Gottlieb*, 305 U.S. 165 (1938)……………………………………………...20

*The Apollon*, 22 U.S. 362 (1824)…………………………………………………..18

*The Paquete Habana*, 175 U.S. 677 (1900)……………………………………..9, 20

*The Prize Cases*, 67 U.S. 635, 688 (1862)…………………………………….8, 9, 10

*The Three Friends*, 166 U.S. 1 (1897)……………………………………………..10

*United States v. Belmont*, 310 U.S. 324 (1937)…………………………………...6

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)………………18

*United States v. Pink*, 315 U.S. 203 (1942)………………………………………….6

*Vanderbilt v. Travelers Insurance Co.*, N.Y. Sup. Ct. 1920,
184 N.Y. Sup. 54…………………………………………………………………………..16

*Williams v. Suffolk Insurance Co.*, 36 U.S. 415 (1839)……………………………..13

Hawaiian Kingdom

*In Re Francis de Flanchet*, 2 Haw. 96 (1858)………………………………………...18

*In Re Landais*, 1 Haw. 353 (1855)…………………………………………………….3

International

*Lotus*, PCIJ Series A, No. 10 (1927)…………………………………………………..18

**TREATIES:**

Convention on Relations between the Three Powers and
the Federal Republic of Germany, May 26, 1952,
6 U.S.T. 4251, 331 U.N.T.S. 327……………………………………………………….19

Convention on the Settlement of Matters Arising Out of the
War and the Occupation, May 26, 1952, 6 U.S.T. 4411,
332 U.N.T.S. 219……………………………………………………………………….19

Hague Convention on the Pacific Settlement of
International Disputes, 36 Stat. 2199 (1907)……………………………………………14

Hague Convention, IV, (Hague Regulations),
36 Stat. 2277 (1907)……………………………………………………………………..20

Protocol on the Termination of the Occupation Regime
in the Federal Republic of Germany, Oct. 23, 1954,
6 U.S.T. 4117, 331 U.N.T.S. 253……………………………………………………….19

Treaty of Friendship, Commerce and Navigation between the
Hawaiian Kingdom and the Kingdoms of Sweden and
Norway, Jul. 1, 1852……………………………………………………………………..2

Vienna Convention on Consular Relations, Apr. 24, 1963,
21 U.S.T. 78, T.I.A.S. No. 6820……………………………………………2, 3

**UNITED STATES CONSTITUTIONAL PROVISIONS:**

U.S. Const. art. II, sec. 2, cl. 1………………………………………………...5

U.S. Const. art. II, sec. 2, cl. 2………………………………………………6

U.S. Const, art. III, sec. 1………………………………………………..17

U.S. Const. art. IV, sec. 3, cl. 2. ……………………………………………..17

**UNITED STATES STATUTES:**

32 Stat. 141………………………………………………………………..17

73 Stat. 4………………………………………………………………..17

**HAWAIIAN KINGDOM CONSTITUTIONAL PROVISIONS:**

1864 Hawn. Const. art. 26…………………………………………………11

1864 Hawn. Const. art. 27…………………………………………………5

1864 Hawn. Const. art. 29…………………………………………………6

1864 Hawn. Const. art 42…………………………………………………...5

**OTHER AUTHORITIES:**

David J. Bederman, "Article II Courts,"
44 *Mercer L. Rev.* 825 (1992-1993)……………………………………18, 19

*Black's Law Dictionary*, 6th ed. (1990)……………………………………11

iv

Roman Boed, "State of Necessity as a Justification for Internationally Wrongful Conduct," 3(1) *Yale Human Rights and Development L.J.* 1 (2000)……………………………………………………20

Ian Brownlie, *International Law and the Use of Force by States* (1963)…………..12

Sheldon M. Cohen, *Arms and Judgment: Law, Morality, and the Conduct of War in the Twentieth Century* (1989)…………………………14

James Crawford, *The Creation of States in International Law* (2nd ed., 2006)…………………………………………………………..14

Christopher Greenwood, "Scope of Application of Humanitarian Law," in Dieter Fleck, ed., *The Handbook of Humanitarian Law in Armed Conflict* (1999)………………………………......8

William Edward Hall, *A Treatise on International Law* (7th ed., 1917)……………3

Douglas Kmiec, "Department of Justice, Legal Issues Raised by Proposed Presidential Proclamation to Extend the Territorial Sea," 12 *Op. O.L.C.* 238 (1988)……………………………………17

Sharon Koman, *The Right of Conquest: The Acquisition of Territory by Force in International Law and Practice* (1996)………………………8

Krystyna Marek, *Identity and Continuity of States in Public International Law* (2nd ed., 1968)…………………………………………………..7

Myers S. McDougal and Florentino P. Feliciano, "The Initiation of Coercion: A Multi-temporal Analysis," 52 *Am. J. Int'l. L.* 241 (1958)…………..8

Lord McNair and A.D. Watts, *The Legal Effects of War* (1966)…………………...11

L. Oppenheim, *International Law*, Vol. 1 (2nd ed., 1912)…………………………3

Yejoon Rim, "State Continuity in the Absence of Government: The Underlying Rationale in International Law," 20(20) *Eur. J. Int. Law* 1 (2021)……………………………………………7

The American Law Institute, *Restatement of the Law (Third) The Foreign Relations Law of the United States* (1987)……………………….....9

Quincy Wright, "When Does War Exist?," 26 *Am. J. Int'l. L.* 327 (1932)…………………………………………………..11, 12

Quincy Wright, "The Status of Germany and the Peace Proclamation," 46(2) *Am. J. Int'l L.* 299 (1952)…………………………………...14

Quincy Wright, *The Control of Foreign Relations* (1922)…………………………11

United Kingdom, *HL Debs*, vol. 566, *WA* 85, Oct. 16, 1995………………………..4

United Nations International Law Commission's Articles on *State Responsibility for Internationally Wrongful Acts* (2001)…………………..3

United States Military Government, Ordinance No. 2, Military Government Courts, 12 Fed. Reg. 2189 (1947)…………………………………19

United States House of Representatives, 53rd Congress, *Executive Documents on Affairs in Hawaiʻi: 1894-95* (1895)…………………………………..........4, 5, 6, 13

### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AS TO <u>ANDERS G.O. NERVELL FILED SEPTEMBER 21, 2021 [ECF 74]</u>

## I.     INTRODUCTION

As its operation and administration occurs within the territory of the Hawaiian Kingdom, this Honorable Court is compelled by international and U.S. constitutional law to first transform itself from an Article III Court to a *de facto* Article II Court before it may lawfully assert subject-matter and personal jurisdiction to address any of the issues raised in Defendant's motion to dismiss [ECF 74].  Moreover, this lawful Article II transformation will then authorize this Court to address and grant the relief demanded in Plaintiff's Complaint.

A judgment is void "if the court that rendered judgment lacked jurisdiction of the subject-matter, or of the parties, or acted in a manner inconsistent with due process."[1] According to Justice Story, "no sovereignty can extend its process beyond its territorial limits, to subject either persons or property to its judicial decisions. Every exertion of authority beyond this limit is a mere nullity."[2]  In *Pennoyer v. Neff*, the Supreme Court reiterated Story's views on territorial jurisdiction. The Court stated:

> [N]o State can exercise direct jurisdiction and authority over persons or property without its territory (citation omitted). The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others. And so it is laid down by jurists as an elementary principle that the laws of one State have no operation outside of its territory except so far as is allowed by comity, and that no tribunal

---

[1] *Jalapeno Prop. Mgmt., L.L.C. v. Dukas*, 265 F.3rd 506, 516 (6th Cir. 2001) (quoting *In re Edwards*, 962 F.2d 641, 644 (7th Cir. 1992)).
[2] *Picquet v. Swan*, 19 F. Cas. 609, 612 (C.C.D. Mass. 1828) (No. 11,134).

established by it can extend its process beyond that territory so as to subject either persons or property to its decisions.[3]

## II.   SWEDISH CONSULATE IN THE HAWAIIAN KINGDOM

According to Article XII of the 1852 Treaty of Friendship, Commerce and Navigation between the Hawaiian Kingdom and the Kingdoms of Sweden and Norway, which is a perpetual treaty, "before any consul shall act as such, he shall, in the usual form, **be approved and admitted by the Government to which he is sent** (emphasis added)." (See, Exhibit "1" to the Declaration of Dexter K. Ka'iama).

The Hawaiian Kingdom does not contest Mr. Nervell's commission by the Swedish Government as an Honorary Consul, but rather denies the approval and admittance of the Honorary Consulate within the territorial jurisdiction of the Hawaiian Kingdom pursuant to Art. XII of the 1852 Treaty. Therefore, Mr. Nervell's actions cannot be considered "official acts" under the Vienna Convention on Consular Relations ("VCCR"). As a *de facto* Article II Court, the Hawaiian Kingdom requests this Honorable Court to take judicial notice of the 1852 Treaty. The Hawaiian Kingdom and Sweden were on good terms prior to the United States invasion on January 16, 1893.

Mr. Nervell is a member of the Swedish Mission to the United States and not to the Hawaiian Kingdom, and, therefore, he cannot be protected by virtue of Art. 71(1) of the VCCR in his official activities. Furthermore, if Mr. Nervell had been admitted by the Hawaiian Kingdom he would not have "immunity from jurisdiction" in the courts of Hawai'i because the Hawaiian Kingdom did not recognize foreign consulates as being privileged from suit according to customary

---

[3] *Pennoyer v. Neff*, 95 U.S. 714, 722 (1878).

2

international law. *In the Matter of Landais*, foreign Consulates as opposed to foreign Diplomats, are not privileged. The Hawaiian Supreme Court stated, "[i]f M. Perrin should be lowered to the rank of a Consul, [he and] his retainers would immediately lose their immunity from the local jurisdiction."[4]

Customary international law states that Consuls "are not diplomatic representatives, [and] they do not enjoy the privileges of diplomatists."[5] Furthermore, Consuls "must be conceded whatever privileges are necessary to enable him to fulfil the duties of his office, except such as would withdraw him from the civil and criminal jurisdiction of the courts."[6] Article 71(1) is not customary international law but rather treaty law. The Hawaiian Kingdom did not sign and ratify the VCCR and, therefore, is not bound by Article 71(1) of the VCCR.

Furthermore, on October 11, 2021, the Permanent Missions to the United Nations, to include the Swedish Permanent Mission, received a Note Verbale No. 2021-1-HI (See, Exhibit "2" to the Declaration of Dexter K. Ka'iama) from the Hawaiian Ministry of Foreign Affairs serving as a notice of claim by an injured State invoking the responsibility of all Member States of the United Nations who are responsible for the internationally wrongful act of recognizing the United States presence in the Hawaiian Kingdom as lawful to cease that act pursuant to Article 30(a) of the International Law Commission's Articles on *State Responsibility for Internationally Wrongful Acts*, and to offer appropriate assurances and guarantees of non-repetition pursuant to Article 30(b).

---

[4] *In Re Landais*, 1 Haw. 353, 359 (1855).
[5] L. Oppenheim, *International Law*, Vol. 1, 484 (2nd ed., 1912).
[6] William Edward Hall, *A Treatise on International Law* 330 (7th ed., 1917).

### III.   CONTINUITY OF THE HAWAIIAN KINGDOM AS A STATE

The United States' overthrow of the government of the Hawaiian Kingdom on January 17, 1893, being a recognized sovereign and independent State, violated the international principle of the duty of non-intervention, whereby the United States committed "unjustified" acts of war against the government of the Hawaiian Kingdom.

After the completion of a Presidential investigation, the new U.S. Minister Plenipotentiary assigned to the Hawaiian Kingdom, Albert Willis, was tasked, by President Cleveland, to negotiate with Queen Liliʻuokalani for resolution and settlement through executive mediation. The negotiations began on November 13, 1893, at the U.S. Legation in Honolulu.

At this initial meeting, Minister Willis made known to the Queen of "the President's sincere regret that, through the unauthorized intervention of the United States, she had been obliged to surrender her sovereignty, and his hope that, with her consent and cooperation, the wrong done to her people might be redressed."[7] It should be noted that because sovereignty is vested in the State, as a subject of international law, what the Queen yielded was not the sovereignty of the Hawaiian Kingdom but rather the executive authority.[8] Willis stated to the Queen that the President would expect a full granting of amnesty to the insurgents after being restored. She responded, "[t]here are, under this [Penal Code], no degrees of

---

[7] United States House of Representatives, 53rd Congress, *Executive Documents on Affairs in Hawaiʻi: 1894-95*, 1242 (1895) (hereafter "Executive Documents").

[8] In a statement by the United Kingdom Government, "Sovereignty is an attribute which under international law resides inherently in any independent State recognized as such. By virtue and in exercise of their sovereignty, states conduct dealings with one another internationally." *HL Debs*, vol. 566, *WA* 85, Oct. 16, 1995.

treason. Plotting alone carries with it the death sentence."[9] She denied granting amnesty.

Willis notified the Secretary of State, Walter Gresham, of the Queen's position. Gresham sent a telegram to Willis stating that "[t]he brevity and uncertainty of your telegram are embarrassing. You will insist upon amnesty and recognition of obligations of the Provisional Government as essential conditions of restoration. All interests will be promoted by prompt action."[10] After several meetings, the Queen, on December 18 agreed to the conditions.[11]

The 1864 Constitution vests the Executive Monarch of the Hawaiian Kingdom, "by and with the advice of His Privy Council, […] the power to grant reprieves and pardons, after conviction, for all offences, except in cases of impeachment."[12] However, Article 42 of the Constitution also provides that "[n]o act of the [Monarch] shall have any effect unless it be countersigned by a Minister, who by that signature makes himself responsible."[13] President Cleveland's pardoning power derives from the United States Constitution that vests the President the "Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment."[14]

Unbeknownst to President Cleveland of the agreement of restoration, he notified the Congress, by message, "that the provisional government owes its existence to an armed invasion by the United States."[15] He also determined that on January 17, "the Government of the Queen […] was undisputed and was both the

---

[9] Executive Documents, 1243.
[10] *Id.*, 1191.
[11] *Id.*, 1269.
[12] 1864 Hawn. Const. art. 27.
[13] *Id.*, art. 42.
[14] U.S. Const. art. II, sec. 2, cl. 1.
[15] Executive Documents, 454.

*de facto* and the *de jure* government,"[16] while the insurgency calling itself a provisional government "was neither a government *de facto* nor *de jure*."[17]

After receiving Willis' telegram of the Queen's acceptance of the conditions, the President notified Congress, by message, on January 13, 1894.[18] The agreement of restoration is a treaty under international law. Under Hawaiian municipal laws, the Monarch "has the power to make Treaties" or international agreements with the countersignature of a Minister that binds the Hawaiian Kingdom.[19] However, treaties or international agreements "involving changes in the Tariff or in any law of the Kingdom shall be referred for approval to the Legislative Assembly."[20] United States municipal laws provide two procedures by which an international agreement can bind the United States. The first is by a treaty whose entry into force can only take place after two-thirds of the United States Senate has given its advice and consent.[21] The second is by way of an executive agreement entered into by the President, under his sole authority, that does not require "advice and consent" by the Senate.[22]

The Queen's yielding of her executive authority on January 17 was conditional and two-fold. The first part was that the yielding of authority was limited "until such time as the Government of the United States shall, upon facts being presented to it, undo the action of its representative." The second part was restoring the Queen "as the constitutional sovereign of the Hawaiian Islands." The first part was met after President Cleveland initiated an investigation with the

---

[16] *Id.*, 451.
[17] *Id.*, 453.
[18] *Id.*, 1241.
[19] 1864 Hawn. Const. art. 29.
[20] *Id.*
[21] U.S. Const. art. II, sec. 2, cl. 2.
[22] *United States v. Belmont*, 310 U.S. 324 (1937); *United States v. Pink*, 315 U.S. 203 (1942); and *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003).

appointment of Special Commissioner Blount on March 11, 1893,[23] and presented his findings to the Congress. The second part of reinstatement, while achieved by executive agreement, was not carried out on the part of the United States. Therefore, the Queen's yielding of Hawaiian executive authority to the President was terminated and the state of war ensued.

The Hawaiian State, as a legal fact, continued to exist despite the unlawful overthrow of its government by the United States. According to Professor Rim, the State continues "to exist even in the factual absence of government so long as the people entitled to reconstruct the government remain."[24] On February 28, 1997, Hawaiian subjects exercised their right of internal self-determination and took the necessary steps to restore the Hawaiian Kingdom Government, as a Regency, under the doctrine of necessity and Hawaiian constitutional law.[25] The international law of occupation allows for an occupied State's government and the occupying State to co-exist within the same territory. According to Professor Marek,

> it is always the legal order of the State which constitutes the legal basis for the existence of its government, whether such government continues to function in its own country or goes into exile; but never the delegation of the [occupying] State nor any rule of international law other than the one safeguarding the continuity of an occupied State. The relation between the legal order of the [occupying] State…is not one of delegation, but of co-existence.[26]

---

[23] Executive Documents, 1185.
[24] Yejoon Rim, "State Continuity in the Absence of Government: The Underlying Rationale in International Law," 20(20) *Eur. J. Int. Law* 1, 4 (2021).
[25] ¶ 86, Complaint.
[26] Krystyna Marek, *Identity and Continuity of States in Public International Law* 91 (2nd ed., 1968).

## IV.   GOVERNING LAW

International law is divided into private and public international law. Private international law regulates private relationships across State borders—interstate conflict of laws or choice of laws. Public international law regulates the relationships between governments of sovereign and independent States and entities legally recognized as international actors, *e.g.,* Permanent Court of Arbitration. Under public international law it is further separated into the laws of peace and the laws of war, and the latter is further divided into *jus ad bellum*—authorization to go to war, and *jus in bello*—regulating war.

"Traditional international law," states Judge Greenwood, "was based upon a rigid distinction between the state of peace and the state of war."[27] This bifurcation provides the proper context by which certain rules of international law would or would not apply. A state of war "automatically brings about the full operation of all the rules of war,"[28] and the laws of war "continue to apply in the occupied territory even after the achievement of military victory, until either the occupant [State] withdraws or a treaty of peace is concluded which transfers sovereignty to the occupant [State]."[29] According to the United States Supreme Court, in *The Prize Cases*,

> The legal consequences resulting from a state of war between two countries at this day are well understood, and will be found described in every approved work on the subject of international law. The people of the two countries become immediately the enemies of each other—**all intercourse**

---

[27] Christopher Greenwood, "Scope of Application of Humanitarian Law," in Dieter Fleck, ed., *The Handbook of Humanitarian Law in Armed Conflict* 39 (1999).

[28] Myers S. McDougal and Florentino P. Feliciano, "The Initiation of Coercion: A Multi-temporal Analysis," 52 *Am. J. Int'l. L.* 241, 247 (1958).

[29] Sharon Koman, *The Right of Conquest: The Acquisition of Territory by Force in International Law and Practice* 224 (1996).

**commercial or otherwise between them unlawful—all contracts existing at the commencement of the war suspended, and all made during its existence utterly void. The insurance of enemies' property, the drawing of bills of exchange or purchase on the enemies' country, the remission of bills or money to it, are illegal and void.** Existing partnerships between citizens or subjects of the two countries are dissolved, and, in fine, interdiction of trade and intercourse direct or indirect is absolute and complete by the mere force and effect of war itself. All the property of the people of the two countries on land or sea are subject to capture and confiscation by the adverse party as enemies' property, with certain qualifications as it respects property on land, all treaties between the belligerent parties are annulled […]. War also effects a change in the mutual relations of all States or countries, not directly, as in the case of the belligerents, but immediately and indirectly, though they take no part in the contest, but remain neutral. […] This great and pervading change in the existing condition of a country, and in the relations of all her citizens or subjects, external and internal, from a state of peace, is the immediate effect and result of a state of war […] (emphasis added).[30]

The Supreme Court's statement, "will be found described in every approved work on the subject of international law," is referring to the writing of scholars, which is a source of the rules of international law. In *The Paquette Habana*, the Supreme Court stated that "Wheaton places among the principal sources of international law, 'text writers of authority.'"[31] The Court explained, "where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is."[32] The Hawaiian Kingdom in its amended complaint and in the instant pleading cites the work of scholars as to the rules of international law.

---

[30] *The Prize Cases*, 67 U.S. 635, 688 (1862).
[31] *The Paquete Habana*, 175 U.S. 677, 700 (1900).
[32] *Id*; see also Restatement Third—Foreign Relations Law §103(c).

Belligerent rights, under the laws of war, stem from war as a legal concept as opposed to a material fact. The Supreme Court distinguished between war in "the material sense" and war "in the legal sense."[33] Justice Nelson, in the *Prize Cases*, although dissenting, made the distinction.

> An idea seemed to be entertained that all that was necessary to constitute a war was organized hostility in the district or country in a state of rebellion—that conflicts on land and on sea—the taking of towns and capture of fleets—in fine, the magnitude and dimensions of the resistance against the Government—constituted war with all the belligerent rights belonging to civil war […].

> Now in one sense, no doubt this is war, and may be a war of the most extensive and threatening dimensions and effects, but it is a statement simply of its existence in a material sense, and has no relevancy or weight when the question is, what constitutes war in a legal sense, in the sense of the law of nations, and of the Constitution of the United States? For it must be war in this sense to attach to it all the consequences that belong to belligerent rights. Instead, therefore, of inquiring after armies and navies, and victories lost and won, or organized rebellion against the General Government, the inquiry should be into the law of nations and into the municipal fundamental laws of the Government. For we find there that to constitute a […] war in the sense in which we are speaking, before it can exist, in contemplation of law, it must be recognized or declared by the sovereign power of the State.[34]

To constitute a war in the legal sense, there must be an act that proceeds from a State's competent authority under its municipal law to recognize or to make war. In the United States, the competent authority to declare war is the Congress, but the competent authority to recognize war is the President. "As Commander-in-Chief," says Wright, "he may employ the armed forces in defense of American

---

[33] *The Prize Cases; The Three Friends*, 166 U.S. 1 (1897).
[34] *The Prize Cases*, 690.

10

citizens abroad, as he did in the bombardment of Greytown, the Koszta case and the Boxer rebellion, and thereby commit acts of war, which the government they offend may consider the initiation of a state of war."[35]

In similar fashion to the United States, the competent authority to recognize war in the Hawaiian Kingdom is the Executive Monarch and the competent authority to declare war is the Legislative Assembly. According to Hawaiian constitutional law, the Monarch "is the Commander-in-Chief of the Army and Navy, and of all other Military Forces of the Kingdom, by sea and land; and has full power by Himself, or by any officer or officers He may appoint, to train and govern such forces, as He may judge best for the defense and safety of the Kingdom. But he shall never proclaim war without the consent of the Legislative Assembly."[36]

"Action by one state is enough. The state acted against may be forced into a state of war against its will."[37] The Queen's conditional surrender of January 17 was an act of cessation of hostilities—*commercia belli,*[38] and it was countersigned by the members of her cabinet pursuant to Article 42, which made the conditional surrender under Hawaiian municipal law valid and legal. It did not require approval from the Legislative Assembly. This act was a recognition of a state of war, not a declaration of war. According to McNair and Watts, "the absence of a declaration […] will not of itself render the ensuing conflict any less a war."[39] In *New York Life Ins. Co. v. Bennion*, the Court explained that "the formal declaration by the Congress on December 8th was not an essential prerequisite to a political

---

[35] Quincy Wright, *The Control of Foreign Relations* 285 (1922).
[36] 1864 Hawn. Const. art. 26.
[37] Quincy Wright, "When Does War Exist?," 26 *Am. J. Int'l. L.* 327, 363, n. 6 (1932).
[38] *Black's Law Dictionary*, 270 (6th ed. 1990).
[39] Lord McNair and A.D. Watts, *The Legal Effects of War* 7 (1966).

determination of the existence of a state of war commencing with the attack on Pearl Harbor" the previous day.[40]

Although the United States Government did not know that U.S. troops committed "acts of war" on Hawaiian territory until after President Cleveland conducted an investigation, customary international law "leads to the conclusion that in so far as a 'state of war' had any generally accepted meaning it was a situation **regarded by one** or both of the parties to a conflict as constituting a 'state of war (emphasis added).'"[41] By its conditional surrender, the Hawaiian Government manifestly regarded the situation as a state of war. Furthermore, the Council of Regency, being the successor to Queen Liliʻuokalani, as the Executive Monarch, also regards the situation of a state of war as unchanged.

A "victim of an act of war, if a recognized state, may always if it wishes, regard the act as instituting a state of war, and if it does, a state of war exists. States victims of […] intervention have usually been much weaker than the state employing such methods."[42] The Hawaiian Kingdom was, at the time of the invasion, a "recognized state" and in a "state of war," which was clearly acknowledged by Secretary of State Walter Gresham in his correspondence to President Cleveland on October 18, 1893. The Secretary of State stated:

> The Government of Hawaii surrendered its authority under a threat of **war**, until such time only as the Government of the United States, upon the facts being presented to it, should reinstate the constitutional sovereign […].
>
> Should not the great wrong done to a feeble but **independent State** by an abuse of the authority of the United States be undone by restoring the

---

[40] *New York Life Ins. Co. v. Bennion*, 158 F.2d 260 (C.C.A. 10th, 1946).
[41] Ian Brownlie, *International Law and the Use of Force by States*, n. 7 at 38 (1963).
[42] Wright, "When Does War Exist," 365.

legitimate government? Anything short of that will not, I respectfully submit, satisfy the demands of justice (emphasis added).[43]

In *Williams v. Suffolk Insurance Co.*, the Supreme Court stated, "when the executive branch of the government, which is charged with our foreign relations […] assumes a fact in regard to the sovereignty of any […] country, it is **conclusive on the judicial department** (emphasis added)."[44] As a *de facto* Article II Court, this Court is bound to take judicial notice of Queen Liliʻuokalani's conditional surrender of January 17, 1893[45] and President Cleveland's message to the Congress of December 18, 1893.[46]

The President's confirmation that the invasion on January 16, 1893, was an "act of war," transformed the situation from a state of peace to a state of war on that date. The Hawaiian Government's conditional surrender took place because of the invasion the previous day. The Hawaiian Government's conditional surrender was not a termination of the state of war. Only by means of a treaty of peace proclaimed by both States can the situation return to a state of peace. An attempt to end the state of war was made by the agreement of restoration, but it was not carried out.

In *Hamilton v. Kentucky Distilleries & Warehouse Co.*, the Supreme Court concluded that the United States' war power does not end in "a technical state of war, [but] only with the ratification of a treaty of peace or a proclamation of peace."[47] And in *J. Ribas y Hijo v. United States*, the Supreme Court stated, in the case of the Spanish-American War, that a "state of war did not, in law, cease until the ratification in April, 1899, of the treaty of peace. 'A truce or suspension of

---

[43] Executive Documents, 462-463.
[44] *Williams v. Suffolk Insurance Co.*, 36 U.S. 415, 420 (1839).
[45] ¶ 63, Complaint.
[46] Executive Documents, 445-458.
[47] *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 161 (1919).

arms,' says Kent, does not terminate the war, but it is one of the *commercia belli* which suspends operations."[48]

The United States' overthrow of the Hawaiian government during a state of war did not affect, in the least, the continuity of the Hawaiian State. Wright asserts that "international law distinguishes between the government and the state it governs."[49] "The state must be distinguished from the government. The state, not the government, is the major player, the legal person, in international law."[50] As Judge Crawford explains, "[t]here is a presumption that the State continues to exist, with its rights and obligations […] despite a period in which there is no […] effective, government,"[51] and "[b]elligerent occupation does not affect the continuity of the State, even where there exists no government claiming to represent the occupied State."[52]

Accordingly, in *Larsen v. Hawaiian Kingdom*, the Permanent Court of Arbitration ("PCA") acknowledged the continuity of the Hawaiian Kingdom as a State "[p]ursuant to article 47 of the 1907 Convention" of the Pacific Settlement of International Disputes that was specifically stated in the PCA Annual Reports from 2000-2011.[53] Article 47 provides that the "jurisdiction of the Permanent Court may, within the conditions laid down in the regulations, be extended to disputes between non-Contracting [States] or between Contracting [States] and non-Contracting [States]."[54] (See, Exhibit "3," Annex 2, p. 51, to the Declaration of

---

[48] *J. Ribas y Hijo v. United States*, 194 U.S. 315, 323 (1904).
[49] Quincy Wright, "The Status of Germany and the Peace Proclamation," 46(2) *Am. J. Int'l L.* 299, 307 (Apr. 1952).
[50] Sheldon M. Cohen, *Arms and Judgment: Law, Morality, and the Conduct of War in the Twentieth Century* 17 (1989).
[51] James Crawford, *The Creation of State in International Law* 34 (2nd, ed. 2006).
[52] *Id.*
[53] PCA Annual Reports online at https://pca-cpa.org/en/about/annual-reports/.
[54] 36 Stat. 2199 (1907).

Dexter K. Kaʻiama). The United States is a Contracting [State] and the Hawaiian Kingdom is a non-Contracting [State] to the 1907 Convention.

All of the governments of the Defendant Consulates, to include Sweden, and the Defendant United States, are member States of the PCA Administrative Council that publishes the PCA's Annual Reports pursuant to Article 49 of the 1907 Convention, and, therefore, specifically acknowledged the Hawaiian Kingdom as a non-Contracting State and the Council of Regency as its government.[55] As a *de facto* Article II Court, the Plaintiff requests this Court to take judicial notice Annex 2 of the PCA Annual Report of 2011. Furthermore, the United States entered into an agreement with the Council of Regency to gain access to all pleadings and records of the arbitral proceedings.[56]

Since the invasion on January 16, 1893, there has been no "treaty of peace or a proclamation of peace" ending the state of war between the Hawaiian Kingdom and the United States. Instead, and in violation of the laws of war, the United States unilaterally seized the territory of the Hawaiian Kingdom and has since imposed its municipal laws, being the war crime of usurpation of sovereignty, and established 118 military sites throughout Hawaiian territory in violation of Hawaiian neutrality. American municipal laws became the weapon employed by the United States that led to the obliteration of the national consciousness of Hawaiian subjects, which concealed the United States' intentional violations of the laws of war for over a century.

The maintenance of Defendant foreign Consulates in the territory of the Hawaiian Kingdom also constitutes acts of belligerency. Regarding the Czech Republic's recent letter to this Court announcing the temporary closure of its Honorary Consulate in the Hawaiian Kingdom on June 30, 2021, the Hawaiian

---

[55] ¶ 104, Complaint.
[56] See Declaration of David Keanu Sai, Ph.D. [ECF 55-1].

Kingdom acknowledges this act to be in conformity with Article 30(a) and (b) of the International Law Commission's articles of *Responsibility of States for Internationally Wrongful Acts* (2001), whereby "[t]he State responsible for the internationally wrongful act is under an obligation (a) to cease that act, if it is continuing [and] (b) to offer appropriate assurances and guarantees of non-repetition, if circumstances so require."[57] India and Finland followed suit and closed their Consulates and have been dismissed from the lawsuit [ECF 100] along with the Czech Republic [ECF 70].

The existence of a state of war is not dependent on the form of hostile operations taken by one of the belligerent States. Nor is it affected by blatant violations of the laws of war because without a "treaty of peace or a proclamation of peace" ending the state of war, the war would nevertheless ensue. As such, New York courts have held that "the death of the insured on board the *Lusitania* must be conceded to be a result of war" despite the death was a result of the violation of the laws of war.[58] Alfred G. Vanderbilt, the insured, drowned after the "*Lusitania* was sunk in accordance with instructions of the Imperial German Government by torpedoes fired from a submarine vessel."[59] The *Lusitania* was a civilian passenger ship and was not, at the time, in the service of the United Kingdom as an auxiliary cruiser, which is why the death of the insured was a violation of the laws of war.

---

[57] Letter from Josef Smycek, Czech Deputy Consul General Los Angeles, to Magistrate Judge Rom A. Trader, *Hawaiian Kingdom v. Biden et al.*, Case 1:21-cv-00243-LEK-RT, Document 34, filed 07/14/21; see also ¶ 99-101, Complaint.
[58] *Vanderbilt v. Travelers Insurance Co.*, N.Y. Sup. Ct. 1920, 184 N.Y. Sup. 54, affirmed App. Div., 194 N.Y. Sup. 986, and Ct. of App., 139 N.E. 715.
[59] *Id*.

## V.    JURISDICTION OF THE COURT IN A STATE OF WAR

"The judicial power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."[60] This provision authorizes the Congress to establish Courts, which came to be known as legislative courts that prevailed in the territories of the United States. These territorial courts were established in view of Congress' power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."[61]

When these territories became States of the Federal Union, Article IV Courts were transformed into Article III Courts. The District Court of Hawai'i was established as an Article III Court by Congress under section 9(a) of the 1959 Hawai'i Statehood Act.[62] Prior to 1959 it was an Article IV Court created by the Congress under section 86 of the 1900 Hawai'i Territorial Act.[63] Section 2 of the Territorial Act erroneously states "the islands [were] acquired by the United States of America under an Act of Congress entitled 'Joint resolution to provide for annexing the Hawaiian Islands to the United States,' approved [July 7, 1898]." The Congress does not have any extraterritorial effect and was not competent to annex a foreign State by enacting a joint resolution.[64] According to the Department of Justice, "[t]here is a serious question whether Congress has the authority either to assert jurisdiction over an expanded territorial sea for purposes of international law or to assert the United States' sovereignty over it."[65]

---

[60] U.S. Const, art. III, sec. 1.
[61] *Id*., art. IV, sec. 3, cl. 2.
[62] 73 Stat. 4.
[63] 32 Stat. 141.
[64] See Douglas Kmiec, "Department of Justice, Legal Issues Raised by Proposed Presidential Proclamation to Extend the Territorial Sea," 12 *Op. O.L.C.* 238 (1988).
[65] *Id*., 238.

The jurisdictional reach of Article IV and Article III Courts are confined to the territorial limits of the United States. In *United States v. Curtiss-Wright Export Corp.*, the Supreme Court stated, "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory."[66] This is also a rule of international law, as stated by the Permanent Court of International Justice, where "the first and foremost restriction imposed by international law upon a State is that—failing the existence of a permissive rule to the contrary—it may not exercise its power in any form in the territory of another State."[67] These cases preclude this Court from exercising subject-matter or personal jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority.

Considering that *Curtiss-Wright* and the *Lotus* case precludes this Court, as an Article III Court, from exercising authority outside the territory of the United States, federal courts, which are separate from consular courts, military commissions, or courts martial, have been established under Article II of the U.S. Constitution. As executive courts, these Article II Courts were established in foreign territory that was under belligerent occupation by the United States and were regulated by the laws of war. According to Bederman:

> What, then, is distinctive about a court established under Article II of the Constitution? First, executive tribunals are established *without* an act of Congress or any other form of legislative concurrence. Congressional intent concerning the status of a presidential court is irrelevant because no congressional approval is needed. The fact that the President alone can create an executive court places it outside the scope of Article III of the Constitution, which demands that Congress shall establish courts inferior to the Supreme Court. Second, the executive courts are created pursuant only to the power and authority granted to the President in Article II of the

---

[66] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936); see also *The Apollon*, 22 U.S. 362, 370 (1824), and *In Re Francis de Flanchet*, 2 Haw. 96, 108 (1858).
[67] *Lotus*, PCIJ Series A, No. 10, 18 (1927).

Constitution. In practice, the only presidential power that would call for the creation of a court is that arising from his responsibility as Commander in Chief of the armed services and his consequent war-making authority.[68]

An Article II Court was established in Germany after hostilities ceased in 1945 during the Second World War. After the surrender, western Germany came under belligerent occupation by the United States, France, and Great Britain. The military occupation officially came to an end on May 5, 1955, with the entry into force of the Bonn Conventions between the Federal Republic of Germany and the three Occupying States.[69] During the occupation, these Article II Courts had jurisdiction "over all persons in the occupied territory," except for Allied armed forces, their dependents, and civilian officials, for "[a]ll offenses against the laws and usages of war[,] […] [a]ll offenses under any proclamation, law, ordinance, notice or order issued by or under the authority of the Military Government or of the Allied Forces, [and] [a]ll offenses under the laws of the occupied territory or any part thereof."[70]

## VI.   CONCLUSION

On September 30, 2021, Magistrate Judge Rom A. Trader issued an Order granting the Motion for Leave to File Amended *Amicus Curiae Brief* on Behalf of Nongovernmental Organizations with Expertise in International Law and Human Rights Law [ECF 90]. *Amici* filed their Amended *Amicus Curiae* Brief on October 6, 2021 [ECF 96]. Before the Court can address the substance of Defendant's

---

[68] David J. Bederman, "Article II Courts," 44 *Mercer L. Rev.* 825, 831 (1992-1993).
[69] Convention on Relations between the Three Powers and the Federal Republic of Germany, May 26, 1952, 6 U.S.T. 4251, 331 U.N.T.S. 327; Convention on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952, 6 U.S.T. 4411, 332 U.N.T.S. 219; Protocol on the Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, 6 U.S.T. 4117, 331 U.N.T.S. 253.
[70] United States Military Government, Ordinance No. 2, Military Government Courts, 12 Fed. Reg. 2189, 2190-91 (1947).

motion to dismiss it must first transform itself into an Article II Court for the reasons stated in the filed *Amicus* Brief, which is "trustworthy evidence of what [international] law really is."[71]

In *Stoll v. Gottlieb*, the Supreme Court stated, "[a] court does not have the power, by judicial fiat, to extend its jurisdiction over matters beyond the scope of the authority granted to it by its creators."[72] **This court precedent, however, does not bind this Court while situated outside of U.S. territory**. United States municipal laws, which have no effect within the territory of the Hawaiian Kingdom, includes not only statutes, but also the constitution, decrees, ordinances, and court precedents. United States municipal laws, which include the *Stoll* case, can be instructional, not binding, in the Hawaiian situation so long it conforms to international humanitarian law.

Therefore, the Court should, by "judicial fiat" and by necessity, transform itself into a *de facto* Article II Court pursuant to Article 43 of the 1907 Hague Regulations, "[t]he authority of the legitimate power having in fact passed into the hands of the occupant, the latter shall take all the measures in his power to restore, and ensure, as far as possible, public order and safety, while respecting, unless absolutely prevented, the laws in force in the country."[73] Under international law, "when a threat to self-preservation arose, it was considered justified to take any steps necessary to preserve one's existence."[74] The Regency's 2014 decree of provisional laws would assist the Court in this transformation regarding all its past decisions as an Article III Court and as an Article IV Court.[75]

---

[71] *The Paquete Habana*, 700.
[72] *Stoll v. Gottlieb*, 305 U.S. 165, 171 (1938).
[73] 36 Stat. 2277.
[74] Roman Boed, "State of Necessity as a Justification for Internationally Wrongful Conduct," 3(1) *Yale Human Rights and Development L.J.* 1, 4 (2000).
[75] ¶ 83, Complaint.

DATED:      Honolulu, Hawaiʻi, October 19, 2021.

Respectfully submitted,

/s/ Dexter K. Kaʻiama

DEXTER K. KAʻIAMA (Bar No. 4249)
Attorney General of the Hawaiian Kingdom
DEPARTMENT OF THE ATTORNEY
GENERAL, HAWAIIAN KINGDOM

*Attorney for Plaintiff, Hawaiian Kingdom*

21